IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT CINCINNATI

- - - - - - - - - - - - - - - -

JEFFREY EVANS, et al.,          :
                                :
          Plaintiffs,           :
vs.                             :   Case No. 1:19-cv-331
                                :   (Judge Cole)
FRANCIS ALOISIO, et al.,        :
                                :
          Defendants.           :

- - - - - - - - - - - - - - - -


          Zoom
          Deposition of:  SCOTT L. TURNER

          Taken:          By the Defendants
                            Pursuant to Notice

          Date:           Wednesday, August 4, 2021

          Time:           10:04 a.m.

          Taken via remote videoconference

          Before:         Lisa L. Weisenberger, RPR
                          Notary Public - State of Ohio




                                Pages:  1 - 113.


*AceMerit Court Reporters*
*acemerit.com  513.241.3200*

```
 1    APPEARANCES: (via videoconference)

 2        On behalf of the Plaintiffs:

 3            Jordan S. Friter, Esq.
             Law Offices of Robert A. Stutman, P.C.
 4           500 Office Center Drive, Suite 301
             Fort Washington, Pennsylvania  19034
 5           Phone:  (215) 283-1177
             Email:  friterj@stutmanlaw.com
 6
         On behalf of the Defendants:
 7
             J. Timothy Riker, Esq.
 8           J.T. Riker Co., L.P.A.
             The Cincinnati Club Building
 9           30 Garfield Place, Suite 920
             Cincinnati, Ohio  45202
10           Phone:  (513) 621-2888
             Email:  Jtriker@jtrikerlaw.com
11

12                        - - -

13

14

15

16

17

18

19

20

21

22

23

24

25
```

JEFFREY EVANS vs FRANCIS ALOISIO
TURNER, SCOTT on 08/04/2021                                    Page 3

```
 1                        INDEX

 2    Examination of SCOTT L. TURNER              Page

 3    By Mr. Riker ................................4

 4

 5                      - - -

 6       Exhibit No.                         Referenced

 7    Deposition Exhibits A through E .............7

 8    Deposition Exhibit F .........................18

 9    Deposition Exhibit G .........................111

10                                           Marked

11    Deposition Exhibits A through G .............111

12

13                      - - -

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    SCOTT L. TURNER,

 2    being by me first duly cautioned and sworn, deposes

 3    and says as follows:

 4                    CROSS-EXAMINATION

 5    BY MR. RIKER:

 6            Q.   Sir, would you state your full name

 7    for the record, please?

 8            A.   Sure.  Scott L. Turner.

 9            Q.   Mr. Turner, are you employed?

10            A.   Yes, sir.

11            Q.   By whom are you employed?

12            A.   Myself, which I'm -- it's an LLC,

13    which is Truck Accident & Incident Experts, LLC.

14            Q.   And in what state did you file your

15    origination papers?

16            A.   For the LLC, sir?

17            Q.   Yes.

18            A.   Well, originally, it was -- there was

19    a former LLC -- it's kind of a long story, but I'll

20    give you the nickel tour.  There was a former LLC,

21    which was Scott L. Turner Consulting, LLC, which was

22    filed in the state of New Jersey.  I had moved down

23    to Naples, Florida, and we re- -- we re-LLC'd it, if

24    you will, for lack of a better term, in the state of

25    Florida, at the advice of counsel and accounting.
```

```
 1              Q.   All right.  So your home office is
 2   the state of Florida; is that correct?
 3              A.   Naples, Florida, yes, sir.
 4              Q.   All right.  Okay.  And what is your
 5   position?
 6              A.   I am the chief consultant, as well as
 7   the owner of the LLC.
 8              Q.   All right.  What is your business
 9   address?
10              A.   14174 Charthouse Court -- and that's
11   one word, Charthouse Court -- Naples 34114.
12              Q.   Thank you.  Mr. Turner, do you have
13   available to you in front of you your report?
14              A.   Yes, sir.
15              Q.   Do you have available to you in front
16   of you your CV, your resume?
17              A.   Yes, sir.
18              Q.   Do you have Mr. Liebe's resume?
19              A.   Mister who?
20              Q.   Aron Liebe.  Am I pronouncing his
21   name correctly?
22              A.   Oh, Liebe.  I can obtain it.  It was
23   actually sent to you yesterday -- or the other day,
24   I believe, through Mr. Friter.
25              Q.   All right.  Well, let's back up.  I
```

 1    pronounced his name Liebe, L-i-e-b-e.  What's his --

 2    is that the right name?

 3              A.   It's actually Liebe.  Liebe.  I

 4    apologize.  Liebe.

 5              Q.   Liebe?

 6              A.   Liebe, that's correct.

 7              Q.   All right.  Liebe.  Okay.  All right.

 8    So do you have it there accessible to you?

 9              A.   It's going to take me a while to pull

10    it up on my computer, and I don't want to lose you

11    all, so --

12              Q.   Well --

13              A.   I can certainly make every attempt

14    while doing it, sure, unless you want to put it up

15    on the screen, what was sent to you.

16              Q.   Well, let me go over two more

17    documents, and then I'll explain why I asked you

18    this series of questions.

19              A.   Sure.

20              Q.   Do you have your testimony log of

21    cases that you've testified?

22              A.   I believe that was submitted with the

23    report.  I can certainly pull it up.

24              Q.   Okay.  And then, finally, did you

25    receive a notice of this deposition?

```
 1              A.   I did.   I don't have it in front of

 2   me, though, but I did receive it, yes.

 3              MR. RIKER:   All right.   Now, let's go

 4         off the record.

 5         (Recess taken: 10:08 a.m. to 10:10 a.m.)

 6                             (Deposition Exhibits A
                               through E were
 7                             referenced.)

 8              MR. RIKER:   We're back on the record.

 9         And I'll simply say, on the record, that

10         counsel conferred on the order of exhibits

11         and marking them.   I'm going to now state

12         for the record the order of the exhibits.

13         Following the deposition, I will then

14         forward a copy of all of the exhibits to

15         the court reporter.

16              Exhibit A is the Notice to Take

17         Deposition of Scott L. Turner.   That's

18         Exhibit A.   Exhibit B is the expert report

19         of Scott L. Turner, dated January 22,

20         2021; Exhibit C is the resume of Scott L.

21         Turner, which is a three-page document;

22         Exhibit D, Delta, is the testimony log of

23         Scott L. Turner; and Exhibit E is the

24         resume of Mr. Aron Liebe, senior

25         consultant, and it is also a three-page
```

 1                document.

 2    BY MR. RIKER:

 3                Q.   All right.  Now, I don't expect we

 4    are going to be together that long, Mr. Turner,

 5    actually.  Most of my questions are going to be

 6    asked, frankly, at trial in cross-examination.  The

 7    report is there; it says what it says.  So I've

 8    never been a big fan of lengthy, mind-bending

 9    discovery depositions of experts.  I want to get

10    some basic stuff down, and then we'll certainly have

11    a long conversation at trial.  But, nonetheless, I

12    want to make the most of your time, and we will go

13    on from there.

14                A.   Sure.

15                Q.   Where are you located today?

16                A.   Currently, I'm at my sister-in-law's

17    house down in South Jersey, which is 29 Rogers Place

18    in Turnersville.  I'm not quite sure --

19                Q.   How far --

20                A.   I'm not quite sure of the ZIP code,

21    though.

22                Q.   How far is that from Cape May?

23                A.   I guess probably about 40 minutes,

24    roughly.

25                Q.   Is anyone in the room with you or

```
 1    listening in to this -- in on this deposition, other
 2    than Mr. Friter?
 3            A.    No, sir.
 4            Q.    What preparations, if any, did you
 5    engage in to prepare for your testimony today?
 6            A.    Essentially, I -- we always try to
 7    write a very comprehensive report, so that's a good
 8    document for us to lean on in order to be able to
 9    refresh our memory and so forth before any type of
10    live testimony.
11            Q.    And so you reviewed your report, but
12    that's it; is that correct?
13            A.    That's correct.  And, also, in
14    addition, I just had received, recently, Mr. Heard's
15    report, so I reviewed his report, as well.  And that
16    was -- I reviewed it yesterday and just made some
17    notations on it from a mental standpoint.
18            Q.    All right.  Well, you did tell us
19    earlier that you had received a copy of Exhibit A,
20    which is the notice for you to appear today in
21    deposition, correct?
22            A.    That's correct.  And I do apologize
23    for not having the documents.  The problem is, is
24    that I just moved out of my home of 25 years up in
25    the northwest corner of New Jersey, and I'm staying
```

1    down here with my sister-in-law before going -- my

2    wife and I -- before going down to Florida -- back

3    down to Florida.  So a lot of my files are boxed up,

4    so I just -- I just made sure that I retained things

5    that I knew that were going to, for sure, be part of

6    this testimony.

7            Q.   All right.  Well, let's refer to your

8    report, and that's Exhibit B.  So if you'll turn to

9    your report.  I have the report.  It's dated

10   January 22nd, 2021; is that correct?

11           A.   Yes, sir.

12           Q.   And there have been no amendments to

13   the report since that date; is that correct?

14           A.   Insofar as I know, no, sir.

15           Q.   All right.  And the report that I

16   have consists of 37 pages.  Is that what you have?

17           A.   I believe so.  Yes, sir.

18           Q.   All right.  Mr. Turner, is this a

19   complete statement of all opinions you will express

20   at trial?

21           A.   There are some add-ons that I came up

22   with in reviewing the report over the last -- you

23   know, within the last 24 hours, a couple of things

24   that I added on that are relatively -- you know,

25   relatively minor, but it doesn't overall change my

```
 1   overarching opinions, if that makes any sense.
 2           Q.   Well, all right.  Let's go back to
 3   the question then.  Then this report is not a
 4   complete -- this report that I have been reviewing
 5   is not a complete statement of all of your opinions,
 6   at the moment; is that correct?
 7           A.   Well, again, yes, it is; however,
 8   there will be a couple of things that I am adding
 9   on.  Not -- not the conclusionary opinions, however,
10   just within the body of the report, for example, I
11   believe it was out of 383.111, paragraph 13 was
12   added into the report, as well.  And then there was
13   one other, if I recall.  If you would like, I can go
14   into it right now.  It would take just a moment.
15           Q.   Well, let's -- what I'm trying to get
16   at, consistent with the Federal Rules of Civil
17   Procedure, your report is supposed to be a complete
18   statement of all opinions that you will express at
19   trial.  So I simply want to make sure that what I
20   have is the complete statement.  So if there is an
21   add-on or an amendment, I need to hear it now.
22           A.   Right.
23           Q.   All right.
24           A.   In terms of -- in terms of the
25   add-on, if you will, the amendment, it would be --
```

```
 1    if you look at page No. 14 --
 2              Q.    Page 14?
 3              A.    Page No. 14, that's correct.  There
 4    is a section that is --
 5              Q.    Standby, sir.  I can't turn that
 6    fast.
 7              A.    Okay.
 8              Q.    All right.  I'm on page 14.  Proceed.
 9              A.    At the bottom there would be a
10    section in there that is added into there that would
11    be -- let's see.  Hold on one second -- after No. 7,
12    "Visual search," there would be an additional one
13    that is added on into there below that.  It would be
14    No. 13, which is called -- referred to as "Hazard
15    perception."  And I could read that into the
16    record --
17              Q.    Well, I --
18              A.    -- but --
19              Q.    Mr. Turner, I am looking at page 14.
20    I am looking at No. 7, in parentheses, "Visual
21    search" --
22              A.    Correct.
23              Q.    -- and I see -- I don't see a single
24    "(i)" in parentheses.  I see a "(ii)" in
25    parentheses, I see a "(iii)" in parentheses, and
```

```
 1   then going over to page 15, I see it skips to "17"
 2   in parentheses.  Is that right?
 3            A.   That's correct.  But if you go --
 4            Q.   Okay.
 5            A.   Where it would be inserted would be
 6   in between No. 7, "Visual search," and No. 17,
 7   "Vehicles inspections."
 8            Q.   All right.  Okay.  So you are going
 9   to read into the record what No. 13, in parentheses,
10   is supposed to say; is that correct?
11            A.   That's correct.
12            Q.   All right.  Now, how long is this
13   paragraph?
14            A.   Oh, it's very brief.
15            Q.   All right.  Then read it.
16            A.   No. 13, in accordance with the FMCSR,
17   the 383.111, is "Hazard perceptions.  The basic
18   information on hazard perceptions and clues for
19   recognition of hazards, including," and then it
20   would be a single "(i) Road characteristics; and
21   (ii) Road user activities."  That's it.
22            Q.   All right.  Any other adds to the
23   report?
24            A.   That -- that number there.  And then
25   if you go to page 16 --
```

```
 1              Q.   Let me get to 16.  Thank you.  I'm on

 2    16.

 3              A.   Okay.  Then if you look at just above

 4    6.2 at the bottom, the last paragraph, "Required

 5    mirror," just above that there is a paragraph that

 6    says, "The non-application of 5 out of 20 points."

 7    It should actually now read -- because of adding

 8    No. 13 in there, it should now read, "The

 9    non-application of 6 out of 20 points."  And then in

10    parentheses where it says "25 percent," it would now

11    say "30 percent."

12              Q.   Any other --

13              MR. FRITER:  I'm sorry.  Just to

14              interject, I think that would make it 6

15              out of 21, right?

16              THE WITNESS:  No, 20.  If you are

17              looking at -- if you are looking at

18              required knowledge of the 20 points of

19              required knowledge.  There's 20 points of

20              required knowledge.

21              MR. FRITER:  Oh, I'm sorry.  Okay.

22              All right.  I just wanted to clarify that.

23              My mistake.  Sorry.

24              A.   Okay.  Bear with me one second, sir.

25    I think there was one more, if I'm not mistaken.
```

```
 1    Standby.  No, that would be it.
 2               Q.   All right.  With those two additions
 3    that you just read into the record --
 4               A.   Yes, sir.
 5               Q.   -- is this report a complete
 6    statement of all opinions you will express at trial?
 7               A.   Yes, sir, at this point, unless
 8    something comes up at a later point, which, you
 9    know, I'm not aware of.  But if something else comes
10    up, then there may -- I would also add into there,
11    too, is that there are -- there are a lot of
12    comments in terms of my criticisms of Mr. Heard's
13    opinion, the expert that is for defense.  There
14    is -- there are a lot of opinions in there.  If you
15    want to get into those specifically, I am more than
16    happy to.  Just let me know.
17               Q.   Is this report a complete statement
18    of the basis and reason for these opinions?  For
19    your opinions that are in the report, that's what
20    I'm interested in.
21               A.   In the report itself, yes, sir, that
22    would be my conclusionary opinions.  As I stated,
23    though, there are additional opinions that would be
24    in terms of Mr. Heard, though.
25               Q.   I'm talking about the report,
```

```
 1    Mr. Turner, only your report.

 2              A.   I understand that, sir.  But --

 3              Q.   All right.  Thank you.

 4              A.   -- I am clarifying for the record to

 5    make sure that that is well understood.

 6              Q.   Does this report contain all facts

 7    and data considered by you in forming your opinions?

 8              A.   In terms of what is in this report,

 9    yes, sir.

10              Q.   Does this report contain exhibits

11    that will be used to summarize or support your

12    opinion?

13              A.   And I will again say, with exception

14    to Mr. Heard's report, yes, sir.

15              Q.   What was your fee to prepare the

16    report?

17              A.   $375 an hour is my general rate.

18              Q.   Well, that's your hourly rate.  What

19    was the total fee to prepare --

20              A.   I don't know.  That gets handled in

21    the billing aspect; I'm not involved with that at

22    all.  That would have been submitted with the

23    report -- with -- excuse me, with the report in

24    order to be able to comply with Rule 26.

25                   So, in other words, invoicing was
```

 1    submitted to Mr. Friter, so it should be in the

 2    file.

 3             Q.   Well, Mr. Turner, I request that you

 4    provide us with the total fee you charged for that

 5    report.  I believe the Federal Rules of Civil

 6    Procedure oblige that to be part of the report.  I

 7    don't know of any attorney who expects it to

 8    necessarily be in the text of the report, but we do

 9    need to see the fee that was charged for the

10    preparation of the report.

11             A.   I fully understand that.  I've

12    testified in federal court.  That's not a problem.

13    Now, as I stated, I am relatively certain that that

14    had been provided to counsel.  What happened after

15    that, I don't know.  However, in the interim, if you

16    would like, we can take a five-minute break, I can

17    have it produced, and have it e-mailed to Mr. Friter

18    and then he can e-mail it to you, however you would

19    like to handle it.

20             MR. RIKER:  All right.  Well, let's

21        go off the record.

22        (Recess taken: 10:23 a.m. to 10:24 a.m.)

23             MR. RIKER:  We're back on the record.

24             All right.  While we were off the

25        record, counsel conferred, and Mr. Friter

```
 1              will produce a copy of the invoice that

 2              shows the fee charged by Mr. Turner to

 3              prepare Exhibit B, and that will be

 4              Exhibit F to this deposition.

 5                             (Deposition Exhibit F
                               was referenced.)
 6

 7  BY MR. RIKER:

 8              Q.   Now, what is your fee for you to

 9  provide your testimony today?  Is it $375 an hour?

10              A.   $450, sir.

11              Q.   I'm sorry?

12              A.   $450.

13              Q.   $450?

14              A.   Yes.

15              Q.   Okay.  And does that include your

16  preparation time for today?

17              A.   No, sir.  Prep time this morning and

18  last night is billed at $375 an hour.

19              Q.   And what will be your fee to provide

20  testimony at trial?

21              A.   Well, it depends on -- oh, that's

22  $3,000 a day, plus travel and standby.

23              Q.   What is "standby"?

24              A.   I get called into court and I am told

25  that I have to testify today, and I wind up sitting
```

```
 1    around in the courtroom for five, six, seven hours,

 2    and I don't wind up testifying, and I've got to -- I

 3    had it happen, as a matter of fact, in federal

 4    court, where I didn't testify until three days

 5    later.  So somebody is, obviously, going to be

 6    paying for my time to sit in the courtroom there and

 7    do nothing.  So that is standby time.  That is

 8    billed out at the rate of $375 an hour.

 9              Q.   At $375 an hour --

10              A.   Yes, sir.

11              Q.   -- is that correct?

12              A.   Yes, sir.

13              Q.   Okay.

14              A.   Actually, that might be $350 an hour.

15    I'm not certain.  But it's one or the other.

16              Q.   All right.  Well, let me see if I've

17    got this.  If you are called to testify in this

18    trial on a particular day at a particular time and

19    that's the time you take the stand and testify,

20    that's a $3,000 fee to testify, correct?

21              A.   To testify, that's correct.

22              Q.   All right.  Because there is no

23    standby, correct?

24              A.   $3,000 a day.  So if it goes over

25    into the second day, that's an additional $3,000.
```

```
 1              Q.   I understand.  Okay.  All right.  But
 2    if it turns out that you are called to testify on a
 3    Monday, but you don't take the stand until Tuesday,
 4    then that would be $350 to $375 an hour, because
 5    that's standby time; is that correct?
 6              A.   Yeah.  Standby time would be charged
 7    up until the point where counsel says, "Listen, you
 8    might as well go back to the hotel, go out and grab
 9    some dinner or something," at 2:00 and says, you
10    know, "You are done for the day."  So I would clock
11    out, you know, if you want to call it that, at 2:00.
12    If I am sitting there from 9:00 a.m. to 2:00 a.m.,
13    he's going to get -- or, excuse me, 9:00 a.m. to
14    2:00 p.m., he's going to get billed five hours.
15              Q.   All right.  Now, the title of the
16    report is "Expert Report Scott L. Turner," correct?
17              A.   That's correct.
18              Q.   All right.  Would you turn to
19    page 36, please.
20              A.   Okay.
21              Q.   And page 36 carries over to page 37,
22    as far as the section called "Documents Reviewed."
23    Do you see that, Mr. Turner?
24              A.   Yes, sir.
25              Q.   And I counted the number of documents
```

```
1    reviewed, and I think I counted correctly 59

2    documents.  And what did your review of these

3    documents consist of?

4             A.   What did I -- I'm sorry.  What did I

5    what now?

6             Q.   What did your review of these

7    documents consist of?

8             A.   I don't really follow your question,

9    what did it consist of.  A review is a review.

10            Q.   Well, all right.  Did you read each

11   page of each document?

12            A.   Well, let me put it this way.  Our

13   practice, our firm reviews every single document,

14   yes, we do.  So that would be a combination of, in

15   this case here, Aron and myself.  Mr. Liebe.

16            Q.   All right.  Well, let's try it again

17   this way.  This is the deposition of you.  So my

18   question is:  Did you, Mr. Turner, read all pages of

19   each document?  That seems to be a yes-or-no

20   question.

21            A.   Sir, I'm not always a yes-or-no

22   witness.  I'm going to give you a full answer.  And

23   that full answer is, I reviewed documents in this

24   report.  This report, it's the report that I wrote,

25   and it's listed on page 36 and 37 of documents
```

```
 1    reviewed.  I reviewed some of them.  My colleague

 2    reviewed some of them, as well.  So, I mean, I

 3    can't -- I can't answer it any other way for you,

 4    other than saying that I reviewed some of them; my

 5    colleague, Aron Liebe, he reviewed some of them; we

 6    worked on the report together; and the final

 7    signature is both of us, but I have -- the overall

 8    authority for that report is me.

 9            Q.   Mr. Turner, I recognize you have

10    overall authority.  You are listed as the "Chief

11    Consultant"; isn't that the title?

12            A.   Correct.

13            Q.   All right.  And, then, Mr. Liebe is

14    listed as a "Senior Consultant," correct?

15            A.   That's correct.

16            Q.   All right.  So is it your testimony

17    that you did not read all pages of each document?

18    Is that a -- is that your answer?

19            A.   No.  My answer would be to you that

20    my firm and I collectively reviewed all of the

21    documents in the "Documents Reviewed" of this file,

22    and in that that's how we proffered this 37-page

23    report.  I'm not going to say that I read every

24    shred of documentation in this file.  It was a

25    combination of my colleague and I.
```

```
 1              Q.   All right.

 2              A.   I can't say it any other way.

 3              Q.   All right.  So is it your testimony

 4    that you read some of the pages of some of the

 5    documents?

 6              A.   As a firm, as a practice, we

 7    collectively reviewed every document, but I read

 8    some of them myself, and my colleague, who is

 9    equally qualified as me, read some of them, as well,

10    and we gave a collective opinion that I ultimately

11    proffered in this report.

12              Q.   Well, all right.  To state the

13    obvious, Mr. Turner, this is not the deposition of

14    Mr. Liebe, correct?

15              A.   I understand that.

16              Q.   All right.  And I say that

17    respectfully to you.  I am just trying to understand

18    what your role is and what Mr. Liebe's role is.  I

19    think that's a fair approach, is it not?

20              A.   Yes, sir, it is, and I think that

21    I gave you --

22              Q.   Thank you.

23              A.   I think I gave you a fair answer.

24    It's just that you don't like my answer, and I think

25    it's a very fair answer.
```

1            Q.    Mr. Turner, I just take the answers

2    as they come.

3                  Regarding the depositions -- there

4    are 13 depositions among those 59 documents.  Do you

5    see that at the end?

6            A.    I do.

7            Q.    Did you read each of the deposition

8    transcripts?

9            A.    I will refer back to my last

10   statement, that I reviewed some of them; my

11   colleague, Aron Liebe, reviewed some of them.

12           Q.    All right.  And did you read each

13   exhibit to each of the depositions?

14           A.    Yes, I believe I went through,

15   virtually, all of the exhibits, as well as Aron.

16   You know, but we don't redundantly invoice for those

17   issues, but we want to have a collective opinion on

18   something.  So both of us may have reviewed certain

19   things based on the importance of that issue.

20           Q.    Are you satisfied that you received

21   all exhibits to all of the depositions?

22           A.    Insofar as I know, yes.

23           Q.    I'm sorry?

24           A.    Can you repeat the question?

25           Q.    Sure.  Are you satisfied that you

```
 1    received all exhibits to all of the depositions that
 2    are listed as having been reviewed?
 3              A.   That I received them?  I would say,
 4    yes, so far as I know.
 5              Q.   I need you to turn to page 33, the
 6    third paragraph.
 7              A.   Okay.
 8              Q.   And the third paragraph starts out,
 9    "The undersigned doesn't recognize the term."  Do
10    you see that?
11              A.   Yes, sir.
12              Q.   All right.  Let's go over to the
13    phrase "SLTC," which I presume stands for Scott L.
14    Turner Consulting.  Do you see that?
15              A.   Yes.
16              Q.   All right.  And it says, "SLTC wasn't
17    afforded the opportunity to inspect the subject
18    tractor-trailer."  Do you see that phrase?
19              A.   That's correct.
20              Q.   All right.  Did you request the
21    opportunity --
22              A.   No.
23              Q.   -- to inspect -- Mr. Turner, you've
24    got to let me finish --
25              A.   Yes.  Go ahead.  I apologize.
```

```
 1              Q.    -- and I'll let you explain all of

 2      your answers.

 3              A.    Sure.

 4              Q.    Did you ask for the opportunity to

 5      inspect the subject tractor-trailer?

 6              A.    The answer is no, because we knew

 7      that the commercial motor vehicle was completely

 8      changed since then, because the piece of equipment

 9      that was on the back would have been cost

10      prohibitive for the motor carrier to have to go find

11      that piece of equipment, load it on, and then go and

12      make a determination of air brake failures, the

13      smoking condition, which obviously would have been

14      repaired by now -- the smoking condition of the

15      wheels -- the three brake failures, the air brake

16      failures, air line failures.  Those things have

17      all -- I assume to have been corrected by this

18      point.  So there is really no point in doing an

19      inspection.

20              Q.    Well, if there is no point in doing

21      the inspection, why did you put in the phrase that

22      "SLTC wasn't afforded the opportunity"?  Why would

23      that be relevant, Mr. Turner?

24              A.    It's just a statement that we were

25      not afforded the opportunity.  We didn't request
```

```
 1    one, and I'm telling you here in the deposition.  We

 2    didn't request one, so however you want to look at

 3    that, we were not afforded the opportunity.  I guess

 4    it's semantics.

 5            Q.   Did you or Mr. Liebe ever meet with

 6    Mr. Evans, either in person or via Zoom?

 7            A.   No, sir.

 8            Q.   All right.  Now, we established a few

 9    minutes ago the report is signed by you as chief

10    consultant, correct?

11            A.   Yes, sir.

12            Q.   And is there only one chief

13    consultant at your firm?

14            A.   That's correct.

15            Q.   And that's you?

16            A.   Yes, sir.

17            Q.   And Mr. Liebe signed as a senior

18    consultant.  Are there other senior consultants at

19    your firm?

20            A.   We have one other, yes, sir.

21            Q.   Okay.  Who is that?

22            A.   An individual by the name of Scott

23    Montgomery.

24            Q.   Now, is there an echelon below that,

25    just plain consultants or special consultants?  Any
```

```
 1    other titles at your firm?
 2              A.   No, sir.   Other than administrative
 3    assistant, outside of that, there's nobody else.
 4              Q.   All right.   Is Mr. Liebe employed
 5    full time by your firm?
 6              A.   He is technically a 1099.   He's a
 7    1099, as is Scott.   So he is -- some weeks he may
 8    work 20 hours, some weeks 30 hours, some weeks, you
 9    know, 22 hours.   It all really depends.   There is no
10    set structure as far as -- you know, sometimes he
11    may work 40 hours in a week.
12              Q.   All right.   So just to clarify that,
13    your firm does not issue Mr. Liebe a W-2 at the end
14    of the calendar year; is that correct?
15              A.   That's correct.   It would be a 1099.
16              Q.   Is that correct?
17              A.   I said that's correct; it would be a
18    1099.
19              Q.   Yes, correct.   Thank you.   What about
20    Mr. Montgomery; does he receive a 1099, also?
21              A.   It is the same relationship.   It's a
22    1099, both of my colleagues.
23              Q.   How many W-2 employees does your firm
24    have?
25              A.   None.
```

```
 1              Q.   How many 1099 contractors,
 2    independent contractors, does your firm have?
 3              A.   I believe it's only two.  Over the
 4    years -- I mean, currently, it's only two.  Yeah,
 5    it's only two this year, so far as I know.
 6              Q.   Now, would you turn to page 2 of your
 7    report?
 8              A.   Yes, sir.
 9              Q.   All right.  And there is a paragraph
10    that is titled "Disclosure."  Do you see that?
11              A.   Yes, sir.
12              Q.   And it says the senior consultant was
13    formerly employed by Iowa Department of
14    Transportation, Office of Motor Vehicle Enforcement.
15    And that would be Mr. Liebe, not you; is that
16    correct?
17              A.   That's correct.
18              Q.   Okay.
19              A.   That's why it refers to "senior
20    consultant."
21              Q.   Yeah.  Right.  All right.  And, then,
22    you have also told us that you, the chief
23    consultant, are now or in the process of moving to
24    Naples, Florida; is that correct?
25              A.   We are in Naples.  We have been in
```

```
 1    Naples for a couple of years.  It's just a -- it's a
 2    final transition.
 3              Q.   All right.
 4              A.   We are in the state of the final
 5    transition.
 6              Q.   Let's turn to your resume and then
 7    we'll come back.
 8              A.   Yes, sir.
 9              Q.   This is Exhibit C.
10              A.   Yes, sir.
11              Q.   All right.  And best place to start
12    there is under your "Professional History."  And I
13    would like to just get an understanding of some of
14    the acronyms that you refer to.
15              A.   Sure.
16              Q.   And the first one, 1985 to 1988, so
17    we're on the same line, is "Professional CMV," which
18    would be "Commercial Motor Vehicle Tractor-trailer
19    Driver"; is that correct?
20              A.   That's correct.
21              Q.   Now, go up three lines to "EPS."
22    What is "EPS"?
23              A.   I don't quite recall.  It's quite a
24    while ago.  It's Emergency something or other, but I
25    don't recall exactly what it was.
```

```
 1              Q.   All right.  So it's Emergency --
 2              A.   Yeah, I just don't remember.
 3              Q.   -- whatever.
 4                   And what is "HM Management"?  Hotel,
 5    Mike, Management.
 6              A.   That's hazardous material.
 7              Q.   Now, up at the 1993 to 2009, you were
 8    president and CEO of HMHTTC.  Hotel, Mike, Hotel,
 9    Tango, Tango, Charlie.  I presume the "HM" is
10    "hazardous material"; is that correct?
11              A.   That would be correct.
12              Q.   All right.  So can you fill in the
13    rest of that?
14              A.   Yeah.  It's pretty complex, because
15    that was actually just an acronym taken off of the
16    training company that I had founded back in 1992, I
17    believe it was, and that was Hazardous Materials
18    Handling Transport Training Centers, and I used the
19    revenue from the training to start a response
20    company, and I used all of the money that I
21    generated from the training.  And when I was on the
22    phone trying to develop a corporate name, I didn't
23    have a lot of money back then to be able to try
24    and -- in the state of New Jersey, every time you
25    tried a name, they'd charge you something like $50.
```

```
 1    And that was, no question, a bunch of money.  So

 2    after about the third or fourth rejection, I said,

 3    "Ahhh" -- and I took the acronym from Hazardous

 4    Materials Handling and Transport Training Centers,

 5    and I called it HMHTTC Response, Incorporated.  We

 6    were largely just known as Response, so --

 7              Q.   All right.  So the earliest entry in

 8    your professional history is 1985, and I want to

 9    close the gap starting with your date of birth to

10    1985.  So what is your date of birth?

11              A.   2/5/62.

12              Q.   2/5/1962?

13              A.   Yes, sir.

14              Q.   And where were you born?

15              A.   Denville, New Jersey.

16              Q.   Are you a high school graduate?

17              A.   Yes, sir.

18              Q.   What year?

19              A.   1981.

20              Q.   What high school?

21              A.   Randolph High School.

22              Q.   Do you have any military service in

23    your background?

24              A.   Yes, sir.  Marine Corps.

25              Q.   What was your MOS?
```

```
 1              A.    0311.

 2              Q.    Which is?

 3              A.    Well, people refer to it as ground

 4   pounders.  Rifleman.

 5              Q.    Honorable discharge?

 6              A.    It was under "Other."  "Other," I

 7   think they called it.

 8              Q.    Well, so it was -- it was an

 9   honorable discharge under "Other"?

10              A.    It was not dishonorable.  It was

11   under -- I think they referred to as "Other" --

12   "Other Conditions."  It was insubordination.

13              Q.    What was the "Other" condition?

14              A.     I -- I believe it was

15   insubordination.  It was -- it was honorable --

16   excuse me, "Other" -- "Other" -- not dishonorable,

17   though.  It was under "Other Conditions," if I

18   remember correctly.  I mean, it was a long time

19   since I saw that.  The DD 214 I have not seen in

20   years.

21              Q.    Well, was this -- this was a

22   particular incident in the Marine Corps?

23              A.    It was the culmination of quite a few

24   run-ins with the same gunnery sergeant that gave me

25   his word he would run me out of the Corps.  And up
```

```
 1    until that point in time, coming across this guy and

 2    him being in my command, I had an exemplary record,

 3    and he lived up to his word.

 4              Q.   How many years were you active duty?

 5              A.   I believe just a little over a year,

 6    if I'm not mistaken.

 7              Q.   All right.  So let me see if I have

 8    this.  You graduated from Randolph High School in

 9    1981.  And did you then enter the United States

10    Marine Corps?

11              A.   No, that was -- that was about

12    19- -- I want to say 1983 or '84, possibly.

13              Q.   All right.  What did you do between

14    high school and the Marines?

15              A.   A variety of different jobs.  Trying

16    to find myself, at that point.

17              Q.   Let me see if I've got the record

18    straight here.  So you were born in 1962 in

19    Denville, New Jersey; high school graduate, 1981,

20    Randolph High School.  Between graduation and Marine

21    Corps, which might have been 1983 or 1984, a variety

22    of jobs.  You enter the Marines and then were

23    discharged after about a year under

24    other-than-honorable conditions; is that correct?

25              A.   That's correct.
```

1        Q.   Okay.  All right.  Have you had any

2  formal education following high school?  And by

3  "formal" I'm talking about a degree-producing

4  program or a certificate-producing program.

5        A.   No, sir.

6        Q.   All right.  Now, let's go back to --

7  all right.  Well, after you were discharged from the

8  Marines, 1984, that gets us to within a year of your

9  resume, which is 1985, where you became a

10  professional driver, right?

11       A.   Correct.

12       Q.   So did you have a period of time

13  where you were doing a variety of jobs?

14       A.   Yeah.  Once I came out, it took me a

15  few months to kind of grab my bearings, and then I

16  got into driving commercial motor vehicles.

17       Q.   Okay.  Did you take some sort of

18  course in driving commercial motor vehicles?

19       A.   You know, I just don't -- I don't

20  recall.  There was nothing required back then; you

21  just had to take an examination and study for the

22  examination portion.  I don't recall if I took an

23  active course or not, to be quite frank with you.

24       Q.   The vehicles that you drove during

25  those three years, were those -- well, proverbial

```
 1   18-wheelers, or were they box trucks, or were they

 2   different trucks?  What were they?

 3           A.    They were 18-wheelers.  And I had

 4   operated van trailers, as well as cargo tanks and

 5   low-boy trailers, very similar to what we have here,

 6   drop-deck-type trailers.

 7           Q.   Did you have a mentor or somebody who

 8   showed you how to operate an 18-wheeler?

 9           A.    Yeah, I had a -- I had a guy by the

10   name of Johnny DiGuiseppi, who has passed.  He

11   basically helped me out learning how to drive

12   commercial motor vehicles.  He owned a very large

13   construction company, so he kind of mentored me on

14   how to operate commercial motor vehicles.

15           Q.   What was Johnny's last name, please?

16           A.    DiGuiseppi.  I'm not quite sure --

17   D-i-G-u-i-s-e-p-p-i, I believe it is.

18           Q.   And was this in New Jersey?

19           A.    Yes, sir.

20           Q.   All right.  So 1985 to 1988, you are

21   a professional driver.  Were you an over-the-road

22   driver or were you local?

23           A.    Both, local and over the road.

24           Q.   What is the longest trip that you

25   ever took over the road?
```

```
 1                  A.   One of my normal routes was from
 2      Vineland, New Jersey, all of the way out to Broken
 3      Bow, Nebraska.  I used to run a lot out into
 4      Kentucky, a lot out into Iowa.  So the midwest, I
 5      guess it would be, were a lot of my normal routes.
 6      And then I did a lot of New England with heavy
 7      machinery on drop-deck trailers.
 8                  Q.   All right.  So then from 1988 to
 9      1991, your resume says you were "Heavy Highway
10      Construction Management."  And was that the name of
11      the company, "Hardroads/Della-Pello Highway
12      Construction"?
13                  A.   Actually, that's two separate
14      companies, and I don't remember what time -- which
15      one I spent how much time at.
16                  Q.   Were both of these companies in New
17      Jersey?
18                  A.   Yes, sir.  Hardroads is out of
19      business; Della-Pello is still around, though.
20                  Q.   All right.  And in 1991 to 1993,
21      we've got the "EPS, CMV Crash Response Manager/HM
22      Management."  Now, what company was that for?
23                  A.   That was -- again, EPS, I don't
24      recall.  It's Emergency something or other.  I don't
25      recall.
```

```
 1              Q.   Well, was it --

 2              A.   It was just referred to as "EPS."

 3              Q.   Was it a private company or --

 4              A.   Yeah.

 5              Q.   -- was it a public agency?

 6              A.   It was a private company.

 7              Q.   Where was it located?

 8              A.   Lincoln, New Jersey.

 9              Q.   All right.  And what -- what did you

10    do for that company?

11              A.   I managed their response program.

12              Q.   And what would you be responding to?

13              A.   Predominantly, it was truck crashes,

14    and then we did some bigger -- bigger event

15    incidents, as well.  But they were more on the

16    smaller side dealing with, predominantly, truck

17    crashes throughout the tri-state area.  And then

18    some larger stuff, too, but it was predominantly

19    truck crashes.

20              Q.   Is this in the nature of cleanup

21    after a truck crash?

22              A.   Recovery and cleanup, yes.  Recovery

23    of the commercial motor vehicle, overseeing that,

24    and, you know, getting back to, for example, the

25    safety director of never putting anything in
```

```
 1    writing, part of the reasons of why we are here

 2    today.  But never putting anything in writing from

 3    litigation purposes and explaining to the safety

 4    director or owner of the company what happened, in

 5    our opinion -- at that point, in my opinion -- so

 6    they would get an understanding of what occurred.

 7              Q.   Then from 1996 to 2009, you list "New

 8    Jersey State Police, Hazardous Material Instructor

 9    for Commercial Motor Vehicle Incidents."

10              Were you a full-time employee of the

11    New Jersey State Police?

12              A.   No.  I was 1099.

13              Q.   All right.  Were you receiving a W-2

14    between 1996 and 2009?

15              A.   I believe I was.  And both 1099.  W-2

16    is direct employee.  So I was 1099.

17              Q.   Well, were you employed by another

18    company --

19              A.   Yes.

20              Q.   -- when you --

21              A.   It ran current with the President/CEO

22    of HMHTTC Response, Incorporated, because that's

23    1993 to 2009 --

24              Q.   All right.

25              A.   -- and then also 1996 to 2009 under
```

```
 1    the instructorship -- got into the instructorship.
 2    That ran concurrent.
 3              Q.   All right.  So you would periodically
 4    work with the New York -- or the New Jersey State
 5    Police; is that correct --
 6              A.   Yeah.
 7              Q.   -- 1996 to 2009?
 8              A.   Yeah.  It was typically several times
 9    a month I would come in and do training.
10              Q.   I'm sorry?
11              A.    It was typically several times a
12    month I would come in and do training.  Not being
13    the recipient of the training; I was the
14    instructor -- well, with the state police.
15              Q.   All right.  And then we also have
16    1996 to 2009, again, the New Jersey State Police, as
17    a "Cargo Tank Truck Specialist Instructor," correct?
18              A.   That's correct.
19              Q.   All right.  So those jobs were
20    performed as 1099.  We've got you President/CEO of
21    the HMHTTC from '93 to 2009.  And is this in the
22    nature of response, again, to crashes?
23              A.   Yes.  But it was much more
24    sophisticated, and that was by design of what I --
25    how I business modeled it.  It was much more
```

1   sophisticated, and our day to day, if you want to

2   call it, bread and butter, were truck crashes, but

3   we did a lot of major disasters such as if you

4   remember the Captain Sullenberger crash in the --

5   jet in the Hudson River.  We recovered that.  Do you

6   remember the anthrax -- the Hart Senate building?

7   We responded to the recovery on that.  We trained

8   the D.C. Bomb Squad for a year, ran with them after

9   9/11, training their guys 24 hours a day, living

10  with them -- our people did.  You know, a lot of

11  major, headliner disasters, we managed and ran the

12  operation.  And, again, the day to day was your

13  everyday truck crashes.  We would be managing a

14  truck crash from the beginning of the call to

15  recovery to the end and instructing the -- or not

16  instructing, but explaining to the motor carrier

17  what had occurred, what our opinions were of the

18  occurrence, and so forth.

19          Q.   All right.  And then since 2010,

20  Truck Accident & Incident Experts, LLC, your

21  consulting firm; is that correct?

22          A.   Yes.

23          Q.   All right.  Now, do you have some

24  sort of connection with Spencer, Tennessee?

25          A.   I do.  I've got a lot of land up

```
 1    there, and we have -- we had an office up there, for
 2    a while.  We wound that down in order to just
 3    concentrate everything down in Naples and Jersey.
 4              Q.   All right.  So you no longer have any
 5    association with Spencer, Tennessee, on a
 6    professional basis; is that --
 7              A.   On a professional basis, no, but I
 8    still own land up there and a bunch of property.
 9              Q.   All right.  Let's take a look at your
10    "Descriptive Certifications and Training."  And, of
11    course, it starts at the top with "Institute of
12    Police Technology & Management," and at the bottom
13    is "National Safety Council."  Do you see that?
14              A.   Yes, sir.
15              Q.   All right.  The "University of
16    Findlay," is that University of Findlay, Ohio?
17              A.   Yes, sir.
18              Q.   All right.  And I was intrigued by
19    your "University of Medicine & Dentistry of New
20    Jersey," two entries.  Which campus was involved in
21    that instruction?
22              A.   The -- Brunswick.  Excuse me.
23              Q.   I'm sorry?
24              A.   Brunswick.
25              Q.   Were any of the above residential
```

```
 1    programs?

 2              A.    I'm sorry?  "Residential" meaning?

 3              Q.    Well, it means where you go to the

 4    site and they put you up in a dorm or a barracks,

 5    and you take your training and --

 6              A.    No.

 7              Q.    -- you are a resident there during

 8    the training.

 9              A.    No, sir.

10              Q.    All right.

11              A.    Although, I take that back.  Findlay.

12    Findlay would have been, yes.  Obviously, I was not

13    commuting from Findlay to New Jersey every day.

14              Q.    All right.  So Findlay -- University

15    of Findlay, Ohio, Hancock County, you were a

16    resident on campus for the duration of the

17    instruction; is that correct?

18              A.    No.  I had to get my own residency

19    while I was out there during the training program.

20              Q.    Oh, all right.  So would you rent an

21    apartment or a house or something like that?

22              A.    It was brief.  I believe it was only

23    a week long, if I'm not mistaken.

24              Q.    All right.

25              A.    I believe I was staying in a hotel.
```

```
 1                Q.   Okay.  Which of these above were

 2   full-time, on-site programs?  Now, that means that

 3   you show up every day and you go to a classroom

 4   on-site.

 5                A.   Yeah, if you want to start at the

 6   top --

 7                Q.   Sure.

 8                A.   -- the first one, the second one,

 9   third, fourth, fifth -- all of the New Jersey State

10   Police training programs, if I'm understanding your

11   question correctly, plus -- oh, there is another

12   one, too.  Tennessee MTA, you know, I was, as you

13   called it, a residence down there staying outside of

14   my home, if you will, for the Tennessee -- the two

15   Tennessee MTAs.  And that would pretty much be the

16   limit -- well, let me back up.  Each one of these

17   courses was a full-day program or a week's long

18   program.

19                Q.   Well, I'm coming to that.  We're not

20   going to go through every program.  I'm just trying

21   to understand the ones that you gave me are

22   full-time, on-site programs, where, again, you went

23   to the source of the instruction and sat in a

24   classroom, whether it was a day or a week or a

25   month.
```

```
 1              A.   Every one of them.
 2              Q.   All right.  So I take it that none of
 3    them, then, were on -- were full-time online
 4    programs; is that correct?
 5              A.   Oh, no.  No, sir.  These were --
 6    these were before online was even coming about.
 7              Q.   Which one was the longest program,
 8    approximately?
 9              A.   That would be the second -- the
10    second from the top, "New Jersey State Police/DOT
11    Commercial Vehicle Inspections, Enforcement,
12    Level 1 - FMCSA."
13              Q.   All right.  How long was that?
14              A.   Two weeks, eight hours a day.
15              Q.   When did you do that?
16              A.   Oh, that was -- I don't know
17    specifically.  I want to say it was probably 15
18    years ago, maybe.  And, you know, I'm just giving
19    you an approximate.  Twelve, maybe 15 years ago.
20              Q.   All right.  So that was the longest
21    one.  Which one was the shortest program, so the
22    ones that would be a day?
23              A.   Oh, I could identify, like, for
24    example, Smith System, the two on the bottom
25    there -- well, start from the bottom, National
```

```
 1   Safety Council, one day; Smith System, one day;
 2   Smith System, one day; Rutgers University, that
 3   program was one day.  And I believe that's
 4   probably -- oh, okay.  Then going up about midpoint
 5   it says, Bendix -- no, that was a week long, Bendix
 6   Air Brake Systems.  Then if you look at the New
 7   Jersey MTA -- there is one, two, three, four -- four
 8   of them.  They were all one day.  Everything else
 9   was multiple days.
10          Q.   Of this list, which one was the
11   earliest program that you attended?
12          A.   I -- I couldn't answer that for you,
13   sir.  I have no idea.
14          Q.   Well, you mentioned that the
15   Institute of Police Tech- -- I'm sorry.  The New
16   Jersey State Police Level 1 was approximately 15
17   years ago.  Were any of these beyond 15 years ago?
18          A.   I said 12 to 15 years ago, yes.  But,
19   yeah, for example, Bendix -- no, I'm sorry, not
20   Bendix, but Findlay, that's probably 20 years ago.
21   And, again, I'm just -- I'm giving you very -- you
22   are asking me for dates and memories of things from
23   quite some time ago.  So Findlay University was
24   probably 20-plus years ago.  Maybe actually more
25   than that.
```

1              Then there is AAR/Bureau of

2    Explosives.  That was -- that was actually out in --

3    out in Colorado, and that was probably 20 years ago.

4         Q.   All right.  What is the most recent

5    program you attended of this list?

6         A.   That would be the -- it's not even in

7    here, either.  It would be New Jersey MTA -- it

8    would be another New Jersey MTA Air Brake Foundation

9    course, and I believe that was in 2019.  But the

10   latest one listed in here is 2017.

11        Q.   All right.  So there is another one

12   in 2019; is that what you are testifying?

13        A.   Yeah, I believe so.  I believe so.

14        Q.   Okay.  Have you ever served as a

15   deputized law enforcement officer?

16        A.   No, sir.

17        Q.   How many Level 1 inspections have you

18   performed?

19        A.   I would say -- well, mine were pretty

20   much almost -- well, a lot of them, let me put it

21   that way -- a lot of them were post crash Level 1

22   inspections, and I would say that -- I would say

23   that if I were to take a guess -- I don't have an

24   exact number.  If you are okay with an approximate,

25   a guess, if you want to call it that, so -- but let

1    me ask you this, first.  Are you talking about post

2    crash, or are you talking about a combination of

3    post crash and just level 1 -- and/or just Level 1?

4            Q.   Well, I am talking about a Level 1

5    inspection that's an enforcement inspection.  Have

6    you done any Level 1 enforcement inspections?

7            A.   Yes, but I would find the violation

8    and give it to the trooper, the New Jersey trooper.

9    So, in other words, I would be at a -- we would be

10   at an inspection point or else we would be up in the

11   tower or we'd see a commercial motor vehicle come

12   in, plug in the DOT number, and it looked like the

13   driver had, for example, a history of brake

14   problems, and we'd tell him, "Go around back."  And

15   we'd go back there and focus in on his brakes and do

16   everything else, as well, to do a complete Level 1

17   inspection.  And as I'm underneath the commercial

18   motor vehicle, in the trench and looking at the

19   brakes, if I find violations, I notify the trooper

20   and he writes -- he writes the 393 violation up.

21           Q.   Okay.  So the trooper signs the

22   violation, you don't; is that correct?

23           A.   He would have to, yes.  He would have

24   to.  I would not be permitted to sign it, because I

25   was not enforcement.

```
 1                 Q.   And were you paid for those

 2     inspections?

 3                 A.   Yeah.  Well, some of them I was, and

 4     some I would do just during a training process.

 5                 Q.   Okay.  And were these all in New

 6     Jersey?

 7                 A.   Yes, sir.

 8                 Q.   All right.

 9                 A.   And then once I did -- now, outside

10     of that is the Level 1 post crash inspections, which

11     are, virtually -- you know, a lot of various places

12     throughout the country.

13                 Q.   But that's after a crash?

14                 A.   That's post crash.  Post crash.

15                 Q.   All right.  When is the most recent

16     Level 1 inspection you have performed?  I'm not

17     talking about post crash now.  I'm talking about

18     Level 1 enforcement inspection.  What's the most

19     recent?

20                 A.   I have been doing nothing but

21     Level 1's for the last -- Level 1's post crash for

22     the last, maybe, ten years.  Nine, ten years.

23                 Q.   Okay.

24                 A.   So nothing outside of post crash.

25                 Q.   When you completed this training for
```

1    the Level 1 inspection, did you receive a

2    certificate?

3              A.    Yes.

4              Q.    And is that a lifetime certificate,

5    or is that something that has to be renewed from

6    time to time?

7              A.    Well, to maintain -- to maintain

8    authority for inspections from the enforcement

9    standpoint, which I was never enforcement, you would

10   have to get recertified.  You would recertify every

11   year.  Now, I'm not applicable to that

12   recertification process, because I'm private sector.

13             Q.    All right.  So, today, could you

14   perform a Level 1 inspection the same as you

15   described to me with a state trooper present?

16             A.    If I were to go -- there's a scale

17   house that's about 20 miles from here.  If I were to

18   go to that scale house and if I notified -- if I

19   contacted the state police and asked them if I could

20   come down and do some inspections, because of my

21   training level, I could go there under a trooper,

22   because he is certified, and then after I do, I

23   believe, five inspections, then I would be

24   recertified.

25             Q.    All right.

1          A.    But they would have to be -- they are

2    not post crash.  So post crash you don't get

3    recertified; you get recertified under enforcement

4    inspections.

5          Q.    What do you have to do to get

6    recertified?

7          A.    Essentially, go through a Level 1,

8    the entire level 1 inspection.  There's about 100 --

9    there's about 100 checkpoints that you do during the

10   Level 1 inspection, everything from brakes --

11   everything.

12         Q.    All right.  So if a person -- the

13   state trooper -- has gone through the Level 1

14   inspection training receives a certificate, then am

15   I correct in understanding that state trooper needs

16   to go through this training every year to be

17   recertified?

18         A.    That's correct.

19         Q.    All right.

20         A.    Well, it's not really -- no, it's

21   not -- let me back up on that.  It's not retraining.

22   What it is, is that you have to do five Level 1

23   inspections in order to be considered current --

24   okay? -- as opposed to training.  It's not training.

25   It's five Level 1 inspections to be considered

1    current.

2            So in order to be able to be

3    considered current, I would have to be accepted to

4    go into a scale house and do those five inspections

5    as an enforcement officer to be able to get

6    recertified.

7            Q.    Well, let me ask you this.  Could a

8    law enforcement officer, in a sense, wait or

9    postpone those five required inspections within that

10   year until the last day and -- or the last week, and

11   perform five in one week and then be considered

12   current?  It's got to be within one year?

13           A.    So far as I understand, yes.

14           Q.    Okay.  So there's not a schoolhouse,

15   either online or residential, that the officer has

16   to go to to get updated on the latest brakes?

17           A.    No, that's not accurate.  There is

18   things you do to remain current with the current

19   regulations.  And one of my methodologies,

20   obviously, is I belong to the motor truck

21   associations, and I also get new copies -- I think

22   it's five times a year -- for the Federal Motor

23   Carrier Safety Regulations that show the actual

24   changes in the regulations that have occurred over

25   that -- and then, plus -- over that quarterly

```
 1    period, if you will.
 2              Q.   All right.  Let's turn to Exhibit D,
 3    which is your log of testimony in other cases.
 4              A.   Can we take a five-minute break?  I'm
 5    going to have to pull it up.
 6              Q.   That's fine.  I have just a couple of
 7    questions.
 8              A.   Do you want to just try it without it
 9    or -- I mean, it's up to you.
10              Q.   Well, all right.  So you sent this
11    report to Mr. Friter at Stutman Law, correct?
12              A.   That's correct.
13              Q.   All right.  And were any of these
14    other attorneys listed here affiliated with Stutman
15    Law?
16              A.   Insofar as I know, no, sir.
17              Q.   Okay.  Were any of the matters that
18    you gave testimony on based upon a workers'
19    compensation claim or file?
20              A.   On that list there, I doubt it.  I
21    doubt it.  I don't believe so.
22              Q.   So to put the answer a different
23    way -- or the question a different way, to the best
24    of your knowledge, you have never previously
25    consulted with Stutman Law or have never previously
```

1    provided a report on a matter based upon a workers'

2    compensation claim and file?

3                A.    For Stutman Law, no, sir.

4                Q.    All right.  And what about a workers'

5    compensation claim or file?

6                A.    I believe I -- I believe that I had

7    only done one case on a workman's comp related

8    matter where a driver had -- I think he fell off a

9    tanker or something like that.  I don't remember.  I

10   mean, we have 90 active cases right now, so I don't

11   remember every case I've done over the last 11

12   years.

13               Q.    All right.

14               A.    There may have been others, too, but

15   none that I can recall testifying on.

16               Q.    All right.  Let's talk about

17   Mr. Liebe a little bit.  The report identifies

18   Mr. Liebe as senior consultant.  Am I correct in

19   understanding that he joined -- well, he started

20   consulting with you in April of 2020; is that

21   correct?

22               A.    It was thereabouts, yes, sir.

23               Q.    All right.  And the report that we

24   are talking about today, Exhibit B, was prepared on

25   January -- or submitted on January 22nd, 2021,

```
 1    correct?

 2              A.    That's correct.

 3              Q.    All right.  Now, who did the actual

 4    writing of the report?

 5              A.    Again, as I stated earlier, it's a

 6    combination.  It's a combination of both of us.

 7    There is -- I would say there's a large part of it

 8    that's written by me and there's a large part that's

 9    written by him, but the actual final sign-off is a

10    testament to my -- my approval of this --

11    100 percent approval of this report.

12              Q.    How much total time did you spend

13    preparing the report?

14              A.    I could not answer that question for

15    you.

16              Q.    Is that in your invoice?

17              A.    It doesn't break it out on who spent

18    what time.  It's just -- it's just, you know, "file

19    review," you know, "authoring the report," and

20    things of that nature.  It doesn't say time

21    dedicated to me or time dedicated to him.

22              Q.    How do you keep track of the time to

23    pay Mr. Liebe?

24              A.    He just gets paid for the hours he

25    puts in.
```

1          Q.    I'm sorry?

2          A.    He gets paid for the hours that he

3    puts in.

4          Q.    All right.  So how many hours did he

5    put in compared to the invoice itself?

6          A.    I don't know the answer to that

7    question.

8          Q.    Do you have information that would

9    tell us how many hours he put in compared to the

10   total number of hours that were billed?

11         A.    No.  Once a check is written -- in

12   other words, he gets paid once a month.  Once a

13   check is written for compensation for the time he

14   did as a 1099 employee for that month, then the time

15   sheets are discarded.  There is no need to keep

16   them.  Otherwise, we would have more paperwork than

17   we know what to do with.  So we try to become a

18   little bit more paperless.

19         Q.    Well, that's certainly admirable, but

20   you are speaking to a lawyer, who has to account for

21   every tenth of an hour.  And so my question is, when

22   Mr. Liebe sends you a report, does he just send you

23   a grand total of hours worked, or does he tell you

24   how many hours he worked on File A, File B, File

25   Evans?  How does that get documented so that you pay

1   him the amount that he is owed?

2          A.   It gets documented by the amount of

3   hours he worked on a particular case for that month.

4   And he may work on three, four, five cases, so by

5   the end of that month he has a cumulative total

6   hours and he is paid for those hours.

7          Q.   But you understand my question, that

8   I am asking whether he breaks down those total hours

9   that he wants you to pay him for into hours worked

10  on each particular case?

11         A.   Of course.  Those -- like I stated,

12  those are submitted on time sheets, and then the

13  time sheets are discarded.  After he is paid, they

14  are discarded.

15         Q.   So Mr. Liebe submits time sheets?

16         A.   That's correct.  And I submit time

17  sheets, and my time sheets are discarded afterwards,

18  as well.

19         Q.   All right.  Do you have the time

20  sheets for the time that you have spent, on this

21  particular case, preparing the report?

22         A.   Again, they would be -- I do not have

23  them, because they are discarded.  Because what

24  happens is that -- it's almost like having notes on

25  a case.  When you transfer those notes to a report

1     in totality, you dispose of the notes.  And the same

2     thing goes with the time sheets.  Once the time

3     sheet is paid, at the end of that month we dispose

4     of the time sheet.  It makes no sense just to keep

5     papers around for no reason, because the time is

6     reflected on the -- on his hourly hours that he

7     spent in that month, not the individual cases that

8     he worked on.

9                    The same thing with me.

10    Collectively, the cases that I work on, time sheets

11    are submitted.  I don't get -- I'm an LLC, so I get

12    paid differently.  But he is paid on the amount of

13    time that he spends.

14             Q.   If a client were to question you on

15    your invoice, how would you show the client the

16    documentation as to how many hours you spent and how

17    many hours Mr. Liebe spent researching, discussing,

18    writing, preparing, submitting the report?

19             A.   Once again, we don't break it out,

20    Aron's time and my time.  It is collectively billed

21    in one invoice.  So if I spend ten hours this week

22    on a -- this week on Mr. Friter's case and Aron

23    spent eight hours on Mr. Friter's case, that's a

24    total of 18 hours that is billed with a light

25    description of what we did.  It doesn't get into

1    details and saying that we read this deposition,

2    that deposition, et cetera, et cetera.  It just

3    simply states it was "file review."

4              Q.   So if Mr. Friter were to ask you,

5    "Well, who spent the 18 hours, you or Mr. Liebe," is

6    it your testimony you couldn't tell him?

7              A.   No, I can't tell him.  It would be

8    simply, "This is -- this is the collective time that

9    we spent as experts on your case to proffer this

10   report."

11             Q.   Did Mr. Liebe consult with you on any

12   other cases between April of 2020 and January 22nd,

13   2021?

14             A.   Of course he did.

15             Q.   Do you have a copy of the 1099

16   available -- not at your fingertips, but do you have

17   a copy of a 1099 showing how much Mr. Liebe received

18   in 2020 for consulting with you?

19             A.   I'm sure we've got it.  My accountant

20   would have it.

21             Q.   All right.  Mr. Turner, I'm going to

22   request -- through counsel, of course -- that you

23   provide a copy of the 1099 for Mr. Liebe for 2020

24   calendar year.  All right?

25             A.   Sure.  Mr. Friter can advise me.  I

```
 1    will take him up on that.

 2                   So you are saying for all of his

 3    work, in other words?

 4          Q.   Well, I would prefer to see the

 5    record of the hours he spent on each case; most

 6    particularly, our case that we are talking about

 7    today.  But as I understand your testimony, that is

 8    not available, correct?

 9          A.   No, sir.

10          Q.   All right.  So it has to be the total

11    hours.  And, then, what does he -- what do you bill

12    him out at, what rate?

13          A.   I want to say it's -- I want to

14    say -- I want to say it's $125 an hour.

15          Q.   Okay.  Well, when you say that --

16    well, I don't want to put words in your mouth, but

17    as I understand it, your testimony is that the

18    report was prepared by the both of you; is that

19    correct?

20          A.   That's correct.

21          Q.   Yes?

22          A.   That's correct.

23          Q.   Do you have an estimate as to what

24    percentage of the report was in your bailiwick and

25    what percentage was in Mr. Liebe's bailiwick?
```

1    A.    Well, I wouldn't use the word

2    "bailiwick," because we are both qualified in a very

3    similar manner and qualifications.  So I am not

4    going to say, you know, this is something that --

5    you know, it's -- I would say that it could be so

6    much as a 60/40 split, it could be so much as an

7    80/20 split, but nothing -- and this is the

8    important thing -- is that nothing comes out of my

9    office, my company, my practice, without my final

10   signature.  So I just don't know how much time.  And

11   we are going round and round on this, but it's

12   just -- I can't tell you how much time Mr. Liebe nor

13   myself spent on any case -- any case, for that

14   matter -- that we have done.

15   Q.    All right.  Well, let me make sure

16   I --

17   A.    Frankly, I've never had a client ask

18   me to do that, break it down.  If a client had said

19   specifically, "We want -- we want your time broken

20   out, Mr. Liebe's time," I wouldn't have any problem

21   with that.  We've never had that request come up, so

22   we just don't do it.

23   Q.    Do you have any resources or data

24   available on which you could do it for this case?

25   A.    Do I have any what?  I'm sorry.

```
 1              Q.   Do you have any data or resources
 2    available in which you could come up with that
 3    breakdown for this particular case?
 4              A.   I thought I was pretty clear on that.
 5    No.  All of the stuff -- all of the time sheets --
 6    sir, let me see if I can explain it another way.
 7    All of the time sheets, once the case is billed on
 8    for the time that is spent, all of the time sheets
 9    are disposed of.  They are not maintained.  They are
10    not kept, because there is really, quite frankly, no
11    reason for us to keep them.
12              Q.   All right.  Well, I will state on the
13    record, I understand what you are saying.  I respect
14    the fact that you take 100 percent accountability
15    for the report, correct, that you signed it?
16              A.   Yes, sir.
17              Q.   All right.  However, you can't tell
18    me today, and you don't have the data that you could
19    tell me in the future, as to whether or not the
20    report was an 80/20 work product by you and
21    Mr. Liebe, or a 60/40, or a 50/50 work product,
22    correct?
23              A.   I have no -- I have no -- no way of
24    telling you that at all, whatsoever.
25              MR. RIKER:  All right.  Well, the
```

```
 1              time is 11:19 a.m., and we will take a

 2              break for ten minutes.

 3                   How is that, Jordan?

 4                   MR. FRITER:  That's fine.

 5                   MR. RIKER:  All right.  Lisa, we are

 6              off the record until 11:30.

 7              (Recess taken:  11:19 a.m. to 11:30 a.m.)

 8                   MR. RIKER:  All right.  We are back

 9              on the record.

10   BY MR. RIKER:

11                   Q.   Mr. Turner, I would like to turn to

12   Exhibit E, which is the qualifications of -- the

13   resume of Mr. Liebe.  Now, do you have that or you

14   don't have that?

15                   A.   I do.  I can pull it up.  Can you

16   give me a minute?

17                   Q.   Well, I suppose we could share a

18   screen on that.  I mean, when you say "pull it up,"

19   do you have the ability to pull it up and look at it

20   on your computer?

21                   A.   Yes.

22                   Q.   All right.  Well, why don't you do

23   that.  That seems easier.

24                   A.   Okay.

25                   Q.   Do you have it?
```

```
 1              A.   Yes.
 2              Q.   All right.  Now, you interviewed
 3    Mr. -- let me make sure I have this right --
 4    Mr. Liebe before you engaged his services, correct?
 5              A.   Of course.  It's Liebe, just like
 6    it's spelled.  Liebe.
 7              Q.   L-i-e-b-e?
 8              A.   Yes.
 9              Q.   All right.  Liebe.  All right.  So
10    you interviewed him before you engaged his services,
11    right?
12              A.   Of course.
13              Q.   And he represents he had 23 years of
14    law enforcement experience.  I'm looking at his
15    profile; do you see that, the first paragraph?
16              A.   Yes, sir.
17              Q.   Do you see that?
18              A.   Yes, sir.
19              Q.   And that would be 23 years -- I'm
20    looking for a clarification of the last sentence,
21    "23 years of uniform patrol, to include eight years
22    of plain clothes and undercover investigations."  Is
23    the eight years subsumed in the uniform patrol?  I
24    mean, was he plain clothes for eight years and then,
25    what, 15 years uniform patrol?
```

1          A.   I don't know the answer to that

2     question.

3               Q.   All right.  And in the next paragraph

4     he talks about over -- well, excess of 20,000

5     traffic stops and more than 12,000 commercial motor

6     vehicle tractor-trailer inspections.  Do you see

7     that?

8               A.   Yes, sir.

9               Q.   All right.  So is the 12,000 part of

10    the 20,000, or is that 32,000?

11              A.   Well, being very aware of the

12    difference between traffic stops and CMV

13    tractor-trailer inspections, they are -- I would --

14    I would venture to say that they are distinctly

15    different.

16              Q.   All right.  So we're talking about a

17    32,000 figure promanation of traffic --

18              A.   Combined.

19              Q.   Well, is that your understanding of

20    his profile?

21              A.   Over the career, yes, sir.

22              Q.   All right.  Now, if you go down --

23    let's see, one, two, three, four -- five paragraphs,

24    in addition to his work in law enforcement, or at

25    least with the state of Iowa, he was a police

```
 1   officer during that 23-year period, at least for a
 2   period of time, correct?
 3            A.   According to this, yes, sir.
 4            Q.   Okay.  And a deputy sheriff?
 5            A.   According to this, yes, sir.
 6            Q.   A firefighter?
 7            A.   According to this, yes, sir.
 8            Q.   A graphic designer?
 9            A.   According to this, yes, sir.
10            Q.   A website developer?
11            A.   According to this, yes, sir.
12            Q.   And a professional photographer,
13   correct?
14            A.   According to his CV, yes, sir.
15            Q.   I'm sorry?
16            A.   According to his CV, yes, sir.
17            Q.   Yes.  Well, I mean, you interviewed
18   him, and this is what he offered you, and you --
19            A.   No, this is not what he offered me.
20   He offered me, originally, a very different CV that
21   was not designed -- if you look at this, it is kind
22   of like almost a mirror image of my CV --
23            Q.   Yes.
24            A.   -- as well as my other colleague.
25   Our CVs all kind of match in structure.  I had him
```

1    rewrite it. I didn't go through and say, you know,

2    "You need to change this" or -- who am I to tell him

3    to change something that is his experience and

4    background?

5            Q.    To clarify, I wasn't talking about

6    that he didn't present this product, but he

7    presented this information to you as his personal

8    profile, correct?

9            A.    We talked mainly about -- when we

10   discussed this, first of all, he became highly

11   recommended by, I believe, a commander of a truck

12   unit out of the state of Iowa. He came highly

13   recommended, that he knows trucks and he is astute

14   in his writing and so forth. And with my guidance,

15   I helped him along, and he has come about today to

16   be a fine expert. He is -- go ahead. My apologies.

17   I'm running off here.

18           Q.    So Mr. Liebe presented this

19   information to you as to his profile, his background

20   and work he had done from 1997 to 2020, correct?

21           A.    Yes. But I'm not looking at his --

22   I'm not looking at his 20,000 traffic stops. I

23   really don't care about that. What my concern was,

24   was his commercial motor vehicle background, his

25   coming with a high recommendation by someone that I

1    know fairly -- somewhat -- and, basically, his

2    positions.  He is pretty well up the food chain.

3    And so I used that basis and an extended interview

4    to come about my decision.

5                    I mean, I don't care about the field

6    sobriety instructor; I don't care about the graphic

7    designer, none of those things.  It didn't really

8    matter to me.

9                    Q.   All right.  Stand by a moment.

10                   All right.  Let's go over to his

11   "Professional History."  And there is an

12   additional -- well, let's go back to the "Profile."

13   You are the one who decided to put it in the

14   profile.  So it's valuable enough to you, as far as

15   his background, that you put this information in his

16   profile; is that a fair statement?

17                   A.   Well, you can see in my CV I've got

18   in there confined space rescue.  I mean, it's not

19   relevant to trucks.  So his 20,000 stops or his --

20   he just -- you know, the thing is, counselor, you

21   found out that he was doing web design or whatever

22   on the side, and you criticized that because it

23   wasn't in his CV.  I'm telling you that I'm allowing

24   his CV to represent what he wrote as to himself.  I

25   used a different basis and information about him in

1   order to make a determination if I felt he was

2   appropriate in bringing on as somebody that I would

3   mentor as an expert, and he would learn and just get

4   better at every case he did.  At the same time,

5   making sure that no report ever left my office

6   without me being the guy that stands behind it.

7           Q.   All right.  And on under his

8   "Professional History," at least it was of interest

9   enough to put in all of these other positions,

10  including the business owner of DC Pros, Inc.,

11  right?

12          A.   Again, mine in there -- my resume has

13  I was a highway builder.  If we didn't put it in

14  there and you found out about it, you would say,

15  "Why didn't you put it in there, Mr. Turner?"  I am

16  allowing his CV to speak for itself.

17          Q.   Do you consider my question somehow

18  veiled criticism of what you put into a resume or

19  don't?

20          A.   No, no.  I just notice that you honed

21  right in on "Business Owner, DC Pros, Inc.," in

22  other words, that's got nothing to do with trucks,

23  so why would you put it in there.  So, yeah, I do

24  think it was a veiled question.  It's -- he put it

25  in there because it's part of his history.

1      Q.   Fine.   All right.   Now, as I
2   understand it, then, he worked for the State of Iowa
3   from 1997 to 2020, correct, under his "Professional
4   History"?
5      A.   1997 to 2020, he worked as a police
6   officer, a sergeant, at Bluff Police Department,
7   which is not the State of Iowa.   '97 to 2012 he
8   worked for the State of Iowa Law Enforcement in the
9   truck unit.
10      Q.   Go up one more line, Mr. Turner, 2012
11   to 2020, he also worked for the State of Iowa during
12   those years, correct?
13      A.   Right.
14      Q.   Is it not, in fact, true that between
15   1997 and 2020, Mr. Liebe worked for the State of
16   Iowa?
17      A.   Based on his CV, that's correct.
18      Q.   Thank you.   All right.   Now, in
19   addition to that, he was a police officer, for a
20   period of time, and a deputy sheriff and a business
21   owner, and some of those years cross some of the
22   time that he was working for Iowa, correct?
23      A.   Yes, sir, as my instructorship with
24   the state police, and I don't know the relationship
25   with 1099 positions.   I don't know.   As mine, you

1  know, there are crossover times as to being an

2  instructor with the state police. So some things

3  overlap and run concurrent with each other; I get

4  that. He's an ambitious guy, as I am.

5          Q.   Between 1997 and 2012, would that be

6  the period of time that he did the 20,000 traffic

7  stops and the 12,000 commercial motor vehicle

8  tractor-trailer inspections?

9          A.   I don't know the answer to that, sir.

10         Q.   Well, did you ask him?

11         A.   Sir, once again, this CV here is not

12  what I used as representation when I interviewed

13  him. This CV here is developed. And I don't know

14  what he pulled out of his original CV and put into

15  here. I don't have the answer to that question. So

16  I didn't have the advantage of looking at this,

17  broken down the way it is, and sit there and say,

18  "So, Aron, tell me, what did you do between 2012 and

19  2020? What did you do '97 to 2012?" I didn't have

20  that in front of me. I was focusing in on

21  commercial motor vehicles, how many inspections he

22  did Level 1, what type of inspections, post crash

23  inspections, et cetera, and his ability to be able

24  to write. Those are the three primary things that I

25  was concerned about.

1          Now, I assume -- now, forgive me if

2    this assumption is incorrect, but I assume he was

3    not a convicted felony, by the fact that he's served

4    law enforcement for so many years.  So I wasn't

5    asking about his felony record.  He's a straight

6    shooting, good business -- a good writer, and he

7    understands trucks, and that's what I wanted to have

8    in my -- in my stable of colleagues.

9          Q.   Well, it would be relevant for you to

10   know when he had his trucking experience, correct?

11         A.   And I can look at this here.  So I

12   would imagine that, in all probability, is somewhat

13   more reflective of his original CV that I received

14   when I discussed the opportunity with him.

15         Q.   Okay.  And it would be relevant for

16   the information that is contained in the CV to be

17   accurate, correct?

18         A.   I would -- I would hope that it would

19   be, but I don't know where the overlaps may be.  I

20   mean, clearly there are some overlaps here.  And,

21   again, I have overlaps in mine.  I understand his

22   background was trucks with the State of Iowa, and

23   that was important to me; and he's a Level 1

24   inspector, that was important to me; and he did post

25   crash inspections, that was important to me; and the

```
 1    fact that he could write, that was important to me;

 2    and the fact that he was not a convicted felony, by

 3    my assumption, that was important to me.  So I think

 4    those five things there were the important things

 5    that I used in determining whether I wanted this guy

 6    in my stable or not, and he passed on all five of

 7    those.  His writing was -- you know, was a little

 8    bit difficult but, you know, we got to that.  And I

 9    am a very good writer, and I made sure that I honed

10    that skill with him over time.

11              Q.   All right.  Let's turn to the report

12    now.  Let's go back to Exhibit B, on page 2, going

13    back to that full "Disclosure."  The disclosure was

14    couched in terms of the senior consultant was

15    disclosing --

16              A.   Yes.

17              Q.   -- and providing a clear and unbiased

18    opinion.  So that applies to you as the chief

19    consultant, too, doesn't it?

20              A.   We -- if you -- you know, if you look

21    at the -- hold on one second.

22              Well, first off, all of my opinions

23    are unbiased, all of my opinions.  And, again --

24    once again, on page 37 is the top signature, chief

25    consultant.  That means that everything that is in
```

```
 1    this report I stand behind, and written in part by

 2    Aron and written in part by me.  What the split is,

 3    I don't know.  But I can tell you that everything in

 4    here, I stand behind.  And, of course, as an expert,

 5    with an outstanding reputation -- all right? -- I

 6    don't give biased opinions.  Never have, never will.

 7    That's why I have survived so long and have thrived

 8    so long is because I don't give biased opinions.

 9    They are unbiased.  I give the raw facts of the

10    FMCSR standards of care and apply it to an incident.

11               Now, if Mr. Friter called me up and

12    gave me a totally different scenario, then I would

13    turn around and say, "You know, I'm sorry," either

14    "I can't help you," or, you know, whatever the case

15    may be, "but this is how I work."  I apologize for

16    the diatribe.  But, anyway, go ahead.

17               Q.   Well, we're going to try it this way.

18    There is a disclosure on page 2, correct?

19               A.   Sure.

20               Q.   And the text of the report reads as

21    follows, "It should be noted, for purposes of full

22    disclosure, that the undersigned Senior Consultant

23    is providing a clear and unbiased opinion."  Did I

24    read that sentence accurately?

25               A.   You did, yes, sir.
```

1              Q.    All right.   And do you agree with me

2    that your signature at the bottom of page 37 means

3    that it also applies to you as chief consultant?

4              A.    Yes, but my name --

5              Q.    Thank you.

6              A.    -- is not there as chief consultant,

7    for the reason being, is that I was not in the Iowa

8    Law Enforcement Truck unit.   This is exclusively

9    regarding Aron, his background with the Iowa State

10   Police, not me.   So that's why we put that in there,

11   just so that you are aware, Mr. Riker, when you read

12   this that -- you know, if somebody came forward in

13   the future, and say you have got -- I can't remember

14   his name, but Mr. -- excuse me, Trooper -- Trooper

15   Floerchinger, he comes forward and says, "Wait a

16   second.   I know that guy, Aron Liebe," I don't want

17   you coming to me and saying, "Mr. Turner, you didn't

18   disclose that in your report."   So we made sure we

19   put in here a full disclosure, so that that way

20   there were no questions in the future, that we are

21   not hiding anything, and we come at this with an

22   unbiased opinion, and we provide you with facts that

23   are supported by regulatory concern.

24             Q.    Thank you.   Now, does this report of

25   37 pages provide a clear and unbiased opinion?

1          A.    I think that I have -- yes, sir, it

2    does.

3          Q.    Thank you.  Now, page 4, let's talk

4    about page 4.

5          A.    Sure.

6          Q.    And down at the bottom of page 4 is

7    paragraph 4.0, the "Assignment."  Let me read this

8    into the record.  "The undersigned has been

9    requested to examine all of the documents listed in

10   the Documents Review section of this report; apply

11   the knowledge, experience and education, along with

12   standards of care and the FMCSR; determine if and

13   how the motor carrier, Marlex, and/or CMV driver,

14   Aloisio, acted and/or failed to act, and if such

15   acts and/or failures to act were causative in any

16   manner whatsoever."  Did I read that "Assignment"

17   accurately?

18         A.    You did.

19         Q.    Who requested the examination of the

20   documents?

21         A.    That's part of the -- that's part of

22   the case.  We get files.  I mean, it's our job to go

23   through the files and figure out the discovery.

24         Q.    Who requested it, Mr. Turner?

25         A.    Of course, Mr. Friter.

1          Q.    Thank you.  I was trying to

2    understand whether this was the assignment from

3    Mr. Friter to you or you to Mr. Liebe.  We have

4    established that.  All right.  So that was who

5    requested the examination.

6                And you accepted the assignment

7    exactly as stated in your report, correct?

8          A.    That's correct, yes.

9          Q.    All right.  And you believe your

10   report completed the assignment with exactitude?

11         A.    Repeat that, please.

12         Q.    You believe the report -- you believe

13   that the -- you completed your assignment and the

14   report exactly as the assignment was given to you?

15         A.    Insofar as I know, yes.

16         Q.    All right.  Now, let's go to page 35,

17   your opinions.  This is paragraph 7.0.

18         A.    Yes, sir.

19         Q.    Now, the "Opinions" paragraph starts

20   off -- and, again, I will read this into the

21   record -- "Based upon the foregoing analysis, as a

22   Commercial Motor Vehicle expert possessing

23   approximately 30 years' experience in the CMV

24   Transportation Industry and based upon what is good

25   and safe practices in the transportation industry, I

```
1    have come to form the following opinions as to the

2    subject incident which occurred on northbound I-29

3    in Fremont County, Iowa."  Did I read that

4    accurately, Mr. Turner?

5              A.    You did.

6              Q.    All right.  So there were two bases

7    for your opinion, right?  You're basing it on your

8    30 years' experience in the commercial motor vehicle

9    transportation industry, correct?

10             A.    Yes.  If I were to --

11             Q.    And --

12             A.    Counselor, if I were looking at this,

13   you know, perhaps I would say, "I and Mr. Liebe's

14   experience here," and the approximate experience in

15   the commercial motor vehicle industry, as opposed to

16   using the word "I," I would put "we," as a practice,

17   as opposed to just me individually.  And that's why

18   we both signed off on it.  That may have been an

19   oversight that I concede to.  And even on the last

20   sentence, "I express these opinions."

21                  So it actually should be "we, as a

22   practice, express these opinions."  So those things

23   I would change.  And if that's where you're going, I

24   get that, and I concur.

25             Q.    Mr. Turner, the only place I am going
```

```
 1    is to my next question.
 2              A.    Okay.
 3              Q.    Do you understand that, sir?
 4              A.    Sure, I do.
 5              Q.    My job is to ask questions --
 6              A.    You put --
 7              Q.    -- and your job is to answer the
 8    questions; do you understand that?
 9              A.    But you put an emphasis on "I."
10              Q.    Do you understand that, Mr. Turner?
11              A.    You put an emphasis on "I."
12              Q.    Mr. Turner, do you understand that?
13              A.    Sir --
14              Q.    Thank you.  Let's go on.
15              A.    -- you put an emphasis on "I," so I
16    wanted to give you the advantage of explaining that
17    to you.
18              Q.    Let's go on.
19              A.    Sure.
20              Q.    So there are two bases, and that's
21    over 30 years' experience in the industry, and the
22    way you wrote the report, and "what is good and safe
23    practices in the Transportation Industry."  So here
24    is my next question --
25              A.    Before you go there, sir --
```

1          Q.   Sir --

2          A.   -- it says, "I wrote the report,"

3    instead of "we, collectively, as a practice wrote

4    the report."  So I just wanted to clarify that.

5          Q.   Well, Mr. Turner, Mr. Liebe isn't in

6    the deposition room, is he?

7          A.   No.  I understand that.  And I --

8    absolutely.

9          Q.   Okay.

10         A.   He has signed off on the report, as I

11   have, and that's been my -- that's been my basis

12   from the beginning, and it's just -- it's a fact we

13   signed off on it.  And that's why I corrected myself

14   on my report on 7.0, the first paragraph and the

15   second paragraph, where I use the term "I" and the

16   "30 years."  In hindsight, I would have also added

17   Mr. Liebe's X years' experience on there, and put

18   "we," as opposed to "I."  That was my purpose of

19   bringing it up, because you emphasized the word "I,"

20   and I wanted to clarify it, that all.

21         Q.   Mr. Turner, would law enforcement

22   experience upon the streets and roadways constitute

23   experience in the commercial motor vehicle industry?

24         A.   I'm sorry.  Can you say that again,

25   please?

1          Q.    Sure.   Would law enforcement

2    experience upon the streets and roadways of this

3    country --

4          A.    Yes, sir.

5          Q.    -- the United States of America,

6    constitute experience in the commercial motor

7    vehicle industry?

8                MR. FRITER:   Objection to form.

9                You can answer.

10         A.    No, but the truck -- the truck

11   enforcement from the state of Iowa certainly does,

12   and that's what I'm basing it on, not 30 years of

13   pulling cars over.

14         Q.    That's not my question, sir.   Would

15   law enforcement experience upon the streets and

16   roadways also constitute experience in the

17   commercial motor vehicle industry?

18               MR. FRITER:   Same objection.

19         A.    If --

20         Q.    You may answer, Mr. Turner.

21         A.    If it is in terms of commercial motor

22   vehicle enforcement and inspection, yes.   If it's

23   just pulling cars over, no.

24         Q.    Okay.   Does a person have to be a

25   trucker to have experience in the commercial motor

1    vehicle industry?

2              A.    No, of course not.

3              Q.    All right.  Could a career law

4    enforcement officer have experience in the

5    commercial motor vehicle industry, by virtue of his

6    or her duties?

7                    MR. FRITER:  Objection to form.

8                    You can answer.

9              A.    Sure.  If he's Level 1 trained and/or

10   other training, as Mr. Liebe clearly has and, of

11   course, I do, yeah.

12             Q.    Could a roadside service technician

13   be considered as having experience in the commercial

14   motor vehicle transportation industry?

15                   MR. FRITER:  Objection.  Form.

16                   You can answer.

17             Q.    You may answer, Mr. Turner.

18             A.    I would say that he would have

19   experience in servicing commercial motor vehicles.

20   He's not an expert in the commercial motor vehicle

21   industry, if that's what you are eluding to.

22             Q.    Now, at the bottom of the seven

23   opinions, you put in a "Note," which I will read

24   into the record, "The afore listed opinions are in

25   addition to the main body of the preceding report,

```
 1    of which are likewise to be considered additional to
 2    the undersigned's opinions."
 3              A.   Yes, sir.
 4              Q.   Now, fundamentally, don't these seven
 5    opinions encapsulate the other opinions reduced to
 6    their essence elsewhere in the report?
 7              A.   Sir, the reason I put that in there
 8    is these were our conclusionary basis opinions, the
 9    seven.  Okay?  We actually changed that 7.0 in a
10    report.  Now it says "Conclusionary Opinions."  So
11    if you look at that statement, to criticize it kind
12    of really didn't surprise me, because I want to make
13    sure that once you read these seven you say, "Well,
14    you didn't say anything about Ms. Yates saying that,
15    you know, he should be there any second.  So that's
16    not really one of your opinions then, Mr. Turner, is
17    it?"  That's why it says in here, the conclusion --
18    not conclusionary, but the opinions, and then it
19    gives that language that "the afore listed opinions
20    are in addition to the main body."  Because I don't
21    want you dismissing something in this report and
22    saying, "Well, you didn't list it here, Mr. Turner,
23    did you?"  But you are an attorney, sir, and I know
24    where you are going.
25              Q.   You think you know where I am going,
```

1    did I understand that?

2              A.    You did.

3              Q.    Okay.  Mr. Turner, would you agree

4    that within the documents you reviewed -- well,

5    first of all, answer again, you did not review all

6    of the documents listed in this report on pages 36

7    and 37, right?

8              A.    Well, I will first state, asked and

9    answered, but, you know, I would agree that I did

10   not personally review every single document listed.

11             Q.    All right.  Would you agree that,

12   within the documents you reviewed, the following

13   facts are revealed and not disputed by either

14   Mr. Evans or Mr. Aloisio --

15             A.    I will review anything.

16             Q.    I'm sorry?

17             A.    Repeat that again, please.

18             Q.    I still didn't understand you.

19             A.    Can you repeat that again?

20             Q.    Your transmission is distorted.

21             A.    Yeah, so is yours, and that's why I'm

22   asking if you could please repeat it.

23             Q.    Would you agree that within the

24   documents you reviewed, the following facts -- I

25   will give you a list; it's not a long list -- are

1    revealed and are not disputed by either Mr. Evans or

2    Mr. Aloisio -- all right? -- the first fact is --

3           A.    What --

4           Q.    The first fact is that the rig was

5    stationary when Mr. Evans arrived on scene; would

6    you agree with that fact?

7           A.    I would agree with that.

8           Q.    All right.  Would you agree that the

9    tractor motor was turned on when Mr. Evans arrived

10    on scene?

11           A.    So far as I recall, yes.

12           Q.    Would you agree that when Mr. Evans

13    arrived on scene he proceeded to crawl underneath

14    the trailer without first introducing himself or

15    discussing with Mr. Aloisio his planned approach to

16    diagnose and repair the trailer?

17           A.    Well, Mr. Evans, according to his

18    testimony, he waved, and apparent -- according to

19    him, Mr. Aloisio waved back to him, acknowledging

20    his presence.

21           Q.    That's not my question.

22           A.    Well, that's my answer.

23           Q.    We understand that that's in dispute.

24    But it is not in dispute that Mr. Evans did not --

25    that he did not walk up to the tractor cab,

1    introduce himself, or discuss with Mr. Aloisio his

2    planned approach to diagnose and repair the trailer;

3    that's the fact, correct?

4            A.   So far as I understand.  However, he

5    did wave.  And --

6            Q.   Thank you.

7            A.   -- that's the point, he did wave.

8            Q.   Now, No. 4, when Mr. Evans arrived on

9    scene --

10           A.   Hold on.

11           Q.   Mr. Turner, these questions have not

12   been asked.  That is in dispute, isn't it, sir?

13           A.   I'm sorry?

14           Q.   The wave is in dispute, isn't it?

15           A.   It's in dispute, yes, but I --

16           Q.   All right.  Well, Mr. Turner, I'm not

17   asking you about facts that are in dispute.

18   Mr. Turner, in this deposition I am asking you to

19   confirm the facts that are not in dispute.  And it

20   is not in dispute, is it, sir, that there was no

21   conversation, no verbal conversation between

22   Mr. Evans and Mr. Aloisio before Mr. Evans went

23   underneath the trailer?  That is an undisputed fact,

24   is it not, sir?

25           A.   I agree that there was no verbal --

1           Q.    Thank you.  Now, No. 4, when
2   Mr. Evans arrived on scene, he proceeded to crawl
3   underneath the trailer without first deploying wheel
4   chocks under any of the rig's eight axles.  That is
5   undisputed, correct?
6           A.    So far as I know, that is correct.
7           Q.    Thank you.  All right.  And --
8           A.    In the same manner that it is
9   disputed that Mr. Aloisio did not put out reflective
10  triangles.
11          Q.    I didn't ask you that question yet.
12          A.    That's my answer.
13          Q.    All right.  Now, within those four --
14  let's go back to your first opinion.  "It is the
15  undersigned's opinion that Aloisio failed to follow
16  the instructions within the FMCSR and State of Ohio
17  CDL Manual in terms of CMV inspections and unsafe
18  operations."  I read that correctly, right?
19          A.    I'm sorry.  Which one are you
20  reading?
21          Q.    Your opinion No. 1.
22          A.    Thank you.  That's correct.
23          Q.    Okay.  That's how the report, going
24  back to the "Assignment," mentions, itself, it was
25  to determine if acts or failures to act were

```
 1    causative in any manner whatsoever.

 2                    And, by the way, as an aside, Jordan

 3    and Mr. Turner -- and, Lisa, you are probably aware

 4    of this -- at noon on the first Wednesday of each

 5    month, the disaster sirens go off.  And so if you

 6    hear a siren in the background, that's the monthly

 7    test.

 8                    All right.  Now, so let's talk about

 9    the term "causative" under the "Assignment."  Define

10    "causative."  What does "causative" mean in your

11    report?

12            A.   Causation.

13            Q.   Well --

14            A.    Things that caused the accident.

15    Things that cause an accident, acts or omissions or

16    such that cause an accident.

17            Q.   So if we go back to the question

18    relating to your first opinion, how did Aloisio's

19    failure to follow instructions within the FMCSR and

20    the Ohio CDL Manual cause Mr. Evans to go underneath

21    the trailer without first introducing himself to

22    Aloisio and discussing his plan or without first

23    applying safety wheel chocks?

24                    MR. FRITER:  Object to the form.

25                    You can answer.
```

```
1              Q.    You can answer, Mr. Turner.

2              A.    No, no, no, no.  You are asking me

3       about Question No. 1 here.  Okay?  So let's be

4       sure --

5              Q.    Yeah.

6              A.    No.  Sir, let's make sure we get a

7       full answer here on Question No. 1.  You are asking

8       me about Question No. 1, and you are convoluting

9       that question by saying, "How is that causative by

10      Mr. Evans not identifying himself before he went

11      under the truck trailer?"  That's got nothing to do

12      with Question No. 1.  Question No. 1 is, "It is the

13      undersigned's opinion that Aloisio failed to follow

14      the instructions within the FMCSR and State of Ohio

15      CDL Manual in terms of CMV inspections and unsafe

16      operations."

17                   So if you go to 390.3 of the --

18      (e)(1) and (e)(2) of the FMCSR, it very clearly

19      states in there that a commercial motor vehicle

20      driver shall be so instructed by its motor carrier

21      employer.  The motor carrier employer duty is No. 1.

22      The driver's duty is No. 2.  Mr. Aloisio is one and

23      the same with Marlex, right?  So you're questioning

24      me on No. 1 here.  So you look at 390.3 -- 390.3,

25      paragraph (e)(1) and (2), especially number No. 2 --
```

```
 1    small double I -- Mr. Aloisio even acknowledged in

 2    his deposition that he was not trained.  He has not

 3    received any training whatsoever.

 4              Q.   How did that cause Mr. Evans to go

 5    under the trailer without talking to him first or

 6    deploying safety wheel chocks in front of any of the

 7    axles?

 8              A.   That has nothing to do with opinion

 9    No. 1, and that's what you are asking the question

10    about, opinion No. 1.

11              Q.   Well --

12              A.   He pre-trip -- sir, he pre-trip

13    inspected his commercial motor vehicle, heard the

14    air leak, which is a violation under the FMCSR, and,

15    as it returns out, he had three air leak

16    violations -- all right? -- one of which was a

17    chaffing issue that your expert heard.  He turns

18    around and says that nobody knows how long that was

19    in there.  Let me tell you something.  Chaffing of

20    air lines happens over time and it wears through the

21    steel belt.  It doesn't happen in a matter of

22    minutes or hours; it happens over weeks to months.

23              Q.   So the answer is -- so the answer to

24    my question, fundamentally, is there is nothing in

25    opinion No. 1 that you can point to that shows how
```

1    that caused Mr. Evans to go under the trailer

2    without talking to Aloisio or first deploying wheel

3    chock, correct?

4            A.    They are mutually exclusive of each

5    other.

6            Q.    Thank you.   Exactly.   Thank you, sir.

7    I appreciate that.

8                  Now, No. 2, "It is the undersigned's

9    opinion that Aloisio failed to GOAL" -- G-O-A-L --

10   "'Get Out and Look.'"  You continued on, "Had

11   Aloisio implemented this method, the subject

12   incident would not have occurred."

13                 How did Aloisio's failure to get out

14   and look, in your opinion, cause Mr. Evans to get

15   under the trailer without first talking to Aloisio

16   or deploying safety wheel chocks?

17           A.    Again --

18                 MR. FRITER:   Objection to form.

19                 You can answer.

20           Q.    You may answer.

21           A.    They are mutually exclusive of one

22   another --

23           Q.    Thank you.

24           A.    -- and you understand -- no --

25           Q.    Thank you.   If they are exclusive,

1      they are exclusive.

2                    MR. FRITER:  Objection.  He is still

3              answering the question.  I would ask you

4              to let him finish.

5           A.    You asked me about No. 2, so I have

6      the right to give you a full answer.  Okay?  And

7      convoluting the two issues that are mutually

8      exclusive doesn't count.  All right?

9                    That issue of Evans going underneath

10     the trailer, you can ask me exclusively of that, but

11     don't combine the two together to make one question,

12     because it's not fair to do that.  Let's address the

13     question that you asked about No. 2.

14                    "It is the undersigned's opinion that

15     Aloisio failed to get out and look," which is an

16     industry standard, quote, get out and look.  "Had

17     Aloisio implemented this method, the subject

18     incident would not have occurred."  So, in other

19     words, he knew, according to Mr. Evans' testimony,

20     when he called and -- not Mr. Evans.  I'm sorry.

21     Ms. Yates.  Ms. Yates said that, "He will be there

22     any second.  If he's not there already, he'll be

23     there any second."  I can find the testimony, if you

24     want.  I have it.  All right?

25                    So he said, "He's going to be there.

1    If he's not there already, he's going to be there

2    any second." So that right there puts him on notice

3    that Mr. Evans is right in the area. So he had a

4    duty, at that point -- because he couldn't see

5    beyond the back, in that blind area of his

6    commercial motor vehicle, he had a duty to get out

7    and look, and he didn't do that. That's the point.

8         Q.   Well, all right.

9         A.   That's Question No. 2.

10        Q.   Did you read -- just answer me this.

11   Did you read Ms. Yates' deposition?

12        A.   I believe I did, yes. I believe so.

13        Q.   All right. And you read all of the

14   exhibits, right?

15        A.   Sir, I saw -- like I said, I saw all

16   of the exhibits, so far as I know.

17        Q.   Okay. Let me see if I can cut to the

18   chase on this, because it will probably save you and

19   me a fair amount of time. On all of your seven

20   opinions, do you consider these opinions mutually

21   exclusive from the undisputed facts as far as

22   causing Mr. Evans to get under the trailer without

23   first talking to Aloisio or deploying safety wheel

24   chocks?

25        A.   I -- quite frankly -- I mean, if it

```
 1   were me, would I have gone over there and knocked on

 2   his door?  Sure.  Sure.  I'll concede on that.  And

 3   that's the point.  You can't convolute my opinions

 4   with that opinion, because they are mutually

 5   exclusive of one another.

 6            Q.   Okay.

 7            A.   Would I have gone over and knocked on

 8   the door?  Yes, I would have.  All right?  But

 9   according to testimony, Mr. Evans waved, and he got

10   a wave back, so, he, in his mind, had -- if the jury

11   or the trier of the facts were to believe that, then

12   he has the right to believe that Mr. Aloisio saw

13   him, and then he climbed underneath the trailer and

14   then the truck started moving forward.

15                 By the way, he should have never ever

16   moved that truck, knowing that he had air leaks of

17   audible -- audible air leaks, and he was only put

18   out of service when he got just miles up the road.

19   "Out of service" is a condition so dangerous that

20   the commercial motor vehicle has to be taken off the

21   road by law enforcement.  So he should have never

22   moved that, in addition to the out-of-service

23   condition that was not factually rectified at that

24   point in time, where he had a smoking of the brake.

25   That's an out-of-service charge, as well.
```

1          Q.   Thank you.

2          A.   You're welcome.

3          Q.   All right.  Now -- all right.  So

4    opinions 1 through 7 are mutually exclusive as a

5    causative factor with regard to Mr. Evans crawling

6    underneath the trailer without talking to Aloisio or

7    deploying safety wheel chocks; do I understand your

8    testimony on that clearly?

9          A.   Yes, sir.  Thank you.

10         Q.   Thank you.  Thank you.  Now, let's

11   look at page 7 of your report.  In your reference do

12   you see --

13         A.   Hold on.  Hold on.

14         Q.   Sure.

15         A.   Okay.  Go ahead.

16         Q.   Page 7.

17         A.   Yes, sir.

18         Q.   And it's a diagram, right?

19         A.   Yes, sir.

20         Q.   Okay.  Now, below that is a

21   paragraph, and you reference a Trooper Nordyke,

22   correct?

23         A.   Yes, sir.

24         Q.   All right.  Did you ever talk with

25   Trooper Nordyke?

```
1               A.   No, sir.
2               Q.   All right.  So you don't know why he
3    did not mention in his written opinion about Aloisio
4    not moving the commercial motor vehicle, knowing
5    full well that the air leak was not repaired?  You
6    don't know why Trooper Nordyke didn't put that in
7    his report, do you?
8               A.   Well, let's look at Mr. Nordyke, in
9    answer to your question.  Mr. Nordyke --
10              Q.   Thank you.
11              A.   Sir, I am answering your question.
12   Hold on.
13              Q.   Yeah.
14              A.   Mr. Nordyke is a -- or Trooper
15   Nordyke -- Trooper Nordyke is an Iowa state trooper
16   employed by the Iowa Department of Public Safety,
17   Iowa State Patrol, and technical investigator in the
18   subject incident.  Nowhere did I see in his
19   testimony or anyplace else that he was a truck guy.
20   When I say "truck guy," meaning a Level 1 FMCSA guy.
21              So what my point is, if you are
22   not -- let me go back to this enforcement issue.  If
23   you are not a Level 1 FMCSA roadside inspection, you
24   cannot write a brake violation on a commercial motor
25   vehicle, if you are a -- I dare to use the word a
```

1    "common trooper."  But a common, everyday road

2    trooper, you are not permitted to write violations

3    on commercial motor vehicles.  And, quite frankly,

4    you don't even know what to do if you hear an air

5    leak in a commercial motor vehicle.  It's not your

6    job.

7                Q.  All right.  Mr. Turner, do you

8    believe that in any collision or allision or

9    incident investigation where a violation of a FMCSR

10   is discovered, the violation is necessarily a

11   proximate cause of the collision, allision, or

12   incident?

13               A.  Are you reading from my report?

14               Q.  No.  That's my question.

15               A.  I was looking for where you were

16   reading from.  Can you repeat that, then, please.

17               Q.  Sure.  Do you believe that in any

18   collision, e-lesion, or incident investigation where

19   a violation of the FMCSR is discovered, the

20   violation is necessarily a proximate cause of a

21   collision, e-lesion, or incident?

22               A.  Not necessarily.  I mean, you could

23   have -- for example, Aloisio could have had --

24   Marlex could have had a lane failure, a stoplight

25   failure, could have had -- well, that wouldn't be a

```
 1    good example.  They could have had failure to apply

 2    retroreflective sheeting on the side of the semi

 3    trailer.  So if they failed to do that, that's got

 4    nothing to do with this, but it's a violation under

 5    part 393.  But is it a causative violation to

 6    determine that you were questioning before

 7    causative?  Is it a causative issue?  No.  But

 8    brakes, in this matter, are all about causation.

 9            Q.   Now, I know your assignment was

10    limited to Marlex's acts or failures to act --

11            A.   And Aloisio.

12            Q.   -- but based upon your 30 -- I'm

13    sorry?

14            A.   And Aloisio.

15            Q.   Yeah.  Well, Aloisio/Marlex, right.

16            All right.  Based upon your 30 years'

17    experience in the commercial motor vehicle

18    transportation industry, and based upon what are

19    good and safe practices in the transportation

20    industry, do you have an opinion as to who, between

21    Mr. Evans and Mr. Aloisio, was in a better position

22    to assess and guard the safety of Mr. Evans,

23    Mr. Aloisio before he tested his brakes or Mr. Evans

24    before he crawled underneath the truck without

25    speaking to Aloisio or deploying his chocks?
```

```
 1              A.   I would say --
 2                   MR. FRITER:  Objection.
 3                   You can answer.
 4              Q.   Do you have an opinion?
 5              A.   It's a compound question.  It's just
 6      very difficult to follow.  So I'm going to answer
 7      the best I can --
 8              Q.   Well, Mr. Turner, I'll restate it.
 9      I'll restate it and give you a chance to answer it
10      here.
11                   You know, based upon your 30 years'
12      experience, and based upon what are good and safe
13      practices in the transportation industry, do you
14      have an opinion as to who, between Mr. Evans and
15      Mr. Aloisio, was in a better position to assess and
16      guard the safety of Mr. Evans.  Was it Mr. Aloisio
17      before he tested his brakes or Mr. Evans before he
18      crawled underneath the trailer without speaking to
19      Aloisio or deploying safety chocks?
20                   MR. FRITER:  Objection.
21                   You can answer.
22              A.   You are saying "test the brakes."
23      Mr. Aloisio tested the brakes.  That's where I am
24      not -- I am hesitating answering your questions.
25              Q.   Well --
```

1          A.    Are you --

2          Q.    -- before moving the truck.

3          A.    Are you talking about --

4          Q.    Before he moved the truck.

5          A.    Are you talking about when he failed

6  to inspect his brakes adequately in the morning at

7  his pre-trip inspection and decided to drive anyway,

8  or are you talking about road side?

9          Q.    Road side, sir.  Road side.

10         A.    Okay.  So now that I understand the

11  context, please repeat the question.

12         Q.    Okay.  Well, let's go back to those

13  questions -- or those facts that we agreed, I think,

14  are not in dispute.  The rig was stationary when

15  Mr. Evans arrived on scene, correct?

16         A.    So far as I know.

17         Q.    That fact is not in dispute, is it,

18  sir?

19         A.    So far as I know, that's correct.

20         Q.    The tractor's motor was turned on

21  when Mr. Evans arrived on scene; not in dispute,

22  correct?

23         A.    According to Mr. Aloisio, that's

24  correct.

25         Q.    When Mr. Evans arrived on scene, he

1    proceeded to crawl underneath the trailer without

2    first introducing himself or discussing with Aloisio

3    his approach to diagnose or repair the trailer; not

4    in dispute, is it?

5            A.   After not introducing himself

6    verbally, I would agree with that --

7            Q.   Thank you.

8            A.   -- but according to Mr. Evans'

9    testimony, he introduced himself by waving, saying,

10   "Hello, I'm here," and then climbing underneath --

11           Q.   Mr. Turner, I'm talking about facts

12   not in dispute.  Would you agree that that is a fact

13   in dispute, sir?

14           A.   It is a fact of this issue, because

15   it's an overarching issue.

16           Q.   The fact is in dispute as to whether

17   or not there was a wave, correct?

18           A.   Sure.  There's also a fact --

19           Q.   Okay.

20           A.   -- that --

21           Q.   I am talking about facts that are not

22   in dispute.

23           A.   Okay.

24           Q.   I will come back -- and, by the way,

25   Mr. Turner, I will come back and ask you some

1    questions about that wave, but that's a third fact

2    that is not in dispute.  It is not in dispute that

3    Mr. Evans did not walk up to the tractor and talk to

4    Mr. Aloisio to introduce himself and to inform him

5    of his plan to diagnose and repair the trailer; not

6    in dispute, is it, sir?

7              A.   Putting the question that way, I

8    would agree.

9              Q.   Thank you.  When Mr. Evans arrived on

10   scene, he also proceeded to crawl underneath the

11   trailer without first deploying the wheel chocks

12   under any of the brakes' eight axles; not in

13   dispute, is it, sir?

14             A.   In the same manner that triangles are

15   put out by professional commercial motor vehicle

16   drivers.

17             Q.   I'm sorry.  Could you repeat that

18   answer?

19             A.   In the same manner that Aloisio, the

20   professional commercial motor vehicle driver, did

21   not deploy safety reflective triangles at 10, 10,

22   and 100 feet.  So in the same manner --

23             Q.   You think that was a causative factor

24   in this incident?

25             A.   I think it could be a contributing

```
 1    factor in terms of if Mr. Aloisio had put those --
 2            Q.   Well --
 3            A.   Hold on a second.  All right?  If
 4    Mr. Aloisio had put those triangles out, he would
 5    have had to collect those triangles up before
 6    leaving.  He would have walked back and picked them
 7    up, and he would have seen Mr. Evans.  But he didn't
 8    do that, because there were no triangles to be
 9    collected up.  And he had a duty, under the FMCSR at
10    392.22, to make sure that those triangles were
11    placed, and he didn't do that.  So you are talking
12    about duty.  I am just giving you a duty of the
13    driver, who is the professional commercial motor
14    vehicle driver --
15            Q.   Do you believe Mr. Aloisio, when he
16    moved the tractor-trailer, was intending to leave
17    the scene?
18            A.   -- a driver that has a regulatory
19    duty under the Federal Motor Carrier Safety
20    Regulations.
21                 But your question was, sir, please?
22            Q.   Do you believe -- well, you said if
23    he had deployed the triangles he would have had to
24    go back and pick them up before leaving the scene,
25    correct?
```

1             A.    Sure.   I mean, I have never seen a

2    truck driver leave triangles behind.   They are

3    expensive.

4             Q.    You believe that Mr. Aloisio, when he

5    moved the truck, was intending to leave the scene?

6             A.    He was planning on driving all of the

7    way up to a half-hour past sunset.   And he already

8    said that the brake was not substantial enough to

9    cause a drain on the air tanks.

10            Q.    Well --

11            A.    That's in dispute, too, by the way.

12            Q.    Okay.   So let's go back to my

13   question.

14            A.    Sure.

15            Q.    Based upon those facts that are not

16   in dispute, when the truck is stationary on the

17   shoulder, milepost 16, Interstate 29, state of Iowa,

18   do you have an opinion as to who, between Mr. Evans

19   and Mr. Aloisio, was in a better position to assess

20   and guard the safety of Mr. Evans; was it

21   Mr. Aloisio when he went to move the truck, or was

22   it Mr. Evans before he crawled underneath without

23   talking to Aloisio or deploying his safety chocks?

24            A.    Well --

25            MR. FRITER:   Objection to form.

1           You can answer.

2           A.   Well, the secretary -- the former

3    NTSB secretary, Hersman, when she says the

4    commercial motor vehicle -- professional commercial

5    motor vehicle driver has a duty --

6           (Zoom dropped and reporter asked for the

7       answer to be repeated.)

8           A.   -- I'm sorry, Lisa -- has a higher

9    duty to the motoring public than that of a car

10   driver, essentially, is what it is.  All right?  So

11   had Mr. Aloisio followed the State of Ohio CDL

12   manual, the Federal Motor Carrier Safety Regulations

13   and defensive driving techniques under, per se, the

14   Smith system, and he had gotten out and looked --

15   G-O-A-L -- had he gotten out and looked, he would

16   have seen the truck of Mr. Evans and not moved.  He

17   had that duty.  So he had the first duty to make

18   sure that, before he moved that truck, not knowing

19   after just speaking with -- with -- if I remember

20   her name --

21           Q.   Yates?

22           A.   -- Ms. Yates, who said, "He should be

23   there.  If he's not there, he will be there any

24   second."  He had a duty to stay right there.  You

25   know what?  He could be behind that wide load piece

```
 1    of equipment.  I think it was 11 feet wide and 11
 2    and a half feet high.  He had a duty to get out and
 3    make sure that nobody was there.  He did not do
 4    that.  And had he, under 392.22, placed his
 5    reflective triangles, being concerned about, rather
 6    than an indifferent attitude toward the motoring
 7    public -- and he was right on the shoulder there --
 8    right? -- on the emergency breakdown lane, had he
 9    placed his reflective triangles, he would have had
10    to have collected them up before he moved his
11    commercial motor vehicle.  He didn't do that.  He
12    intended to continue moving forward, because, as he
13    said, the problem was resolved.  It was resolved by
14    his method of supposedly putting antifreeze into an
15    air line, which is not going to stop an air leak.
16              Q.   Why don't you turn to page 21,
17    Mr. Turner, 21 and 22?
18              A.   Sure.  Okay.
19              Q.   And at the very bottom -- I'm going
20    to read the last paragraph on 21 and the first
21    paragraph on 22, and then I'll ask my question.  The
22    paragraph reads -- or two paragraphs read, "Aloisio
23    made a conscious decision to put the safety of
24    himself and the motoring public at risk by
25    dangerously and irresponsibly leaving, knowing full
```

```
 1    well that he had a violation somewhere on the

 2    trailer causing an air leak/hissing sound.

 3                    "Aloisio chose profit over safety and

 4    compliance.  Conceptual metaphors and/or aphorisms

 5    described Aloisio's poor decisions; 'Time is money';

 6    and 'If your wheels ain't turning you ain't

 7    earning.'" Did you write those two paragraphs?

 8              A.   Yeah, I -- I don't -- let me think

 9    back.

10              Q.   Well, if you don't remember --

11              A.   I believe -- well, let me put it this

12    way.  It's -- it's -- at least I have a moment -- I

13    don't know if I specifically wrote all of those

14    exact words.

15              Q.   The answer to my question is, you

16    don't know whether you wrote it or not?

17              A.   I mean, I certainly contributed to

18    it.

19              Q.   Okay.

20              A.   I don't know if I specifically wrote

21    every single word.  We're going back to earlier in

22    the deposition.  Did I write everything?  No.  Did

23    Aron write everything?  No.  Did we collectively

24    write and did I ultimately finally approve

25    everything on this?  Yes.
```

```
 1                    Matter of fact, I would say that,
 2      because the term -- the term of -- bear with me one
 3      second.
 4                    "Profit over safety" is one of my --
 5      you can go back ten years, eleven years, and see I
 6      use that phraseology many, many, many times over my
 7      career.  So, yeah, in all probability, I probably
 8      did write it.  It sounds like something I would say.
 9               Q.   All right.  Turn to page 34,
10      Mr. Turner, please.  Go down to paragraph 1, and
11      then you have the FMCSR citation; and then paragraph
12      two, "It is clear"; paragraph three, "It was
13      further"; paragraph four, "Aloisio knew of"; and go
14      to the paragraph where it starts, "Accordingly."
15               A.   I completely lost volume.
16                    MR. FRITER:  I think he lost
17               connection.
18               A.   Hold on one second.  I'm going to
19      have to --
20               Q.   Oh, all right.
21               A.   Okay.  Can you hear me?  Hello?
22               Q.   I can hear you.  Can you hear me?
23               A.   I can hear you now, yes, sir.
24               Q.   All right.  Now, where did you lose
25      me?  Page 34.
```

```
 1              A.   Okay.  No, I am not even on page 34.
 2   Bear with me a second.  Okay.
 3              Q.   All right.  Let's start at the bottom
 4   of the page.  Do you see where it says, "6.9"?
 5              A.   Yes, sir.
 6              Q.   All right.  Now, go up to the
 7   paragraph that starts, "Accordingly."
 8              A.   Okay.
 9              Q.   All right.  And reading the
10   paragraph, it says, "Accordingly, considering the
11   following definition by North American
12   Transportation Management Institute (NATMI) as to
13   preventability, the incident would be adjudicated as
14   preventable based on the failure of Aloisio as he
15   consciously decided to take the CMV onto the public
16   roadways."  Did I read that accurately?
17              A.   You did.
18              Q.   And did you write that paragraph?
19              A.   Yes, I did, because I'm -- my data
20   would say absolutely, because I'm a NATMI trained --
21   I am NATMI trained; whereas, Aron is not.
22              Q.   All right.
23              A.   See, there are going to be certain
24   cues in the report where I know that I wrote it
25   based on stylistic of writing or maybe something
```

```
 1    where I re-address something that Aron wrote.  But I

 2    know something like that, for example, that I

 3    certainly would have written it.

 4              MR. RIKER:  All right.  Let's see

 5              where we are.  What I have down, Jordan,

 6              is that you are going to -- well,

 7              Mr. Turner is going to provide you the

 8              invoice to prepare the report.  And,

 9              Jordan, you are going to forward that to

10              Lisa, and that will be marked as

11              Exhibit F.  Did I get that recorded

12              correctly?

13              MR. FRITER:  You did.  I will just

14              need Lisa's e-mail address.

15              MR. RIKER:  Okay.  And, then,

16              Mr. Turner, you are going to provide the

17              1099 for Mr. Liebe and send it to Jordan,

18              who will then send it to me; is that

19              correct?

20              THE WITNESS:  At Mr. Friter's

21              request, yes.

22              MR. RIKER:  All right.  And, Jordan,

23              I would like to mark that as Exhibit G.

24              MR. FRITER:  That's -- his 1099?

25              Tim, you want to mark the 1099 as
```

```
 1      Exhibit G?

 2            MR. RIKER:  Yes.  Yes.  Correct.

 3            MR. FRITER:  Okay.

 4                          (Deposition Exhibit G
                             was referenced.)
 5

 6            MR. RIKER:  Well, Mr. Turner, thank

 7      you very much for your appearing here

 8      today, and I am sure we will see more of

 9      each other soon, again.

10            THE WITNESS:  Yes, sir.  Thank you

11      very much.  Have a nice day.

12            MR. FRITER:  Thank you, Scott.  I

13      appreciate it.

14                          (Deposition Exhibits A
                             through G were marked
15                           for identification.)

16

17

18                  - - -

19      (Deposition concluded at 12:27 p.m.)

20                  - - -

21

22

23

24

25
```

```
 1

 2                 IN THE UNITED STATES DISTRICT COURT

 3                FOR THE SOUTHERN DISTRICT OF OHIO

 4                 WESTERN DIVISION AT CINCINNATI

 5      - - - - - - - - - - - - -
        JEFFREY EVANS, et al.,      :
 6                                  :
                    Plaintiffs,     :
 7      vs.                         :  Case No. 1:19-cv-331
                                    :  (Judge Cole)
 8      FRANCIS ALOISIO, et al.,    :
                                    :
 9                  Defendants.     :
        - - - - - - - - - - - - -

10

11

12

13          I, Scott L. Turner, state that I have reviewed the
        transcript of the testimony given by me at my deposition
14      on August 4, 2021, and that I wish to have the
        corrections contained on my errata sheet appended to
15      said transcript.

16

17

18

19                              _____
                                      SCOTT L. TURNER
20

21

22

23

24

25
```

```
 1               C E R T I F I C A T E

 2    STATE    OF    OHIO  :
                           :SS
 3    COUNTY OF HAMILTON   :

 4        I,  Lisa L. Weisenberger, a duly qualified

 5    and commissioned notary public in and for the State

 6    of Ohio, do hereby certify that prior to the giving

 7    of his deposition, the within named SCOTT L. TURNER

 8    was by me first duly sworn to testify the truth, the

 9    whole truth and nothing but the truth; that the

10    foregoing pages constitute a true and correct

11    transcript of testimony given at said time and place

12    by said deponent; that said deposition was taken by

13    me in stenotypy and transcribed under my

14    supervision; that I am neither a relative of nor

15    attorney for any of the parties to this litigation,

16    nor relative of nor employee of any of their

17    counsel, and have no interest whatsoever in the

18    result of this litigation.  I further certify that I

19    am not, nor is the court reporting firm with which I

20    am affiliated, under a contract as defined in Civil

21    Rule 28(D).

22        IN WITNESS WHEREOF, I hereunto set my hand and
      official seal of office, at Cincinnati, Ohio, this
23    16th day of August, 2021.

24                              S/LISA L. WEISENBERGER, RPR
      MY COMMISSION EXPIRES:    S/LISA L. WEISENBERGER, RPR
25    August 30, 2023           NOTARY PUBLIC, STATE OF OHIO
```

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT CINCINNATI

| | |
|---|---|
| JEFFREY EVANS, et al., | Case No. 1:19-cv-331 |
| Plaintiffs, | Judge Cole |
| v. | |
| FRANCIS ALOISIO, et al., | |
| Defendants. | |

## NOTICE TO TAKE DEPOSITION OF SCOTT L. TURNER

**To: Scott L. Turner**
**c/o Jordan S. Friter, Esq.**
**Law office of Robert A. Stutman, P.C.**
**500 Office Center Drive, Suite 301**
**Fort Washington, PA 19034**

Please take notice that on Wednesday, **August 4, 2021, at 10:00 a.m. EDT**, the deposition of Scott L. Turner will be taken upon oral examination by ZOOM pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure before a Notary Public or some other officer authorized by law to administer oaths. The Deposition shall be taken for the purposes of discovery, the preservation of evidence, or use at trial and shall continue from day to day until completed.

Respectfully submitted,

J. Timothy Riker (0011500)
Attorneys for Aloisio and Marlex
J.T. RIKER CO., L.P.A.
The Cincinnati Club Building
30 Garfield Place, Suite 920
Cincinnati, Ohio 45202
(513) 621-2888
(513) 345-4449 – fax
jtriker@jtrikerlaw.com

LAW OFFICES OF
I. RIKER CO., L.P.A.
30 GARFIELD PLACE
SUITE 920
CINCINNATI, OHIO 45202
513.621.2888
513.345.4449 (FAX)

**EXHIBIT**
A Turner

1

## PROOF OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing *Notice to Take Deposition of Scott L. Turner* was served upon all counsel identified below by electronic mail only, this 28th day of July, 2021.

J. Timothy Riker (0011500)

Jordan S. Friter, Esq.
John M. Popilock, Esq.
Law Offices of Robert A. Stutman, P.C.
500 Office Center Drive, Suite 301
Fort Washington, Pennsylvania 19034
friterj@stutmanlaw.com
popilockj@stutmanlaw.com

Patrick J. O'Malley, Esq.
Keis George LLP
55 Public Square, Suite 800
Cleveland, Ohio 44113
pomalley@keisgeorge.com

LAW OFFICES OF
J. RIKER CO., L.P.A.
30 GARFIELD PLACE
SUITE 920
CINCINNATI, OHIO 45202
513.621.2888
513.345.4449 (FAX)

2



# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106
844-974-1870

# Expert Report of Scott L. Turner

### January 22, 2021

### United States District Court for the Southern District of Ohio

### Docket Number: 1:19-cv-331

### Jeffrey and Amanda Evans
**Plaintiff**

v

### Francis Aloisio and Marlex Express, Inc.
**Defendant**



*"The Finest in Transportation Consulting to the Legal Community"*



## Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106
844-974-1870

**Date:** January 22, 2021

**Report by** Scott L. Turner, Chief Consultant
Aron Liebe, Senior Consultant

**Prepared for:** Jordan Friter, Esq.
Stutman Law Firm
500 Office Center Drive, Suite 301
Fort Washington, PA 19034

**Case Caption:** Jeffrey and Amanda Evans **v.** Francis Aloisio and Marlex Express, Inc.

**Jurisdiction:** United States District Court for the Southern District of Ohio

**Cause/Case/Docket Number:** 1:19-cv-331

**General Information:**

**Date & Time of Crash/Loss:** March 7, 2018 / Approximately 09:46AM

**Location of Crash/Loss:** Interstate 29 Northbound at MM 16, Freemont County, Iowa

**Equipment Involved: Pltf:** None (Pedestrian)

     **Def:** 2009 Peterbilt (VIN #1XPWD4EX99D788437)
     2004 American Trailer (VIN #1A9AF502941572383)

**Motor Carrier USDOT Number(s):** #644159

**Motor Carrier Status:** Authorized for Property

**Safety Rating:** Satisfactory as of 3/14/2001

**Weather Conditions:** Clear

**Road Surface Conditions:** Dry

**Posted Speed Limit:** 70 MPH

**Natural Lighting Conditions:** Hours of Daylight

**Artificial Lighting Conditions:** N/A

**Disclosure:** It should be noted for purposes of full disclosure that the undersigned Senior Consultant is providing a clear and unbiased opinion. The Senior Consultant was formerly employed and retired from the law enforcement entity that was involved in the inspection of the subject CMV; the Iowa Department of Transportation, Office of Motor Vehicle Enforcement. The undersigned Senior Consultant does know of the two IDOT MVE Officers but does not know them personally and did not work with them professionally.

### 1.0 Persons and Organizations-

➢ Marlex Express, Inc. (hereinafter "Marlex"; "Aloisio"): Marlex is the Motor Carrier of FMCSA record in the subject incident. Marlex is incorporated, however; was founded, owned, and operated by Francis Mark Aloisio. This operation is commonly referred to as Owner/Operator.

➢ Sapp Bros., Inc. (hereinafter "Sapp Bros."): Sapp Bros. is the Mobile Service Center employer of Jeffrey Evans. Sapp Bros. is domiciled at 2496 210th Avenue, Percival, Iowa.

➢ Francis Mark Aloisio (hereinafter "Aloisio"): Aloisio is a professional CMV driver who has an Ohio CDL-A, and on the date of the subject incident was employed in the *Safety Sensitive Function* as a professional CMV driver by Marlex.

➢ Jeffrey Evans (hereinafter "Evans"): Evans is a diesel mechanic from Sapp Bros. in Percival, Iowa who turned pedestrian when he arrived at the subject incident location to work on an air leak on the Marlex CMV.

➢ Delmar Shaw (hereinafter "Shaw"): Shaw is the assistant manager for Sapp Bros. in Percival, Iowa.

➢ Joshua Fritz (hereinafter "Fritz"): Fritz is the assistant general service manager for Sapp Bros. in Percival, Iowa.

➢ Frank Adkins Jr. (hereinafter "Adkins"): Adkins is the maintenance supervisor for Sapp Bros. in Percival, Iowa.

➢ Alysia Marie Yates (hereinafter "Yates"): Yates is the service writer for Sapp Bros. in Percival, Iowa.

> Mike Driskell (hereinafter "Driskell"): Driskell is the manager in training for Sapp Bros. in Percival, Iowa.

> Zac Denton (hereinafter "Denton"): Denton is the general manager for Sapp Bros., in Percival, Iowa.

> Officer Matthew Shannon (hereinafter "Officer Shannon"): Officer Shannon is a Hazardous Materials Specialist, Motor Vehicle Enforcement Officer, employed by the Iowa Department of Transportation, Office of Motor Vehicle Enforcement.

> Sergeant Dereck Floerchinger (hereinafter "Sergeant Floerchinger"): Sergeant Floerchinger is a Motor Vehicle Enforcement Officer, employed by the Iowa Department of Transportation, Office of Motor Vehicle Enforcement.

> Trooper Aaron Nordyke (hereinafter "Trooper Nordyke"): Trooper Nordyke is an Iowa State Trooper, employed by the Iowa Department of Public Safety, Iowa State Patrol and is the Technical Investigator in the subject incident.

> Sergeant Blair Paulsen (hereinafter "Sergeant Paulsen"): Sergeant Paulsen is an Iowa State Trooper, employed by the Iowa Department of Public Safety, Iowa State Patrol.

> Trooper Kevin Leffler (hereinafter "Trooper Leffler"): Trooper Leffler is an Iowa State Trooper, employed by the Iowa Department of Public Safety, Iowa State Patrol.

> Trooper Dillon Malone (hereinafter "Trooper Malone"): Trooper Malone is an Iowa State Trooper, employed by the Iowa Department of Public Safety, Iowa State Patrol.

## 2.0 Abbreviations and Acronyms-

> USDOT – United States Department of Transportation
> 49 CFR – USDOT, Code of Federal Regulations
> FMCSA – Federal Motor Carrier Safety Administration
> FMCSR – Federal Motor Carrier Safety Regulations
> MCSAP – Motor Carrier Safety Assistance Program
> IDOT MVE – Iowa Department of Transportation Motor Vehicle Enforcement
> NASI – North American Standard Inspection
> NASV OOSC – North American Standard Vehicle, Out of Service Criteria
> NHTSA – National Highway Traffic Safety Administration
> ATRI- American Transportation Research Institute
> CMV – Commercial Motor Vehicle (by FMCSR definition)
> OOS – Out of Service (FMCSA)

3

> ➤ CDL – Commercial Driver's License
> ➤ MM – Mile Marker
> ➤ IDPS – Iowa Department of Public Safety
> ➤ ISP – Iowa State Patrol
> ➤ IDOT – Iowa Department of Transportation
> ➤ MVE – Motor Vehicle Enforcement
> ➤ FABC – Fine Aggregate Bituminous Concrete

**3.0 General Description-**

The subject incident occurred after the CMV combination with an oversize load operated by CMV driver Aloisio stopped on the east shoulder of Interstate 29 northbound at approximately MM 16 near Percival, Iowa after experiencing brake problems on the trailer, reported to be an overheating condition, evidenced by smoke. Once stopped professional CMV driver Aloisio called Sapp Bros. service center and requested a mechanic be sent out as there was an air leak and the brakes on the trailer were locked.

While waiting for the arrival of the mechanic from Sapp Bros., professional CMV driver Aloisio attempted to repair the brakes on the trailer. Alleged as to believing the brake problem was resolved professional CMV driver Aloisio called Sapp Bros. and spoke to Yates to inform her their mechanic was no longer needed; however, Yates informed Aloisio the mechanic had already departed, and was enroute to the site of the breakdown, and would be arriving in a few minutes.

Upon arriving at the location of Aloisio's CMV, Evans parked the Sapp Bros. service truck behind Aloisio's CMV. Evans immediately heard an air leak in area of the passenger-side tires on the trailer when he exited his service truck. To further investigate the point source of the air leak, Evans partially crawled under the trailer at which point professional CMV driver Aloisio placed the CMV in gear and moved it forward dragging Evans for approximately twenty (20) feet. At any point an air leak is audible, the CMV must be further investigated and assured as to safety before attempting to operate the CMV in any manner on public roadways.

Evans was severely injured as a result of the CMV dragging him, causing an emergency airlift evacuation. Evans managed to crawl out from under the passenger-side trailer wheels. Aloisio observed Evans lying on the roadway shoulder. Aloisio then attempted to aid Evans and called 911. Evans was eventually transported by ambulance and helicopter to a hospital.

**4.0 Assignment-**

The undersigned has been requested to examine all the documents listed in the Document's Reviewed section of this report. Apply the knowledge, experience and education along with standards of care and the FMCSR. Determine if and how the Motor

4

Carrier, Marlex and/or CMV driver Aloisio acted and/or failed to act, and if such acts and or failures to act were causative in any manner whatsoever.

## 5.0 Introduction and History-

The area of the subject incident is at approximately MM 16 northbound Interstate 29 in the State of Iowa, near the community of Percival. The roadway is constructed of FABC topcoat asphalt with no contributing factor roadway defects noted at the time of the incident. Image #1 below depicts the scene of the incident with the view of the back/rear of the subject CMV looking northbound:



**Image #1**                                                                 **Source: Discovery**

Image #2 below depicts the subject CMV and the over-dimensional article of cargo from a broadside perspective:



**Image #2**                                          Source: Discovery

As indicated on the Iowa State Patrol *Investigating Officer's Report of Motor Vehicle Accident* diagram observed below in Image #3, the CMV combination unit operated by professional CMV driver Aloisio was parked on the improved shoulder with the Sapp Bros. service truck operated by Evans parked behind the CMV combination unit:



**Image #3**                                                            Source: Discovery

According to Trooper Nordyke: *"It is this investigators opinion this incident could have been prevented had better communication transpired between Mr. Aloisio and Mr. Evans. Mr. Evans should have went up and notified Mr. Aloisio he was on scene to work on the vehicle. Mr. Aloisio knowing Mr. Evans was on his way should have checked his mirrors better or exited his vehicle to check and make sure no one was behind his vehicle."* (ISP Technical Collision Investigation, p. 4). However, one issue not mentioned in Trooper Nordyke's written opinion is that Alisio should not have moved the CMV knowing full well that the air leak was not repaired. Such movement was a violation of the FMCSR.

The aforestated by Trooper Nordyke in combination with the unsafe movement and operation of the CMV along with the failure to adequately comply with the FMCSR pre-trip inspection and operational mandates is in and of itself violations of the FMCSR. There is no acceptable reasoning as to recklessly and negligently operating a CMV on public roadways in a knowingly unsafe condition.

It is the professional CMV driver's non-delegable duty to *be satisfied that the motor vehicle is in safe operating condition* and adequately inspect around his/her CMV before

7

causing the CMV to move in a rearward or forward direction and/or upon any roadway, as learned in the rudimentary basic level of acquiring a CDL. The duties of the professional CMV driver and the operation and inspection of the CMV will be further discussed hereunder, in this report.

## 6.0 Document Examination-

There were various documents examined as listed below in "Documents Reviewed" section of this report. Throughout the review process the specific points, testimony and issues of examination are included in this section of the report while they are often applied to industry standards of care and the FMCSR, in combination with the undersigned's years of experience, training and knowledge.

## 6.1 Federal Motor Carrier Safety Regulations-

The Federal Motor Carrier Safety Regulations (FMCSRs) were established by the USDOT in an effort to reduce the number of CMV crashes resulting in injury and/or death involving Commercial Motor Vehicles. Originally, the Motor Carrier safety and enforcement in terms of regulations were governed by the ICC established in 1935. In 1966 the responsibility of Motor Carrier safety and enforcement was transferred to the USDOT, of which was then newly formed. Currently the regulations remain under the executive branch, the USDOT, but are in oversight and enforcement by the FMCSA.

The FMCSA established the regulations to cause for Motor Carriers and/or their professional CMV drivers to comply with a set of regulations that would apply to FMCSA registered Motor Carriers. Such regulations are intended to cause said drivers to comply through safety policies and procedures. The FMCSR's are fully applicable to all Interstate Motor Carriers in commerce and Intrastate according to the adoption by the specific State and/or Commonwealth.

Over the years, the FMCSR's have grown substantially as the FMCSA, industry and academia learned more as to the causative and preventative effects of crashes and incidents involving Motor Carriers, this in addition to new technologies. As such, the regulations currently cover a plethora of areas, all geared towards the safety of the general motoring public, the professional CMV driver(s), and the protection of property.

When CMV drivers or the employer Motor Carriers violate the FMCSRs, the Motor Carrier and/or CMV driver(s) are often issued notices of violation, typically citing the USDOT, 49-CFR, the Federal Motor Carrier Safety Regulations.

The FMCSR violations are intended as a deterrent for Motor Carriers and/or their professional CMV drivers that fail to comply with the regulations that would apply to USDOT-FMCSA registered Motor Carriers.

8

Professional *employee* CMV drivers must comply through safety policies and procedures that would cause compliance with such regulations, caused by *adequate management controls* established and enforced by the Motor Carrier employer. The FMCSR's apply to all Interstate Motor Carriers and Intrastate by specific state adoption such as the State of Iowa.

Over the decades, the FMCSR's have grown substantially as the FMCSA, industry and academia learned more as to the causative and preventative effects of Motor Carrier operations. As such, the regulations currently cover a plethora of areas, all intended towards safety of the general motoring public as stated; the CMV drivers; and the protection of property.

### 6.1.1 FMCSR General Applicability-

It is a Motor Carrier's duty; therefore, Aloisio being an owner/operator to cause for himself and other employee CMV drivers to be knowledgeable of the FMCSR. Aloisio testified: *Q: "Currently, does Marlex have somebody who is designated as either the director of safety or as a certified safety inspector?" A: "That would be me."* (MA:26/10).

The owner/operator can accomplish continuing education and required training through independent third parties who may conduct road tests, training programs, supply handouts, and hold safety meetings to name a few such methods. A business such as JJ Keller, is a trusted source within the DOT transportation industry, who specialize in transportation related consulting, training/education, and products which many Motor Carriers and government enforcement agencies obtain their resources from.

After review of the additional Discovery; a full determination regarding Aloisio's qualifications or lack thereof will be established in the sections hereunder. To that point, when a professional CMV driver is found to have violated the FMCSR and/or Motor Carrier safety policies, they should be disciplined and/or further instructed regarding compliance.

Otherwise, the employee driver may very well only observe the same as corporate bravado that may well cause an attitude of implied consent as to the CMV driver's driving mannerisms and/or habits; even to overlook critical safety areas within the pre-trip inspection that clearly occurred in the subject incident. Hence, the owner/operator Aloisio-Marlex of which, he is held to the high standard of being the professional CMV driver and the employer/owner of the Motor Carrier:

> ➤ *§ 390.3 General Applicability (e) Knowledge of and compliance with the regulations.*

9

*(1) Every employer shall be knowledgeable of and comply with all regulations contained in this subchapter which are applicable to that motor carrier's operations.*

*(2) Every driver and employee shall be instructed regarding, and shall comply with, all applicable regulations contained in this subchapter.*

➤ *§ 392.1 Scope of the rules in this part.*

*(a) Every motor carrier, its officers, agents, representatives, and employees responsible for the management, maintenance, operation, or driving of commercial motor vehicles, or the hiring, supervising, training, assigning, or dispatching of drivers, shall be instructed in and comply with the rules in this part.*

➤ *§ 396.1 Scope.*

*(a) Every motor carrier, its officers, drivers, agents, representatives, and employees directly concerned with the inspection or maintenance of commercial motor vehicles must be knowledgeable of and comply with the rules of this part.*

The FMCSR is very clear in this respect. The driver *shall* be so instructed in the FMCSR as it pertains to his discipline of driving a CMV. As such, if the CMV driver possesses such *Required Knowledge*, they must not only apply that knowledge to their CMV driving mannerisms and practices, they too must apply the same to all disciplines within their *Safety Sensitive Function* of driving a CMV. It is likewise the professional CMV driver *employer's* duty to make certain the driver is operating his/her CMV in a manner consistent with the FMCSR, such as pre-trip inspections and knowing when it is safe to cause the CMV as to forward and/or rearward movement. Again, regarding the subject incident Aloisio not only is the driver, but he is the employer Motor Carrier, Marlex and all of the duties and responsibilities of *shall be instructed and shall comply* ultimately begins and ends with Aloisio.

Aloisio testified: *Q: "Have you ever taken any safety classes or courses regarding the operation of your tractor-trailer on the highway?" A: "No." Q: "Do you hold any kind of certifications in tractor-trailer or trucking safety?" A: "No." Q: "Have you personally had any training in either accident prevention or accident reconstruction as it relates to tractor-trailers?" A: "No." Q: "Do you personally have any training in being a diesel mechanic?" A: "No, not – not anything certified, no." Q: "Any training in tractor-trailer maintenance or repair?" A: "Not certified training, no." Q: "Do you have any training in the operation of air braking systems in tractor-trailers?" A: "Not – a certified…" Q: "Do you have any training in either the maintenance or repair of air braking systems in*

10

*tractor-trailers?" A: "Not any certified training, no." (MA: 31/4); And: Q: "Do you have familiarity with the Federal Motor Carrier Safety Regulations, which are sometimes referred to as the FMCSRs?" A: "Some of it, yes. A little bit." Q: "What do you mean by, "some of it"?" A: "Yes, that I - - understand some of the regulations. I don't know the whole safety book. I've got books on it. But I Have not read every regulation that's in there." (MA: 33/19); And: Q: "So we're going to be referring quite a bit today to the date of March 7th, 2018, which was the date of the accident that we're here to discuss. As of that date, did Marlex Express have a safety program?" A: "No." (MA: 34/5).*

If and when Marlex would be subject to a compliance review by FMCSA, to determine compliance with the *safety fitness standard* for Motor Carriers; Marlex must demonstrate it has adequate *safety management controls* in place, the above aforestated is a direct violation of non-compliance by Aloisio-Marlex:

> ➤ **FMCSR § 385.3 Definitions and acronyms.**
>
> **(3) Safety management controls** *means the systems, policies programs, practices, and procedures used by a motor carrier to ensure compliance with applicable safety and hazardous materials regulations which ensure the safe movement of products and passengers through the transportation system, and to reduce the risk of highway accidents and hazardous materials incidents resulting in fatalities, injuries, and property damage.*

> ➤ **FMCSR § 385.5 Safety fitness standard.**
>
> *The satisfactory safety rating is based on the degree of compliance with the safety fitness standard for motor carriers. For intrastate motor carriers subject to the hazardous materials safety permit requirements of subpart E of this part, the motor carrier must meet the equivalent State requirements. To meet the safety fitness standard, the motor carrier must demonstrate it has adequate safety management controls in place, which function effectively to ensure acceptable compliance with applicable safety requirements to reduce the risk associated with:*
>
> *(a) Commercial driver's license standard violations (part 383 of this chapter),*
>
> *(b) Inadequate levels of financial responsibility (part 387 of this chapter),*
>
> *(c) The use of unqualified drivers (part 391 of this chapter),*
>
> *(d) Improper use and driving of motor vehicles (part 392 of this chapter),*
>
> *(e) Unsafe vehicles operating on the highways (part 393 of this chapter),*

11

*(f) Failure to maintain accident registers and copies of accident reports (part 390 of this chapter),*

*(g) The use of fatigued drivers (part 395 of this chapter),*

*(h) Inadequate inspection, repair, and maintenance of vehicles (part 396 of this chapter),*

*(i) Transportation of hazardous materials, driving and parking rule violations (part 397 of this chapter),*

*(j) Violation of hazardous materials regulations (parts 170-177 of this title), and*

*(k) Motor vehicle accidents and hazardous materials incidents.*

### 6.1.2 FMCSR Required Knowledge-

In the examination, and during the road test phase of the CDL test, the driver must both demonstrate knowledge of various aspects of the FMCSR and a road test. Specifically, the candidate must demonstrate the *Required Knowledge*, but not limited to that of *FMCSR § 383.111* although *§ 383.111* is critical knowledge in the undersigned's opinion.

In this specific regulation, it is required by Aloisio to understand twenty general areas of the *"Required Knowledge"* regulation. If professional CMV driver Aloisio understands this Part of the FMCSR, he will have a strong knowledge base on their respective State CDL Manual, and vice-versa; however, the specific State CDL Manual is intended as an instruction document for obtaining a CDL, and often used as a continuing guidance document for CMV drivers interested in keeping their knowledge base sharp and up to date, hence the term *Required Knowledge*. The *Required Knowledge* of Aloisio is as follows:

➢ *§ 383.111 Required knowledge. (a) All CMV operators must have knowledge of the following 20 general areas:*

1. *Safe Operations Regulations;*
2. *Safe Vehicle Control Systems;*
3. *CMV Safety Control Systems;*
4. *Basic Control;*
5. *Shifting;*
6. *Backing;*
7. *Visual Search;*
8. *Communication;*
9. *Speed Management;*
10. *Space Management;*
11. *Night Operations;*

*12. Extreme Driving Conditions;*
*13. Hazard Perceptions;*
*14. Emergency Maneuvers;*
*15. Skid Control and Recovery;*
*16. Relationship of Cargo to Vehicle Control;*
*17. Vehicle Inspections;*
*18. Hazardous Materials;*
*19. Mountain Driving;*
*20. Fatigue and Awareness*

It should be noted that even though professional CMV driver Aloisio has been issued a State of Ohio CDL-A, it is still incumbent of him to not only know this information, but more importantly, he must incorporate it to his driving habits and skillsets; further, as stated *FMCSR § 390.3* and additionally for owner/operators in *FMCSR § 390.11*.

> ➢ *FMCSR § 390.11 Motor carrier to require observance of driver regulations.*

> *Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

Aloisio is both the CMV driver and Motor Carrier employer, Marlex. Aloisio has a duty and is likewise bound to so instruct/educate the same in accordance with *FMCSR § 390.3*, as aforestated.

In general, as to this specific *Required Knowledge* section, the following coincide with the parts of the *Required Knowledge* that were either ignored or were not exercised when Aloisio was operating his CMV at the time of the incident:

> ➢ *§ 383.111 Required Knowledge*

> *(a) All CMV operators must have knowledge of the following 20 general areas:*

> *(1) Safe operations regulations. Driver-related elements of the regulations contained in parts 391, 392, 393, 395, 396, and 397 of these subchapters, such as:*

> *(i)Motor vehicle inspection, repair, and maintenance requirements;*

> *(ii) Procedures for safe vehicle operations;*

> **Commentary:** Aloisio and/or Marlex failed to *repair and maintain all motor vehicles subject to its control* per *FMCSR § 396.3*. Evidence discovered by IDOT MVE during the NASI Level 1 MCSAP inspection

13

and testimony by Aloisio. Aloisio did not exercise *procedures for safe vehicle operations.*

*(3) CMV safety control systems.*

*(i) Proper use of the <u>motor vehicle</u>'s safety system, including lights, horns, <u>side and rear-view mirrors</u>, proper <u>mirror adjustments</u>, fire extinguishers, symptoms of improper operation revealed <u>through instruments</u>, motor vehicle operation characteristics, and <u>diagnosing malfunctions</u>.*

> **Commentary:** Aloisio and/or Marlex failed to repair the *hissing air leak* prior to operating the CMV. Aloisio testified that he was made aware of an issue because the driver of a pick-up truck warned him something was wrong. Aloisio failed to recognize through air pressure gauge instruments and proper mirror adjustments that there was an issue with smoking/locked-up and/or dragging brake shoe friction material indicating his foundation air-brake system was failing. This failure should never have gone this far as the CMV should never have been operating knowing of the audible air-leak at pre-trip inspection.

*(4) Basic control. The proper procedures for performing various basic maneuvers, including:*

*(ii) <u>Putting the vehicle in motion</u> and stopping;*

> **Commentary:** Aloisio and/or Marlex put the CMV in motion for approximately 20 feet with Evans under the trailer between the wheels. It is the duty of the professional CMV driver to not move their CMV when he/she knows full well that there is to a high degree of probability that their may be a service technician in and/or around the CMV, a service technician that Alosio was advised as to a highly probable presence based on him summoning the service technician.

*(7) Visual search. The <u>importance of proper visual search</u>, and proper visual search methods, including:*

*(ii) <u>Use of mirrors</u>; and*

*(iii) <u>Seeing to the rear</u>.*

> **Commentary:** Aloisios' transportation of over-dimensional cargo has a known restricted view to the rear; therefore, additional mirrors, camera devices and/or completing physical *GOAL/walk-around inspections* prior to operating the CMV are essential to safe operation. Aloisio failed to recognize, utilizing a visual search and seeing Evans under the trailer between the wheels.

14

*(17) Vehicle inspections.* The objectives and <u>proper procedures for performing vehicle safety inspections</u>, as follows:

*(i)* The importance of periodic inspection and <u>repair</u> to vehicle safety.

*(ii)* The effect of <u>undiscovered malfunctions upon safety</u>.

*(iii)* What safety-related parts to look for when inspecting vehicles, e.g., fluid leaks, interference with visibility, bad tires, wheel and rim defects, <u>braking system defects</u>, steering system defects, suspension system defects, exhaust system defects, coupling system defects, and cargo problems.

*(iv)* Pre-trip/enroute/post-trip inspection procedures.

*(b) Air brakes.* All <u>CMV</u> <u>drivers</u> operating vehicles equipped with air brakes must have knowledge of the following 7 areas:

*(1)* General air brake system nomenclature;

*(2)* The dangers of <u>contaminated air supply</u> (dirt, <u>moisture</u>, and oil);

*(3)* Implications of severed or disconnected air lines between the power unit and the trailer(s);

*(4)* <u>Implications of low air pressure readings</u>;

*(5)* Procedures to conduct safe and accurate pre-trip inspections, including knowledge about:

*(i)* Automatic fail-safe devices;

*(ii)* <u>System monitoring devices</u>; and

*(iii)* <u>Low pressure warning alarms</u>.

*(6)* Procedures for conducting en-route and post-trip inspections of air-actuated brake systems, including:

*(i)* <u>Ability to detect defects that may cause the system to fail</u>;

*(ii)* Tests that indicate the amount of air loss from the braking system within a specified period, with and without the engine running; and

*(iii)* Tests that indicate the pressure levels at which the low air pressure warning devices and the tractor protection valve should activate.

15

*(c) Combination vehicles. All CMV drivers operating combination vehicles must have knowledge of the following 3 areas:*

*(2)Vehicle inspection - The objectives and proper procedures that are unique for performing vehicle safety inspections on combination vehicles; and*

*(3) General operating practices and procedures, including:*

*(i) Safely operating combination vehicles; and*

*(ii) <u>Air brakes</u>.*

> **Commentary:** Aloisio failed to follow the *repair* obligation as the result of a pre-trip inspection when he heard the *hissing sound* air leak; Aloisio operated the CMV in a *forbidden* condition and as a result Aloisio did not discover the failed hoses of which were leaking air. Aloisio believed there was ice and/or moisture/contaminated air supply. Aloisio failed to recognize low air pressure gauges and/or lights/audible warning system. Aloisio recognized a problem with the air-brake system *hissing* air-leak of which in all probability caused the air-brake system to fail and yet Aloisio still did not act accordingly and responsibly to repair; Aloisio improperly decided to operate the CMV in a negligent manner endangering the motoring public.

Had Aloisio applied the *FMCSR § 383.111, Required Knowledge* part, at the time of the subject incident; the basis and foundation of a driver's CDL license, the incident involving Evans would not have occurred.

The non-application of 5 out of 20 points (25% fail rate) of *Required Knowledge (a)* demonstrated by a "professional" CMV driver is a failure of Aloisio's performance as a professional CMV driver and is a proximate cause to the subject incident. This is in addition to the genesis of such failures and said proximate cause in the fact that Aloisio failed to so instruct as required by the FMCSR and industry standards of care.


## 6.2 Required Mirror Usage and GOAL-

It is the duty of the professional CDL driver to both properly and adequately utilize his/her mirrors when in the process of operating a CMV. However, exclusively using the CMV mirrors as a substitute of applying the *GOAL Method* is unacceptable when conditions warrant. Aloisio didn't *GOAL* and made the following statement to the ISP: *"I could not see him or his pick-up truck because I'm hauling an overdimensional wide load. The load blocked my visibility of seeing him right behind me."* (Aloisio Statement to ISP, p. 2)

16

*GOAL* is an acronym for *Get Out And Look;* a practice by professional CMV drivers. The practice and habit of the driver getting out of the CMV and physically walking around the CMV and knowing that the area is clear and safe to operate the CMV. The GOAL method is obligatory when backing; however, it is likewise necessary when the CMV driver is uncertain as to any issues that may cause a safety hazard or concern; Alosio knew full well that Evans was both enroute and/or should be on site when he decided to move his CMV in the forward direction. This is in addition to the fact that Alosio should never have moved his CMV with a known audible air leak.

Both methods must be utilized in tandem with one another when and where applicable. In the subject incident, it was by all means necessary to employ both methods for safety considering the over-dimensional cargo blocked Aloisio's complete view to the rear alongside his CMV and he knowing of Evans probable presence as it was he, Alosio that summoned Sapp Bros. (Evans) to his disabled CMV: The Dispatcher from Sapp Bros. clearly stated as to indicating Evans presence and/or near presence; therefore Alosio was put on notice and should have acted accordingly, such as applying the GOAL method: *Q: "Okay. Do you recall why he was calling?" A: "Yeah, he wanted to know when our technician would be on site, and I told him he should already be on site. If he was not, he should be there any second."* (AY: 36/14). Had Alosio applied the GOAL method due to uncertainty; the subject incident would not have occurred.

When and if Aloisio observes circumstances changing, regarding time periods when mechanics and/or other pedestrians being present, Aloisio must manage his CMV operations accordingly. In other words, if Aloisio's attention and focus is on anything other than observing the potential for hazards/pedestrians surrounding his CMV, he must utilize the *GOAL Method* to be assured as to the safety prior to moving and operating his CMV.

Had both safety methods been effectively deployed, the subject incident that was clearly *preventable* and would not have occurred.

### 6.2.1 Smith-System Defensive Driving-

Specifically, the Smith-System – arguably the premier defensive driver training program in the North America, if not the world – has a program that would have trained Aloisio on safe defensive driving tactics to more safely negotiate motor vehicle operations in general.

Basing the following on driving skillset alone, if Aloisio were trained in the entirety of the defensive driving programs of the Smith-System, or thereabouts equivalent, and incorporated the teachings into his daily driving habits of which the failures to comply were clear contributing factors, the subject incident would not have occurred. It is the

sole and non-delegable duty of his Motor Carrier employer, Marlex (and/or himself) to ensure such necessary training to cause for the prevention of incidents and/or crashes.

The Smith-System is another example of a third-party independent resource which Aloisio could have incorporated into his driving and skillset to enhance his professional operations involving a CMV.

The Smith-System instructs as to the following methodology in terms of core content, *The 5 Keys to Forward Motion and Backing*. The principles hereunder apply at all times before a professional CMV driver moves his/her CMV, they are such as, but not limited to: *"Know what objects are around your vehicle and their proximity to your vehicle"*; *"Don't assume you know what is around your vehicle: Get Out and Look (G.O.A.L.)"*; and: *"Know what may be under and above your vehicle as well as what is around it."*

There are five primary key elements in the driver training program. In these five primary key elements, there are sub-elements; they are collectively as follows:

*Key #1: Aim High in Steering*

> *Evaluate the parking environment and its unique characteristics.*
> *Scan the parking area and plan for your departure when you choose your parking space.*
> *Look for opportunities to avoid backing. Use pull through or curb side spaces, if available.*

*Key #2: Get The Big Picture*

> *Know what objects are around your vehicle and their proximity to your vehicle.*
> *Don't assume you know what is around your vehicle: Get Out and Look (G.O.A.L.)*
> *Know what may be under and above your vehicle as well as what is around it.*

*Key #3: Keep Your Eyes Moving*

> *Move your head and eyes to scan the entire area around your vehicle. Don't fixate.*
> *Back slowly to allow time for eye activity and reduce possible damage if you hit something.*
> *Incorporate the available technology in your scanning pattern but don't use it exclusively.*

*Key #4: Leave Yourself an Out*

> *Whenever possible, find a parking space that is surrounded by space.*
> *Back no further than you must.*
> *Choose a site with the fewest hazards whether it is other vehicles or objects.*

18

*Key #5: Make Sure They See You*

> ➤ *Seek eye-to-eye contact.*
> ➤ *Communicate. Use your warning devices to alert others.*
> ➤ *Don't move the vehicle until you are absolutely sure it is safe to do so.*

Note on Keys #1-#5: All of the **bolded** above primary key elements and sub-elements are bolded as they are either directly or indirectly associated to necessary driving behaviors as preventative actions to the subject incident.

If such instruction were provided to Aloisio, and if he had applied such training prior to moving his CMV, the subject incident would not have occurred.

Aloisio clearly did not utilize the *GOAL Method and* exit his CMV prior to operating to be sure of safe operations; regarding Evans being under the semi-trailer. If Aloisio had incorporated the *GOAL Method,* of the Smith-System, he would have observed Evans, spoke to him regarding the repairs, ultimately communicating and made eye to eye contact with Evans. Additionally, Aloisio would have observed Evans by implementing the last bullet in *Key 5-Make Sure They See You – Don't move the vehicle until you are absolutely sure it is safe to do so,* to his daily CMV operations.

According to ATRI's, Predicting Truck Crash Involvement from October 2005, it states the following as to defensive driver type training programs: *"Most directors require that new drivers go through both National Safety Council's Defensive Driving Program and/or Smith System Training".*

Had investment in proper defensive driver training been undertaken by Marlex, and subsequently been applied by Aloisio in his driving habits and/or skills, they would have without question been preventative functions that would have averted the subject incident.

### 6.3 Duty to Pre-Trip Inspect-

It is the duty of the professional CMV driver to perform a thorough pre-trip inspection of the CMV that he/she is assigned to operate before taking the CMV onto the public roadways, both the truck-tractor and the semi-trailer as a combination unit.

During the pre-trip inspection process, it is required that at a minimum the CMV driver inspect all of the components listed in the pre-trip inspection process, as listed in *FMCSR § 392.7*, note the first component being *service brakes:*

19

> *§ 392.7 Equipment, inspection and use.*
>
> *(a) No commercial motor vehicle shall be driven unless the driver is satisfied that the following parts and accessories are in good working order, nor shall any driver fail to use or make use of such parts and accessories when and as needed:*
>
> *Service brakes, including trailer brake connections.*
> *Parking (hand) brake.*
> *Steering mechanism.*
> *Lighting devices and reflectors.*
> *Tires.*
> *Horn.*
> *Windshield wiper or wipers.*
> *Rear-vision mirror or mirrors.*
> *Coupling devices.*
> *Wheels and rims.*
> *Emergency equipment.*

All of the equipment checked in a pre-trip inspection are typically identifiable by the visual, audible, and physical inspection during a walk around inspection such as tire conditions, wheel, and lug nut tightness, etc... and/or they are detected by performance inspections such as brake testing and lighting activation. *FMCSR § 392.7* describes what has to be inspected, and *FMCSR § 396.13* requires the inspection and states the following:

> *FMCSR § 396.13 Driver inspection.*
>
> *Before driving a motor vehicle, the driver shall:*
> *(a) Be satisfied that the motor vehicle is in safe operating condition;*

Aloisio testified that he completed a pre-trip inspection the morning of the subject incident and he heard an air leak. Aloisio testified: *Q: "Did you notice any problems with the air pressure in the trailer?" A: "I heard a hissing sound in the trailer."* (MA: 123/2); And: *Q: "Okay. So, once you heard the hissing sound, did you take any action at that point to try to identify the cause of it?" A: "Yes." Q: "What did you do?" A: "I tried to find it."* (MA: 126/2); And: *Q: "And were you able to locate where the hissing sound was coming from?" A: The general area, but not exactly where it was. I knew the general area."* (MA: 126/15).

Aloisio looked for the leak but couldn't find it. Aloisio testified: *Q: "How long did you try to look around your trailer to diagnose threat problem?" A: "I don't know the exact time I took. I put in a good effort to find it. And like I said, I knew the general area, but I did not find it exactly. I have a little bit of a problem, a little bit claustrophobic getting*

20

*under the trailer with it loaded. So, I didn't crawl under very far. I just tried to pin it down by listening to where it was coming from."* (MA: 127/21).

The aforestated is the first opportunity Aloisio had to recognize a problem with the semi-trailers air system. Aloisio didn't know where the air was leaking from. Air leaking from any part, and/or system upon the CMV is a violation under *FMCSR § 396.3;* and additionally, when specifically cited in other parts. Because Aloisio didn't know what was leaking, he also wouldn't know if it was an Out of Service violation. Aloisio should have never operated the CMV departing his undisclosed *pre-trip* location on March 7th, 2018.

> *FMCSR § 396.3 Inspection, repair, and maintenance.*

> *(a) General. Every motor carrier and intermodal equipment provider must systematically inspect, repair, and maintain, or cause to be systematically inspected, <u>repaired</u>, and <u>maintained</u>, all motor vehicles and intermodal equipment subject to its control.*

> *(1) <u>Parts</u> and accessories <u>shall be in safe and proper operating condition at all times</u>. These include those specified in part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels and rims, and steering systems.*

Additionally, Aloisio operated the CMV in violation of *FMCSR § 396.7*. Even if Aloisio had first discovered the air leak while operating upon the highway, the exemption below mandates that he continue only to the nearest place where repairs can safely be affected; not after he drives all day and shuts down at thirty minutes after dusk. Aloisio operated his CMV *in a condition that caused a breakdown of the vehicle.*

> *FMCSR § 396.7 Unsafe operations forbidden.*

> *(a) General. A motor vehicle <u>shall not be operated</u> in such a condition as to likely cause an accident or <u>a breakdown</u> of the vehicle.*

> *(b) Exemption. Any motor vehicle discovered to be in an unsafe condition while being operated on the highway may be continued in operation only to the nearest place where repairs can safely be effected. Such operation shall be conducted only if it is less hazardous to the public than to permit the vehicle to remain on the highway.*

Aloisio made a conscious decision to put the safety of himself and the motoring public at risk by dangerously and irresponsibly leaving, knowing full well that he had a violation somewhere on the trailer causing an air leak/*hissing sound.*

Aloisio chose profit over safety and compliance. Conceptual metaphors and/or aphorisms describe Aloisio's poor decisions; "Time is Money"; and "If your wheels ain't turning you ain't earning".

According to Aloisio the CMV air system was able to maintain pressure in the air reservoir, with an idle engine, therefore he dangerously assumed everything was okay, and chose to delay the air leak repair and begin is trip. Aloisio testified: *Q: "Okay. So then after you applied the brake and the air gauges didn't go down, what did you do at that point?" A: "I – I left shortly after that." Q: "Okay." A: "When I new everything was okay, I left on the trip." Q: "So at that point, you did not make a call to any nearby service stations or nearby truck mechanics or anything to come take a look at it, correct?" A: "No. I knew I had to shut down at dark, so I was going to take care of it when I had to shut down at dark that evening."* (MA: 132/4). Additionally, knowing of an air leak by definition does not rise of *"everything was okay"*.

On the subject date, on two separate occasions Aloisio heard the *hissing sound.* Hearing is an obligatory aspect of operating CMVs and part of utilizing your senses to properly conduct a *walk-around vehicle inspection* and detect potential problems and/or violations that could lead to a breakdown.

Audible hearing testing is obligatory and essential to what are commonly referred to as the DOT medical qualification standards in the *Medical Advisory Criteria* within the FMCSR:

> ➢ *Appendix A to Part 391 - Medical Advisory Criteria*

> *K. Hearing: § 391.41(b)(11)*

> *1. A person is physically qualified to drive a commercial motor vehicle if that person: First perceives a forced whispered voice in the better ear at not less than 5 feet with or without the use of a hearing aid, or, if tested by use of an audiometric device, does not have an average hearing loss in the better ear greater than 40 decibels at 500 Hz, 1,000 Hz, and 2,000 Hz with or without a hearing aid when the audiometric device is calibrated to American National Standard (formerly ADA Standard) Z24.5-1951.*

**Hearing**
*Standard: Must first perceive whispered voice at not less than 5 feet OR average hearing loss of less than or equal to 40 dB, in better ear (with or without hearing aid).*

Check if hearing aid used for test: ☐ Right Ear ☐ Left Ear ☒ Neither

| **Whisper Test Results** | Right Ear | Left Ear |
|---|---|---|
| Record distance *(in feet)* from driver at which a forced whispered voice can first be heard | ≤ 5 | 5 |

OR

**Audiometric Test Results**

| Right Ear | | | Left Ear | | |
|---|---|---|---|---|---|
| 500 Hz | 1000 Hz | 2000 Hz | 500 Hz | 1000 Hz | 2000 Hz |
| _____ | _____ | _____ | _____ | _____ | _____ |
| Average (right): _____ | | | Average (left): _____ | | |

Image #4                                                                 Source: Discovery

As observed above in Image #4, Aloisio met this standard according to his medical report. Aloisio meeting the *Medical Advisory Criteria* for hearing and yet ignoring and/or delaying the repair of a known violation and problem with Aloisio's 40 plus years of experience as a professional CMV driver, CDL-A holder, and over-dimensional/heavy hauler is an irresponsible, and blatant disregard for the rights and safety of the motoring public; additionally, to the Sapp Bros. mechanic, Evans.

Aloisio continued to operate his CMV *in a condition that caused a breakdown of the vehicle*, not only once, but twice. The first occasion was when Aloisio began his trip in the morning as aforestated above, and the second occasion was later that morning upon the roadside at the scene of the subject incident when Aloisio dragged Evans for approximately 20 feet, Aloisio testified: *Q: "Okay. So now that the air pressure had gone all the way back up, did you check again to see if you could still hear the same air leak you heard in the morning?" A: "Once it was all the way up, yes." Q: "Did you hear that air leak?" A: "Yes." Q: "You still heard it. Was it still coming from the same general area that you heard before you took to the road that morning?" A: "Yes."* (MA: 155/3).

The aforestated occurred after Aloisio allegedly solved the problem by pouring antifreeze into the air-lines (aka: brake hose) through the CMV glad-hands: *Q: "So by process of elimination, then, and seeing as you heard the air leak before, you at least determined that the problem was in the trailer, right?" A: "Correct. Yes." Q: "So then you put the antifreeze in. Is there like one main line that goes to the trailer and then like splits off to the different chambers? How does that work?" A: "Well, you have two lines that feed it.*

23

*One is - - like I said, the blue and red, one is service, and one is emergency." Q: "Okay."
A: "I put it in both."* (MA: 153/12).

The reality of over-dimensional haulers is that they are additionally regulated and are
held to a much higher standard, as they are specifically regulated as to specific hours in
the day they are allowed to operate. As in Aloisio's circumstances he was regulated by
Missouri and Iowa, and only allowed to operate thirty minutes prior to sunrise through
thirty minutes after sunset, according to Discovery in (Marlex Express State Permits, P.
4-5).

Aloisio provided a statement to Iowa State Patrol why he had stopped on the shoulder of
the roadway: *"Brakes began to drag on trailer. Pulled over and found air not going to
trailer. Called Sapp Bros. and they sent mechanic." "When I called Sapp Bros. I told
them problem was in trailer and to <u>bring several different kinds of air lines</u> because
<u>that's what I thought was wrong.</u>"* (Aloisio Statement Iowa State Patrol, p. 1); yet he
opted to carelessly operate his CMV suspecting his air lines (aka: brake hose) to being
compromised with an air leak.

Aloisio testified to a different recollection of his statement to ISP: *A: "I had a pickup
truck come up next to me and pointed to the rear. He straddled or stayed next to me.
When I looked down, he was pointing to the rear. And I immediately pulled over.* (MA:
136/20); And: *"I got out of the truck and went to the rear." Q: "And – go ahead. No, go
ahead, you can finish." A: "I saw a little bit of smoke coming from one of the axles, one
of the wheels."* (MA: 138/8).

It should be noted that smoke coming from one of the wheels is an Out of Service
violation according to NASV OOSC referencing *FMCSR § 393.48 Brakes Operative*
and/or according to *FMCSR § 396.3 – Wheels Rims and Hubs* when a CMV is in a
condition which is identified in NASV OOSC, it is *forbidden* to operate the CMV:

> ➢ *NASV OOSC Part II*

> *1. Brake Systems*
> *(f.) Brake Smoke/Fire*
> *Brake malfunction causing smoke or fire to emit from the wheel end. (393.47(a)).*
> (NASV OOSC, p. 25)

> *13. Wheels, Rims and Hubs*
> *(i.) Hubs*
> *(2.) Smoking from wheel hub assembly due to bearing failure. (396.3(a)(1)).*
> (NASV OOSC, p. 62)

The subject incident would not have occurred if Aloisio had identified the hose chafing
air leak and improper hose T-connection during his pre-trip inspection and recognized the
condition as an operation prohibition.

The air leaks were caused by hose jacket chafing and improper and/or a defective hose T-connection as identified on the Iowa DOT Motor Vehicle Enforcement Level 1 Inspection Report (p. 1 of 2), both of which are OOS conditions as observed below in Image #4 and #5:

| VIOLATIONS | | | |
|---|---|---|---|
| Violation Code | Unit No. | Out Of Service | Citation |
| 395.8F12 | D - DRIVER | NO | |
| Description DRIVER FAILED TO LOG SHIPPING# OR SHIPPER & COMMODITY - ALL DAYS | | | Verification |
| 395.22A | D - DRIVER | NO | |
| Description OPERATING WITH A DEVICE THAT IS NOT REGISTERED BY FMCSA - NO ELD, PAPER RODS | | | Verification |
| 393.45 | 2 - FIRST TRAILER | YES | |
| Description BRAKE HOSE WORN THRU OUTER PLIES W AIR LEAK - OTHER OOS BRAKE VIOS SEE COMMENTS | | | Verification |
| 393.45D | 2 - FIRST TRAILER | NO | |
| Description BRAKE CONNECTION WITH LEAK BETWEEN AXLE 5 - T CONNECTION LEAKING AIR | | | Verification |

Image #4                                                          Source: Discovery

| COMMENTS |
|---|
| AXLE 8 BRAKE MEASUREMENTS<br>RIGHT 1/2"<br>LEFT 1"<br><br>PERMIT # 594889 ISSUED 3/5/18 VALID FROM 3/5/18-3/9/18<br><br>Load was LeTourneau 4592 Log Stacker<br><br>Owner/Operator pbx - 513-509-3627<br><br>NEAR AXLE 5 LOCATED BETWEEN NUMEROUS AIR HOSES- BRAKE HOSE WITH AUDIBLE AIR LEAK- WORN THROUGH REINFORCEMENT PLIES<br>PHOTOS TAKEN OF BRAKE HOSE W AIR LEAK<br><br>BRAKE HOSE REPAIRED WITH HOSE ENDS SLID OVER TUBING AND CLAMPED WITH HOSE CLAMPS. NOT AN APPROVED REPAIR METHOD.<br><br>BRAKE HOSE WORN THROUGH REINFORCEMENT PLY.<br><br>3 SEPARATE HOSES WITH OUT OF SERVICE VIOLATIONS. DRIVER REPAIRED HOSE WITH AUDIBLE AIR LEAK SO BRAKES COULD BE MEASURED. REPAIRED ON SCENE. |

Image #5                                                          Source: Discovery

Aloisio provided a statement to Iowa State Patrol as to why he had stopped on the improved shoulder of the roadway as to "*his trailer brakes were beginning to smoke*" (Iowa Incident Report Supplemental, Motor Vehicle Enforcement, p. 1 of 2).

It is unconscionable that a professional CMV driver would operate the CMV knowing full well that he had an air leak; an air leak that would in all probability lead to other foundation airbrake failures that would cause additional OOS conditions.

**6.4 NASI Level 1 Inspection-**

The IDOT MVE Officers responded out of duty to assist ISP at the scene of the subject incident. Sergeant Floerchinger arrived and identified the CMV driver to be Aloisio and immediately observed an air leak: *"While checking the scene, I observed an audible air leak near axle 5 on the truck tractor/semi-trailer and identified a hole in a brake line causing the audible air leak."* (IDOT MVE Reports, p. 1).

Sergeant Floerchinger's observation *"I observed an audible air leak...and identified a hole in a brake line..."* triggered the decision to conduct the full Level 1 MCSAP-NASI at the Exit 12 Fremont scale house wherein the serious violations were confirmed causing the CMV to be placed out-of-service.

The decision by MVE to move the tractor-trailer in a known OOS condition to the Fremont scale house located at Exit 12; which required going north to Exit 20, crossing over the interstate, and traveling back south to Exit 10 and then back north to the scale at Exit 12, is always a high-risk situation regarding safety of the motoring public, even with a law enforcement escort utilizing police lights and directional arrow sticks. The closest exit ramp to the north of the incident location at MM 20, would have been the closest, safe location for repairing the OOS trailer without exposing the *forbidden condition* of the tractor-trailer to the general motoring public any longer than necessary; approximately four miles as compared to approximately sixteen miles.

IDOT MVE discovered serious mechanical foundation airbrake OOS conditions as follows: *"There were 3 brake lines near axle 5 of the vehicle. Axle 5 would be the first axle on the trailer. One brake line had an audible air leak which is an out of service violation. The second brake line had been repaired improperly, by using hose clamps and clamping the air hose to a piece of tubing which is also an out of service condition. The third brake line had been damaged through the reinforcement ply which is also an out of service condition. SHANNON and I each observed the violations and I took photos of each brake hose violation. An out of service condition as defined in the North American Standard Vehicle Out Of Service Criteria occurs when a "commercial motor vehicle which by reason of its mechanical condition or loading would be likely to cause a crash or breakdown"."* (IDOT MVE Reports, p. 1).

Sergeant Floerchinger's description in the comments section of the NASI is as follows: *"3 SEPARATE HOSES WITH OUT OF SERVICE VIOLATIONS. DRIVER REPAIRED HOSE WITH AUDIBLE AIR LEAK SO BRAKES COULD BE MEASURED. REPAIRED ON SCENE."* (IDOT MVE Inspection, p. 2)

26

> *FMCSR § 393.45: Brake hose worn through outer plies w/ air leak – other OOS brake vios see comments.*
> *FMCSR § 393.45: Brake connection with leak between axle 6 – T connection leaking air.*

In a highly *forbidden* condition, the CMV combination should not have been operated in any manner whatsoever by Aloisio on the subject incident date with the OOS conditions. Aloisio testified to his awareness of the air leak, and he acknowledged to Iowa Enforcement personnel that he attempted to repair the problem, and the air leak was serious enough in that it was audible enough for IDOT MVE to hear the same.

> *FMCSR § 393.45 Brake tubing and hoses; hose assemblies and end fittings.*

> *(b) Brake tubing and hose installation. Brake tubing and hose must –*

> *(1) Be long and flexible enough to accommodate without damage all normal motions of the parts to which it is attached;*

> *(2) Be secured against chaffing, kinking, or other mechanical damage; and*

> *(3) Be installed in a manner that prevents it from contacting the vehicle's exhaust system or any other source of high temperatures.*

> *(d) Brake tubing and hose connections. All connections for air, vacuum, or hydraulic braking systems shall be installed so as to ensure an attachment free of leaks, constrictions or other conditions which would adversely affect the performance of the brake system.*

> *NASV OOSC Part II*

> *(h.) Air Brake Hose/Tubing*

> *(1) Any damage extending through the reinforcement ply. (393.45(a))*

> *(3) Audible air leak at other than a proper connection. (393.45(a))*

> *(4) Improperly joined, such as a splice made by sliding the hose ends over a piece of tubing and clamping the hose to the tube. (393.45(a))*

Post-incident interview of Aloisio by MVE and/or ISP may have in all probability revealed that Aloisio knew about the air leak prior to departing for the day in Missouri. As he testified to the same in his Deposition (redundant): *Q: "Did you notice any problems with the air pressure in the trailer?" A: "I heard a hissing sound in the*

*trailer."* (MA: 123/2); And: *Q: "Okay. So, once you heard the hissing sound, did you take any action at that point to try to identify the cause of it?" A: "Yes." Q: "What did you do?" A: "I tried to find it."* (MA: 126/2). At minimum MVE and/or ISP should have issued fines/citations to Aloisio according to *FMCSR § 396.7 and § 393.45.*

### 6.4.1 Unsafe Operation-

There are numerous Parts of the FMCSR that address the violation of regulations as to operating a CMV in such a condition that may cause an accident and/or breakdown of the CMV, most notably the following should have resulted in citations to Aloisio by MVE (redundant):

> ➢ *§ 396.7 Unsafe operations forbidden.*
>
> *(a) General. A motor vehicle <u>shall not</u> be operated in such a condition as to likely <u>cause an accident</u> or a <u>breakdown of the vehicle.</u>*
>
> *(b) Exemption. Any motor vehicle discovered to be in an unsafe condition while being operated on the highway may be continued in operation only to the nearest place where repairs can safely be effected. Such operation shall be conducted only if it is less hazardous to the public than to permit the vehicle to remain on the highway.*

Then, there is the specific requirement of the regulation that mandates the assurance of *inspection, repair and maintenance* of CMVs. The FMCSR demands the Motor Carrier cause for the inspection process according to Part 396 of the FMCSR (redundant):

> ➢ *§ 396.3 Inspection, repair, and maintenance.*
>
> *(a) General. Every motor carrier and intermodal equipment provider must systematically inspect, repair, and maintain, or cause to be systematically inspected, repaired, and maintained, all motor vehicles and intermodal equipment subject to its control.*
>
> *(1) Parts and accessories shall be in safe and <u>proper operating condition</u> at all times. These include those specified in part 393 of this subchapter and any additional parts and accessories which may affect safety of operation, including but not limited to, frame and frame assemblies, suspension systems, axles and attaching parts, wheels and rims, and steering systems.*

The result of Aloisio failing in his duty to inspect the CMV combination discover and correct (or have corrected) the noted OOS conditions was the proximate cause of the incident which occurred on March 7, 2018. Simply stated: the CMV was not in a

roadworthy and safe condition, in fact, it was in a highly *forbidden* condition, and should never have been permitted to be on the public roadways by both the professional CMV driver, Aloisio and the Motor Carrier employer, Marlex.

## 6.5 State of Ohio CDL Manual-

Although all CDL Manuals are essentially the same through all 50-states, as they model from the AAMVA CDL Manual for interstate Motor Carrier commerce, the State of Ohio CDL Manual is referenced herein as Aloisio is both domiciled out of Ohio and he is a State of Ohio CDL-A licensed driver.

Accordingly, Aloisio is required to follow the instructions within the State of Ohio CDL Manual; however, although Aloisio is required to comply with the entirety of the State of Ohio CDL Manual, as applicable, there are several directly causative sections in particular within the State of Ohio CDL manual that Aloisio has a duty to follow that is relative to the subject incident. The sections that are applicable are as follows, but not limited to:

> ➢ *2.1.1 – Why Inspect*

> *Safety is the most important reason you inspect your vehicle, safety for yourself and for other road users.*

> *A vehicle defect found during an inspection could save you problems later. You could have a breakdown on the road that will cost time and dollars, or even worse, an incident caused by the defect.*

> *Federal and state laws require that drivers inspect their vehicles. Federal and state inspectors also may inspect your vehicles. If they judge the vehicle to be unsafe, they will put it "out of service" until it is fixed.*

> ➢ *2.4 – Seeing*

> *To be a safe driver you need to know what's going on all around your vehicle. Not looking properly is a major cause of accidents.*

> ➢ *2.4.2 – Seeing to the Sides and Rear*

> *It's important to know what's going on behind and to the sides. Check your mirrors regularly. Check more often in special situations.*

---

Aloisio, the professional CMV driver has a duty and is responsible to be knowledgeable of and comply with the regulations for vehicle inspections and how to in effect operate a CMV in a safe manner, an immutable duty of the professional CMV driver. The State of Ohio CDL Manual provides such instruction.

It is further the duty of the Motor Carrier employer, Marlex-Aloisio to ensure application of the *Required Knowledge* section of the FMCSR, and does not operate his CMV in a *forbidden* condition, of which are directly connected to the content of the State of Ohio CDL Manual, and is knowledgeable regarding the jurisdictions that he is directed to operate within:

> ➤ *§ 390.11 Motor carrier to require observance of driver regulations.*
>
> *Whenever in part 325 of subchapter A or in this subchapter a duty is prescribed for a driver or a prohibition is imposed upon the driver, it shall be the duty of the motor carrier to require observance of such duty or prohibition. If the motor carrier is a driver, the driver shall likewise be bound.*

Had Aloisio complied with the instructions of the CDL Manual and had Marlex so instructed Aloisio in the State of Ohio CDL Manual, the subject incident would not have occurred.

## 6.6 Safety Measurement System-

Perhaps one of the best tools that can be viewed to determine a Motor Carriers safety and compliance efforts is demonstrated on the Safer-Web.

The Safer System provides a 24-month lookback on Motor Carriers performance and their willingness to make efforts to comply with the Federal Motor Carrier Safety Regulations. Note that the word "Safety" is underscored; the reason, the entirety of the FMCSR and its very existence is for Motor Carrier safety.

The Safer-System is to allow for the determination of a Motor Carrier's willingness to comply with the FMCSR and when utilized, it can provide a Motor Carrier with outstanding tools to determine their own 'on road' performance, compared to peer Motor Carriers.

Safer-System allows for the Motor Carrier management to quickly observe how their CMVs are performing, and how their safety personnel are performing, including the CMV mechanical staff. This can be accomplished by a few strokes of the computer keyboard, but Motor Carrier management must make the effort.

When a Motor Carrier takes these critical and necessary steps, they must act when they determine their Motor Carrier operation is deficient or becoming deficient in terms of *Adequate Management Controls* to keep not only their CMV drivers safe, but equally important and perhaps more important, the motoring public of whom cannot control any of the safety requirements owed by the Motor Carrier.

When accessing the USDOT number for Marlex Express Inc, they report to having 1-CMV driver in employment, and 2-vehicles. They reported to having operated 72,000 miles in 2018.

A Snapshot of USDOT #644159 was taken on December 10th, 2019. Their driver Out of Service (OOS) rate was then 11.1%, which is more than double the National Average for their peer grouping as indicated below in Image #6:


**SMS** Safety Measurement System

**MARLEX EXPRESS INC.**
U.S. DOT#: 644159
Address: 9994 CINCINNATI DAYTON ROAD
WEST CHESTER, OH 45069
Number of Vehicles: 2
Number of Drivers: 1
Number of Inspections: 9

**Safety Rating & OOS Rates**
(As of 12/10/2019 updated daily from SAFER)

SATISFACTORY
(Rating Date: 03/14/2001)

**Out of Service Rates**

| Type | OOS % | National Avg % |
|--------|-------|----------------|
| Vehicle | 14.3 | 20.7 |
| Driver | 11.1 | 5.5 |
| Hazmat | | 4.5 |

**Licensing and Insurance**
(As of 12/10/2019 updated hourly from L&I)

Active For-Hire Authority

| Type | Yes/No | MC#/MX# |
|----------------|--------|-----------|
| Property | Yes | MC-301190 |
| Passenger | No | |
| Household Goods | No | |
| Broker | No | |

**Image #6**                                                    **Source: Discovery**

Over the last 24-months, Marlex has been operating on public roadways and was subjected to roadside MCSAP inspections. Aloisio was in violation of Hours-of-Service compliance three out of nine inspections. A glimpse into the 9 inspections revealed 6 violations as indicated below in Image #7:

31

**VIOLATION SUMMARY**

Violations: 6

| Violations | Description | # Violations | # OOS Violations | Violation Severity Weight | BASIC |
|---|---|---|---|---|---|
| 395.8 | Record of Duty Status violation (general/form and manner) | 1 | 0 | 1 | HOS Compliance |
| 395.8A-ELD | ELD - No record of duty status (ELD Required) | 1 | 1 | 5 | HOS Compliance |
| 395.8F01 | Drivers record of duty status not current | 2 | 0 | 5 | HOS Compliance |
| 393.45 | Brake tubing and hose adequacy | 1 | 1 | 4 | Vehicle Maint. |
| 393.45(d) | Brake connections with leaks or constrictions | 1 | 0 | 4 | Vehicle Maint. |

**INSPECTION HISTORY**

Total Inspections: 9

| Inspection Date | Number | State | Plate Number | Plate State | Type | Severity Weight (SW) | Time Weight (TiW) |
|---|---|---|---|---|---|---|---|
| 10/1/2019 | MIBEAMW01379 | MI | PWF8723 | OH | TRUCK TRACTOR | | 3 |
| 9/7/2019 | TX5JPF0XLG1A | TX | PWF8723 | OH | TRUCK TRACTOR | | 3 |
| HOS Compliance Violation: 395.8F01 Drivers record of duty status not current | | | | | | .5 | |
| 6/20/2019 | MIMEADR01262 | MI | PWF8723 | OH | TRUCK TRACTOR | | 3 |
| 5/29/2019 | MOW144002683 | MO | PWF8723 | OH | TRUCK TRACTOR | | 3 |
| 5/19/2019 | MOH2N5004533 | MO | PWF8723 | OH | TRUCK TRACTOR | | 2 |
| HOS Compliance Violation: 395.8A-ELD - No record of duty status (ELD Required) (OOS) | | | | | | 5 + 2 (OOS) | |
| 1/2/2019 | MIVANHJ00880 | MI | PWF8723 | OH | TRUCK TRACTOR | | 2 |
| 3/10/2018 | WAW425000242 | WA | PWF8723 | OH | TRUCK TRACTOR | | 1 |
| HOS Compliance Violation: 395.8 Record of Duty Status violation (general/form and manner) | | | | | | 1 | |
| HOS Compliance Violation: 395.8F01 Drivers record of duty status not current | | | | | | 5 | |
| 3/7/2018 | IA000TT6FSMJ | IA | PWF8723 | OH | TRUCK TRACTOR | | 1 |
| Vehicle Maint. Violation: 393.45 Brake tubing and hose adequacy (OOS) | | | | | | 4 + 2 (OOS) | |
| Vehicle Maint. Violation: 393.45(d) Brake connections with leaks or constrictions | | | | | | 4 | |
| 1/17/2018 | MIFREEJ00341 | MI | PWF8723 | OH | TRUCK TRACTOR | | 1 |

Image #7                                                                     Source: Discovery

Aloisio testified to not being familiar with the aforestated: *Q: "Are you also familiar with something called the - - the FMCSA has something called the Safety and Fitness Electronic Record System, which you may know as SAFER?" A: "No, I'm not familiar with that."* (MA: 33/14). Had Marlex, therefore Aloisio incorporated the mandatory and required *safety program/safety fitness standard*, Aloisio could observe where he is deficient, and focus on receiving training and the industry safety standards to give Aloisio the *Required Knowledge,* to better comply with the mandatory requirements within the FMCSR.

## 6.7 Aloisio's Inconsistent Statements-

Aloisio gave a statement to ISP and stated what happened regarding the subject incident: *"Brakes began to drag on trailer. Pulled over and found <u>air not going to trailer</u>."* (Aloisio statement to ISP, p. 1).

32

Aloisio also gave a statement to the insurance carrier and described what happened: *Q: "...What was the reason why you pulled over?" A: "I noticed I was getting some drag and I started, like what I thought might have been, uh, some smoke coming from my right side of my trailer." Q: "OK." A: "I couldn't see it perfectly, but I did feel a drag and I noticed my air pressure going down." Q: "OK. And when you say air, so is that the gage, the air pressure gage was going down?" A: "Correct, yes."* (Aloisio Statement to Insurance Carrier; 5/193); And: *A: "I know that they were hanging up, that's the reason why they were smoking a little bit, because they were starting to, the air pressure going down, it wasn't allowing the brakes to stay released. The style of brake is when the air goes down the brakes come on. So those, a couple of brakes, the air pressure got low enough where they were starting to apply." Q: Mm-hmm." A: So then I pulled over and I started looking around, I, I had an air leak, I could hear an air leak earlier in the day, so I knew I had a bit of an air leak, it wasn't hurting the air pressure, my air pressure was staying up, but I did know that I had an air leak." "Q: Mm-hmm." A: "I thought it had something to do with that, I thought well maybe the air leak has gotten worse and this is allowing too much air to leak, that was not the problem, I started checking different things, and I narrowed it down to the gooseneck of my trailer from where the red line hooks up to the peach neck where you detach there was hardly any, there, there, it wasn't getting air between those two."* (Aloisio Statement to Insurance Carrier; 6/242).

Aloisio testified to the contrary as aforestated above: *A: "I had a pickup truck come up next to me and pointed to the rear. He straddled or stayed next to me. When I looked down, he was pointing to the rear. And I immediately pulled over."* (MA: 137/20); And: *A: "I saw a little bit of smoke coming from one of the axles, one of the wheels."* (MA: 138/12); And: *Q: "Did you notice, before you pulled off, any change in any of your four air pressure gauges?" A: "No, there was no change."* (MA: 140/9).

The undersigned doesn't recognize the term *peach neck* as stated above; and SLTC wasn't afforded the opportunity to inspect the subject tractor-trailer, however in the typical tractor-trailer air brake system, when there isn't air pressure in the *red line* (Emergency side and/or Parking Brake) connecting to the trailer; all the brakes on the trailer set and/or lock-up. The exact issue involving the air brake system during the subject incident would be conjecture to this point. The inconsistent recollection of events by Aloisio additionally compounds the issues surrounding the air brake system.

Aloisio knew there was an air leak prior to beginning his trip and carelessly operated the CMV in a *forbidden condition*, eventually leading to a sudden breakdown where he had to immediately pull over on the shoulder. It is highly probable that, had Aloisio taken the time to have the semi-trailer air leak identified and repaired prior to leaving the morning of March 7th, 2018, the subject incident would not have occurred.

33

**6.8 Preventability-**

Based on the definitions of "*preventable accident*" by the Federal Motor Carrier Safety Regulations (the basis of all CMV crash/accident preventability definitions) the subject incident was preventable solely by the actions and/or inactions of the Motor Carrier *employee*, Aloisio, and/or the Motor Carrier, Marlex:

> ➢ *FMCSR § 385.3 "Preventable accident on the part of a motor carrier means an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted <u>but for an act</u>, or <u>failure to act</u>, by the motor carrier or the driver".*

It is clear that by the *FMCSR § 390.5* the subject *accident* was *preventable* as it was both Aloisio and/or Marlex that failed in the duty of *inspection, repair and maintenance* of the CMV; a *failure to act*.

It was further the direct failure of Aloisio to effectively ensure that the area around his CMV was free of hazards and/or persons knowing that Sapp was sending a technician to repair his air leaks. However, Aloisio should have known that he was not permitted to move his CMV in such a *forbidden* condition with such air leaks. Had Aloisio not moved his CMV with such air leaks, in violation of the FMCSR, the subject *accident*/incident would not have occurred.

Aloisio knew of the air leak and chose to operate the CMV irrespective of the *forbidden* condition; this speaks volumes as to him being inadequately qualified in terms of his knowledge base concerning the FMCSR, the State of Ohio CDL Manual, industry standards of care, and just overall professional CMV driver integrity toward compliance and safety.

Accordingly, considering the following definition by North American Transportation Management Institute (NATMI) as to preventability, the incident would be adjudicated as preventable based on the failures of Aloisio as he consciously decided to take the CMV onto the public roadways:

> ➢ *NATMI preventability of Accidents: "The decision of preventability should always be made solely on the basis of what the company driver did or did not reasonably do to prevent the accident."*

The subject *accident*/incident was fully preventable had Aloisio and/or Marlex simply complied with the FMCSR.

**6.9 Higher Standard-**

According to ATA's Transport Topics, the trucking industries leading weekly industry newspaper, then NTSB Chairwoman weighed in on her thoughts as to the NTSB's position

34

on CMV drivers being held to a higher standard of care than that of a private motor vehicle:
*Beyond technology and addressing fatigue, Hersman said truck drivers are held to a higher standard than the average driver, and they need to address safety issues accordingly. "What people in the trucking industry need to realize is they are professionals," she said. "They are professional drivers, and the standard of care and the level of expectations for them and their performance are higher."*

**7.0 Opinions-**

Based upon the foregoing analysis, as a Commercial Motor Vehicle expert possessing approximately 30 years-experience in the CMV Transportation Industry and based upon what is good and safe practices in the Transportation Industry, I have come to form the following opinions as to the subject incident which occurred on northbound I-29 in Fremont County, Iowa.

I express these opinions with a reasonable degree of professional certainty and probability:

1. It is the undersigned's opinion that Aloisio failed to follow the instructions within the FMCSR and State of Ohio CDL Manual in terms of CMV inspections and unsafe operations.

2. It is the undersigned's opinion that Aloisio failed to *GOAL, "Get Out And Look"*. Had Aloisio implemented this method, the subject incident would not have occurred.

3. It is the undersigned's opinion that the subject incident that occurred was fully preventable in terms of the definition of the FMCSR and the Ohio CDL Manual.

4. It is the undersigned's opinion that Marlex; therefore, Aloisio failed to adequately instruct in terms of *Required Knowledge*.

5. It is the undersigned's opinion that Marlex; therefore, Aloisio knowingly and recklessly operated the subject CMV on public roadways in a dangerous condition in violation of the FMCSR.

6. It is the undersigned's opinion that the non-application of 5 out of 20 (25%). of the *Required Knowledge (FMCSR § 383.111)* by a professional CMV driver is an extraordinary failure of Aloisio's performance and is a proximate cause to the subject incident.

7. It is the undersigned's opinion that if Marlex; therefore, Aloisio had received training in the Smith-System defensive driver training program, or thereabouts equivalent, and incorporated the teachings into his daily driving habits, the subject incident would not have occurred, if such instruction were applied by Aloisio.

**Note:** The afore listed opinions are in addition to the main body of the preceding report, of which are likewise to be considered additional to the undersigned's opinions.

**Documents Reviewed:**

- Iowa State Patrol Technical Collision Investigation
- Iowa State Patrol Investigating Officer's Report of Motor Vehicle Accident
- Complaint
- Iowa OSHA Investigation Summary
- Statement of Jeffrey Evans
- Statement of Francis Aloisio
- Statement of Mike Driskell
- Statement of Joshua Fritz
- Statement of Frank Adkins
- Statement of Delmar Shaw
- Statement of Alysia Marie Yates
- Sapp Bros Employee Statements
- Aloisio- Prior Police Reports
- Aloisio-Responses to Plaintiffs Interrogatories
- Aloisio-Responses to Request for Production
- Aloisio-Statement to Insurance Carrier
- Aloisio-Statement to Police
- Aloisio-USDOT Medical Report
- Written Statement of Alysia Yates
- Defendants Answers to Plaintiffs Complaint
- Statement of Jeffery Evans-Federated Statement
- Evans-Sapp Bros Personnel File
- Evans-Statement to OSHA
- Evans-Responses to Interrogatories
- Evans-Responses to Request for Production
- Evans-Statement to Iowa State Patrol
- Iowa DOT Motor Vehicle Enforcement Inspection Report
- Iowa DOT Motor Vehicle Enforcement Incident Report
- Iowa State Patrol Supplemental Report
- Iowa State Patrol Measurement Data Log
- Iowa State Patrol Photos
- Marlex Express Responses to Interrogatories
- Marlex Express Responses to Request for Production
- Marlex Express Shipping Documents
- Marlex Express State Overdimensional Permits
- Photos from Accident Scene
- Defendants Photos of Tractor Trailer
- Sapp Bros Employee Handbook
- Sapp Bros Invoice

36

- ➢ Sapp Bros Lockout Tagout Procedure
- ➢ Sapp Bros Roadside Safety Manual
- ➢ Photo of Sapp Bros Service Truck
- ➢ Sapp Bros Work Order
- ➢ Sapp Bros Lockout Tagout Procedure-Service Calls
- ➢ Tractor Trailer Repair Invoice-Date of Incident
- ➢ Tractor Trailer Repair Invoices-Prior to Incident
- ➢ Deposition Transcription of Alysia Yates w/Exhibits
- ➢ Deposition Transcription of Delmer Shaw w/Exhibits
- ➢ Deposition Transcription of Zach Evans w/Exhibits
- ➢ Deposition Transcription of Frank Adkins w/Exhibits
- ➢ Deposition Transcription of Mary Ericksen w/Exhibits
- ➢ Deposition Transcription of Michael Driskell w/Exhibits
- ➢ Deposition Transcription of Trooper Dillon Malone w/Exhibits
- ➢ Deposition Transcription of Trooper Kevin Leffler w/Exhibits
- ➢ Deposition Transcription of Sergeant Blair Paulsen w/Exhibits
- ➢ Deposition Transcription of Specialist Matthew Shannon w/Exhibits
- ➢ Deposition Transcription of Sergeant Derek Floerchinger w/Exhibits
- ➢ Deposition Transcription of Jeffrey Evans w/Exhibits
- ➢ Deposition Transcription of Francis Mark Aloisio w/Exhibits

**References:**

- FMCSR: § 383.111; § 385.3; § 385.5; § 390.3 § 390.5; § 392.1; § 392.7; § 393.45; § 396.3; § 396.7; § 396.13;
- State of Ohio, CDL Manual
- Smith-System Core Content: The 5 Keys to Forward Motion and Backing-Truck
- North American Standard Out of Service Criteria Handbook and Pictorial 4/1/17

**I reserve the right to change or amend my conclusions and opinions based on information that was not available to me at the time of this report writing. Should the need for such changes or amendments be necessary I will submit the same to the retaining counsel of this report.**

**Reported By:**

**Scott L. Turner, Chief Consultant**

**Aron Liebe, Senior Consultant**

37

# Truck Accident & Incident Experts, LLC
## dba/ Scott L. Turner Consulting

*"The Finest in Transportation Consulting to the Legal Community"*

### Nationwide Services

SLTurner@SLTurnerConsulting.com
www.SLTurnerConsulting.com
**(844) 974-1870**

**Profile:** Highly qualified and well-rounded expert opinions are supported by nearly 30-years experience in the highly specialized field of commercial motor vehicle (CMV, meaning "truck") crashes and incidents, including 16 years at the helm of a national incident response company. Specializing in CMV crash investigation, CMV loading/offloading incidents, scene investigation and post crash/incident CMV inspection/investigations, Scott's career of service includes response and investigation to well in excess of 1,000 CMV tractor-trailer crashes, 1,000 CMV loading/off-loading incidents, over 200 CMV cargo-tank truck crashes/incidents and a multitude of industrial setting incidents such as loading rack fires and/or explosions.

Trained in Level 1 FMCSA CMV roadside enforcement inspections and CMV post crash inspections, Scott's in-depth knowledge of the Federal Motor Carrier Safety Regulations, detailed and well written reports, in-depth knowledge of applicable standards of care and professionally delivered testimony can be a focal point of any civil or criminal litigation or arbitration where CMV crashes, with or without hazardous material involvement and/or transport related matters are at issue.

In addition to Scott's years of experience responding to and/or investigating truck crashes, Scott spent several years behind the wheel as an 18-wheeler CMV tractor-trailer driver. In his overall driving experience, he was a driver of low-boys (flatbeds), dry-van trailers and cargo-tanks. During Scott's experience as a CMV operator, he became extensively experienced as to both driving, loading and offloading of van trailers, load securement on drop-decks (flatbeds) and cargo-tanks. The approximate total mileage driven as a CMV operator was 250K.

During part of the years as detailed above, from 1996-2009 Scott was an instructor for the New Jersey State Police. In this specific discipline, Scott was a CMV crash specialist instructor for cargo-tank truck incidents and as an Instructor with a focus on CMV tractor-trailer crashes, incidents and recovery with or without HM.

Scott has inspected many Commercial Motor Vehicles for road worthiness as required by the FMCSA. Not only was he responsible for inspecting his own trucks in the late 1980's as pre- and post-trip inspections, then overseeing a fleet of CMV inspections through the 1990's and 2000's, he eventually came to inspecting CMVs side-by-side with the New Jersey State Police at various CMV roadside inspections/weight stations. In addition, as aforementioned, Scott has responded to and/or inspected in excess of 1,000 CMV crashes.

On a multitude of responses and cases Scott has managed incidents involving cargo related loading and/or offloading incidents including loading dock; forklift related; loading rack incidents; and, flatbed cargo securement failures.

Scott's CMV expert consulting career started in January 2010. It has provided him a rich experience whereas he has continued inspecting CMVs post crash, crash scene/site investigations and inspections, litigation support and examining discovery documents and evidence, then pulling a seemingly impossible universe of documents together, then proffered into a well constructed report in the most difficult and complex of cases. Having served as a CMV expert in numerous cases for both Defense and Plaintiff throughout the United States, spanning from Hawaii to New York and from Texas to Michigan, Scott has earned an outstanding reputation as clearly indicated on the website testimonial section.

1



**Professional History:**

2010 – Present; Truck Accident & Incident Experts, LLC; dba/ Scott L. Turner Consulting
1993 – 2009; President/CEO HMHTTC Response, Incorporated (owned and
      operated a fleet of tractor trailers within HMHTTC Response, Inc.)
1996 – 2009; New Jersey State Police, Cargo Tank Truck Specialist Instructor
1996 – 2009; New Jersey State Police, HM Instructor for CMV Incidents
1991 – 1993; EPS, CMV Crash Response Manager / HM Management
1988 – 1991; Heavy Highway Construction Management
      (Hardroads/Della-Pello Highway Construction)
1985 – 1988; Professional CMV Tractor Trailer Driver/Owner-Operator hauling van-trailers and
      flatbed type semi-trailers

**Descriptive Certifications/ Training:**

Institute of Police Technology & Management, Commercial Vehicle Crash Investigation
New Jersey State Police/USDOT Commercial Vehicle Inspections, Enforcement; Level I – FMCSA
New Jersey State Police/USDOT Commercial Motor Vehicle Inspections, Enforcement; Level III – FMCSA
New Jersey State Police/USDOT Roadside HazMat Inspections, Enforcement; PHMSA
New Jersey State Police/USDOT Passenger Vehicle Inspection (Bus and Motorcoach)
New Jersey State Police Weights and Measures; Commercial Motor Vehicle
New Jersey State Police, HM Highway Transportation Emergency Response Instructor
New Jersey State Police, Cargo-Tank Specialist, Highway Transportation Specialist Instructor
Essex County College, Police Academy; Commercial Motor Vehicle Crash Investigation
Tennessee MTA, North American Transportation Management Institute; Safety Supervisor Training
Tennessee MTA, North American Transportation Management Institute; Director of Safety Training
New Jersey MTA, Air Brake Foundation, 10/2017
New Jersey MTA, Air Brake Foundation, 10/ 2014
New Jersey MTA, Air Brake Foundation, 5/2011
New Jersey MTA, Federal Motor Carrier Regulations
NTTC, Cargo-Tank Test, Inspection and Repair
Bendix, Air Brake Systems – Operation and Maintenance
University of Findlay, Advanced Emergency Response – Cargo-Tank Truck
University of Medicine & Dentistry of New Jersey, Site Investigation Certification
University of Medicine & Dentistry of New Jersey, Site Investigation Supervisor Certification
AAR/Bureau of Explosives, Rail-Tank Car Specialist
New Jersey State Police, Confined Space Operations-Trainer
Rutgers University, Traffic Control Coordinator Certified - MUTCD
Smith System, Multi-Company Driver Trainer-Instructor Certified
Smith System, Principles of Space Cushion – No Accident Driving
National Safety Council; Defensive Driver Certified

    *Additional relative certifications available upon request

**Professional Experience:**

In excess of 1,000 CMV Tractor-Trailer Crashes
In excess of 1,000 CMV Loading/Offloading Incidents
In excess of 200 CMV Cargo-Tank Crashes
In excess of 1,000 CMV Post-Crash; and, FMCSA Compliance and Pre-Trip Inspections
Motorcoach and Bus Crash Inspection/Investigation
Load Securement Failures CMV Flatbeds
Driver Qualifications; Hours-of-Service; Motor Carrier Fitness; CDL

2

Highway construction Zone Crashes - CMV
Loading/Offloading Incidents (Loading Docks/Loading Racks)
Forklift Operations/Loading Dock
CMV Post Crash Inspections
FMCSA & PHMSA Regulatory
Hazardous Materials Regulations (HMR)
Maritime Shipping Container/Chassis Incidents

**Professional Associations:**
Commercial Vehicle Safety Alliance
National Tank Truck Carriers (NTTC)
American Trucking Association (ATA)
North American Transportation Institute (NATMI)
Tire Industry Association (TIA)
Accident Reconstruction Communications Network (ARC)
National Academy of Sciences; Transportation Research Board (NAS;TRB)

- Speaking engagements: American Law Firm Association (ALFA); Transportation Lawyers Association (TLA); National Tank Truck Carriers (NTTC) annual conferences (Annual Safety Managers Conference, Annual Board of Directors meeting); NJ State Safety Council Annual Conferences; Middlesex County Fire Academy; Hazardous Materials Advisory Council's, Transportation Regulatory Compliance Enforcement Program; Marine Fire Fighting Task Force; Association of American Railroads (BOE); American Towmen's Association; Vessel Operators HM Association; Pennsylvania Association Annual Conference (HACC); California Regional HM Response Organizations (CRHMRO); etc.

**Geographic Area:**
Continental US, Hawaii, Puerto Rico, Alaska, US Virgin Islands, Canada and Brazil

**Fees:**
Expert and consulting rates schedule available upon request

**Litigation Case History:** Available upon request

3

| Retention Date: | Attorney or Contact: Attorney or Contact: | Case Caption: | Plaintiff/Defense Side: | Firm: Firm: | | Action: |
|---|---|---|---|---|---|---|
| 11/12/2015 | Randy Fairless (Tim Nisbet) | Demayo v. ArjoHuntleigh, Inc., et al | Plaintiff | Johanson & Fairless, LLP | TX | Deposed |
| 1/29/2016 | Don Derrico [Ryan Dempsey] | DePalma v. C&S Wholesale | Defense | Gordon Rees [Raven & Kolbe, LLP] | NY | Trial |
| 11/14/2016 | Damian M. Taranto | Blais, et al v. Source One Transportation, LLC | Defense | Fowler, Hirtzel, McNulty & Spalding, LLP | PA | Deposition |
| 2/6/2018 | Joe Carruthers | Colvin (Estate) v. Lyndon Steel | Plaintiff | Wall Babcock, LLP (Travelers) | NC | Deposition |
| 3/24/2017 | Michelle M. Tullio | Garces v. Singh, et al | Plaintiff | Garces, Grabler & Lebrocq, P.C. | NJ | Deposed |
| 11/16/2017 | Herbert J. Kessler | Baughn v. Guillermo | Plaintiff | Kessler, Diglovanni & Jesuele, LLP | NJ | Deposed |
| 3/14/2018 | Wade Byrd (Brett Tishler) | Estate of Bonnabel v. Tiliman | Defense | Wade Byrd Law | NC | Deposed/Trial |
| 1/30/2018 | Thomas Safane | Robert Charles v. FJW Trucking, LLC; ACW Transport | Plaintiff | Turner Padget | SC | Trial |
| 5/14/2014 | William Martin | Vuksanaj v. Taylor Abbott, et al | Plaintiff | Martin & Colin, PC | NY | Trial Deposition |
| 10/19/2018 | Thomas Papain | Burrel-Hamilton v. CR England, et al | Plaintiff | Zaremba Brown, PLLC | NY | Trial |
| 10/20/2018 | Nuru Witherspoon | Cook v. Corbin, et al. | Defense | The Witherspoon Law Group | AL | Deposition |
| 2/12/2019 | Alyssa Wickern | Whitley v. NAPCO Precast, LLC | Plaintiff | McCoy Leavitt Laskey, LLC | TX | Deposition |
| 10/25/2018 | Glenn P. Falk | Dayes v. Werner Enterprises | Defense | Falk Waas Hernandez Cortina Solomon | FL | Deposition |
| 10/23/2017 | Joe Carruthers | Colvin (Estate) v. Lydon Steel | Defense | Wall Babcock, LLP (Travelers) | NC | Trial |
| 9/18/2019 | Tim Nesbit | Simpson v. Genesis Energy | Defense | Johanson & Fairless, LLP | TX | Deposition/Trial |
| 1/29/2018 | Raymond Lackey | Stephens v. Yates Services, LLC | Plaintiff | Travelers Insurance | TN | Deposition |
| 8/28/2019 | Damian Thomas | Estate of Fenlon v. Performance Food Group | Plaintiff | Wasserman & Thomas | FL | Deposition |
| 2/14/2020 | James Thompson | Muminov v. XPO Logistics; Judd Trans | Plaintiff | Edelman & Thompson | MO | Deposition |
| 8/10/2020 | Michael Techmeier | Slodgel [Estate] v. JTE, et al | Plaintiff | Techmeier Law Firm | WI | Deposition |
| 4/20/2020 | James T. Thompson | Ralston v. PFG Transco, Inc. | Plaintiff | Edelman & Thompson | ND | Deposition |
| 11/16/2018 | Mike Sussen | (Estate) Noone v. Hub Group Trucking | Plaintiff | Law Offices of Vincent J. Clecka, P.C. | NJ | Deposition |

#### Venue:

217th District Court of Jefferson County, Texas; A0195893
Supreme Court, State of New York, County of Orange; #2013/3115
Allegheny County, Pennsylvania: #GD15-16510
North Carolina, Forsyth County, Superior Court: 15 CVS 5887
Superior Court of New Jersey, Middlesex County Law Division: MID-L 06172 15
Superior Court of New Jersey, Union County: UNN-L-3134-15
General Court of Justice, Robeson County, North Carolina: 16-CVS-01929
US District Court, South Carolina, Columbia Division: 2:16-cv-3803-JFA
Supreme Court of Putnam County, NY; Docket No.: 1030/2013
US District Court, Southern District of New York: 1:17-cv-02634-PGG
Circuit Court, St. Claire County, Alabama, Pell City Division
57th Judicial District, Bexar County, Texas: 2017CI16955
11th Circuit Court, Miami-Dade, Florida: 17-018241 CA 24
North Carolina State Court, Forsyth, NC: 15 CVS 5887
136th Judicial District, Jefferson District, Texas: D-199677
Circuit Court, Coffee, TN: #44333
20th Circuit Court, Lee County, Florida: 18-CA-004123
US District Court, Western District of Missouri, Western Division: 4:19-cv-00390-ODS
Dane County Circuit Court, Dane County, Wisconsin: 18-CV2453
US District Court for the Eastern District of North Dakota
Superior Court of New Jersey; Burlington Division: BUR-L-002517-18


EXHIBIT
D Turner
tabbies

# Aron Liebe – Senior Consultant
# Truck Accident & Incident Experts, LLC
## dba/ Scott L. Turner Consulting

**Profile:** A highly qualified and well-rounded consultant with opinions supported by 23-years of law enforcement experience including the highly specialized field of commercial motor vehicle (CMV/Motor Carrier) law enforcement, crash investigations, CMV spills/incidents, intoxicated and impaired driver detection, contraband interdiction, criminal investigations, facial recognition analysis/comparison, interview and interrogations, computer/cellular forensics. 23 years of uniform patrol, to include 8 years of plain clothes and under-cover investigations.

Aron's career of service includes CMV response, inspections, enforcement, and investigations in excess of 20,000 traffic stops, more than 12,000 CMV tractor-trailer inspections, crash investigations. Along with several Hazardous Material incidents, domestic terrorism, police shootings, high-speed pursuits, domestic abuse, child abuse, child pornography forensics, odometer fraud, identity theft, interview and interrogation, auto theft, along with expert testimony in vehicle origin and identification.

Aron was trained by the CVSA (Commercial Vehicle Safety Alliance) to include Level 1, Level 2, Level 3, Hazardous Materials, and Cargo Tank Certifications. FMCSA, CVSA roadside enforcement inspections and CMV post-crash inspections. Aron's in-depth knowledge of the Federal Motor Carrier Safety Regulations, detailed and well written reports, in-depth knowledge of applicable standards of care and professionally delivered testimony can be a focal point of any civil or criminal litigation or arbitration where CMV crashes, with or without hazardous material involvement and/or transport related matters are at issue.

In addition to Aron's years of experience responding to and/or investigating truck crashes, Aron was tasked with being a Field Training Officer for new hire law enforcement and additional duties of Driver's License testing to include Non-CMV(s) and CDL (Commercial Driver's License) Testing for the Iowa Department of Transportation to include, Pre-Trip/Skills/Driving exams.

In addition to and during the years as detailed above, from 1997-2020 Aron worked as a city Police Officer, a Deputy Sheriff, a Fire Fighter, a Graphic Designer, Web Site Developer, and a Professional Photographer. Aron was an instructor for the State of Iowa; Iowa Law Enforcement Academy and others, as a Field Sobriety Instructor, Oleoresin Capsicum Instructor, Defensive Tactics Instructor, NHTSA Radar and Lidar Instructor, NIMS Instructor (National Incident Management System). Aron has certifications as a Certified Peace Officer by the Iowa Law Enforcement Academy, Cellebrite-Certified Operator and Certified Physical Analyst, NW3C-Advanced Digital Forensic Analysis for Windows, NW3C-Digital Forensic Analysis: Acquisition, Certified Computer Examiner-Bootcamp, Certified in the Reid Interview Interrogation Method, Fire Fighter I, Pumper Operator, Safety Officer, FBI-FACE Services Analyst and others.

Aron's CMV expert consulting career started in April of 2020. Aron's past professional experiences have provided him with an overwhelming amount of knowledge and solid opinion sets of which are proving to provide him a rich experience whereas he has contributed to numerous litigation support cases to include examining discovery documents and evidence, then pulling a seemingly impossible universe of documents together, then proffered into a well-constructed report in the most difficult and complex of cases. Having testified as an expert in prosecutorial state and federal cases, Aron has earned an outstanding reputation as an honest, informed and highly educated witness.



**Professional History:**

2020 – Present; Sr. Consultant-Scott L. Turner Consulting
2012 – 2020; State of Iowa Law Enforcement-Investigator, Iowa Dept. of Transportation-
    Bureau of Investigation & Identity Protection
1997 – 2012; State of Iowa Law Enforcement – Officer, Iowa Dept. of Transportation-
    Motor Vehicle Enforcement/CMV Carrier Enforcement
1999 – 2020; Police Officer, Sergeant Bluff Police Department
2018 – 2019; Deputy Sheriff, Plymouth County Sheriff's Office
2006 – 2017; Business Owner, DC Pros Inc.

**Descriptive Certifications/ Training:**

State of Iowa/CVSA CMV Inspections, Enforcement; Level I – FMCSA
State of Iowa/CVSA CMV Inspections, Enforcement; Level II-FMCSA
State of Iowa/CVSA CMV Inspections, Enforcement; Level III – FMCSA
State of Iowa/CVSA CMV HazMat Inspections, Enforcement; PHMSA
State of Iowa/CVSA CMV Cargo Tank Inspections, Enforcement; PHMSA
State of Iowa Weights and Measures Enforcement; Commercial Motor Vehicle
State of Iowa, Iowa Law Enforcement Academy; Field Sobriety Instructor
State of Iowa, Iowa Law Enforcement Academy; Oleoresin Capsicum Instructor
State of Iowa, Iowa Law Enforcement Academy; Defensive Tactics Instructor
State of Iowa, Iowa Law Enforcement Academy; NHTSA Radar Instructor
State of Iowa, Iowa Law Enforcement Academy; NHTSA Lidar Instructor
Smith System Defensive Driving the 5Keys-Truck
FEMA/USDHS, NIMS 100-900 Instructor
Cellebrite; Certified Cellebrite Operator (CCO)
Cellebrite; Certified Cellebrite Physical Analyst (CCPA)
ISFCE; Int. Society of Forensic Computer Examiners; (CCE)-Bootcamp
NW3C; Advanced Digital Forensic Analysis for Windows
NW3C; Digital Forensic Analysis, Acquisition
NFPA; Firefighter I
NFPA: Pumper Operator
NFPA: Safety Officer
NFPA: Hazmat Awareness
NFPA: Hazmat Operations
FBI: Face Services Analyst
IHSAA; Certified Varsity Wrestling Official
LEIN-Law Enforcement Intelligence Network
Desert Snow-Drug Interdiction-CMV
Smith-System Driving the 5 Keys
Smith-System The 5 Keys to Forward Motion and Backing-Truck

**Professional Experience:**

In excess of 20,000 Traffic Stops
In excess of 12,000 CMV Inspections-Level 1, 2, and 3
100's of CMV Tractor-Trailer Crashes
Presentations to Law Enforcement and CMV Industry about; Load Securement Failures,
Driver Qualifications; Hours-of-Service; Motor Carrier Fitness; CDL; Overweight; Oversize Loads;
Permit Requirements, Drug/Contraband Interdiction, Impaired Driving, Facial Recognition.

**Professional Associations:**

CVSA-Commercial Vehicle Safety Alliance
DIAP- Drug Interdiction Assistance Program
AAMVA-American Association of Motor Vehicle Administrators
IAATI-International Association of Auto Theft Investigators
HTCIA-High Technology Crime Investigation Association
IHSAA-Iowa High School Athletic Association
NICB-National Insurance Crime Bureau
NW3C-National White Collar Crimes Center
LEIN-Law Enforcement Intelligence Network
Desert Snow-Drug Interdiction-CMV
ISAC-Iowa State Association of Counties
AFSCME-American Federation of State, County and Municipal Employees

- Speaking engagements: Iowa Law Enforcement Intelligence Network (LEIN); Drug Interdiction Assistance Program (DIAP); Iowa State Association of Counties (ISAC)

**Geographic Area:**  Continental US, Hawaii, Puerto Rico, Alaska, US Virgin Islands, Canada, and Brazil

**Scott L. Turner Consulting**
**P.O. Box 185**
**Blairstown, NJ 07825**
**908-496-4273**

**November 22, 2019**

Stutman Law
Law Offices of Robert A. Stutman, P.C.
500 Office Center Dr. Suite 301
Fort Washington, PA 19034

Attorney: Jordan S. Friter

**Invoice# R-19-979**

**Re:** Jeffrey and Amanda Evans v. Francis Aloisio and Marlex Express, Inc
File No. 1:19-cv-331

### STATEMENT OF PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | $ AMOUNT |
|------|-------------|-------|----------|
| 11/22/19 | Expert Retainer Fee | | 5,000.00 |

| | | |
|---|---|---|
| **Total current invoice:** | | **$5,000.00** |
| **Previous Balance Due:** | | |
| **Total due on this invoice:** | | **$5000.00** |

Please make check payable to:

Scott L. Turner Consulting, LLC
P.O. Box 185, Blairstown, NJ 07825





# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106
844-974-1870

March 9, 2020

Stutman Law
Law Offices of Robert A. Stutman, P.C.
500 Office Center Dr. Suite 301
Fort Washington, PA 19034

Attorney: Jordan S. Friter

Invoice# 20-1015

**Re:** Jeffrey and Amanda Evans v. Francis Aloisio and Marlex Express, Inc
File No. 1:19-cv-331

### STATEMENT OF PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | $ AMOUNT |
|------|-------------|-------|----------|
| 01/24/20 | 10:00AM -11:25AM<br>Review file, 11:00AM conference call with JF | 1.5 | 562.50 |
| | 12:00PM – 1:00PM<br>Begin initial file review | 1 | 375.00 |
| 02/28/20 | 1:30PM – 4:35PM<br>File review | 3.1 | 1162.50 |
| 03/03/20 | 11:20AM – 2:20PM<br>File review, Draft Report | 3 | 1125.00 |
| 03/05/20 | 10:00AM – 2:30PM<br>File review, Draft Report | 4.5 | 1687.50 |
| 03/07/20 | 1:00PM – 4:00PM<br>File review, Draft Report | 3 | 1125.00 |
| 03/08/20 | 10:10AM – 1:30PM<br>Draft Report | 3.4 | 1275.00 |
| 03/09/20 | 9:35AM – 2:20PM<br>Draft Report | 4.8 | 1800.00 |

**Expenses:**
11/26/19 to 03/09/20
B/W Copies (65 pages)                                          16.25
Color Copies (141 pages)                                      141.00
AA: (Administrative Assistant              1.1               115.50

---

**Total current invoice:**                                  **$9,385.25**

---

**Previous Balance Due: Retainer Fee Credit:**              **<$5,000.00>**

---

**Total due on this invoice:**                              **$4,385.25**

---

Please make check payable to:      **Scott L. Turner Consulting**
                                    PO Box 1007, Naples, FL 34106

**EIN: 84-3978627**



# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106
844-974-1870

January 13, 2021

Stutman Law
Law Offices of Robert A. Stutman, P.C.
500 Office Center Dr. Suite 301
Fort Washington, PA 19034

Attorney: Jordan S. Friter

**Invoice# 21-1166**

**Re:** Jeffrey and Amanda Evans v. Francis Aloisio and Marlex Express, Inc
File No. 1:19-cv-331

### STATEMENT OF PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | $ AMOUNT |
|------|-------------|-------|----------|
| 12/21/20 | 1:30PM – 4:30PM<br>File review | 3 | 1125.00 |
| 12/22/20 | 9:00AM – 11:30AM<br>File review | 2.5 | 937.50 |
| | 12:15PM – 1:15PM<br>File review | 1 | 375.00 |
| | 2:45PM – 4:15PM<br>File review | 1.5 | 562.50 |
| 12/23/20 | 9:00AM – 11:00AM<br>File review | 2 | 750.00 |
| | 12:15PM – 2:45PM<br>File review | 2.5 | 937.50 |
| 12/28/20 | 10:30AM – 11:30AM<br>File review | 1 | 375.00 |
| | 3:40PM – 5:30PM<br>File review | 1.9 | 712.50 |
| 12/29/20 | 10:25AM – 11:35AM<br>File review | 1.2 | 450.00 |

|  | | | |
|---|---|---|---|
|  | 12:40PM – 3:00PM<br>File review | 2.3 | 862.50 |
| 12/30/20 | 9:00AM – 11:00AM<br>File review | 2 | 750.00 |
|  | 11:45AM – 1:55PM<br>File review | 2.2 | 825.00 |
|  | 2:00PM – 3:15PM<br>File review | 1.3 | 487.50 |
| 12/31/20 | 9:30AM – 12:00PM<br>File review | 2.5 | 937.50 |
|  | 12:30PM – 3:15PM<br>File review | 2.8 | 1050.00 |
| 11/04/21 | 9:15AM – 12:15PM<br>File review, Draft report | 3 | 1125.00 |
|  | 12:45PM – 5:00PM<br>File review, Draft report | 4.3 | 1612.50 |
| 01/05/21 | 9:00AM – 11:06AM<br>File review, Draft report | 2.1 | 787.50 |
|  | 12:45PM – 3:45PM<br>File review, Draft report | 3 | 1125.00 |
| 01/12/21 | 9:00AM – 11:40AM<br>Draft Report | 2.7 | 1012.50 |

**Expenses:**
12/21/20 to 01/13/21

| | | |
|---|---|---|
| B/W Copies (2712 pages) | | 678.00 |
| Color Copies (135 pages) | | 135.00 |
| AA: (Administrative Assistant | 2.8 | 350.00 |

| | |
|---|---|
| **Total current invoice:** | **$17,963.00** |
| **Previous Balance Due:** | |
| **Total due on this invoice:** | **$17,963.00** |

Please make check payable to:  **Scott L. Turner Consulting**
PO Box 1007, Naples, FL 34106

**EIN: 84-3978627**



# Truck Accident & Incident Experts, LLC

## dba/ Scott L Turner Consulting

P.O. Box 1007 • Naples, FL 34106
844-974-1870

January 23, 2021

Stutman Law
Law Offices of Robert A. Stutman, P.C.
500 Office Center Dr. Suite 301
Fort Washington, PA 19034

Attorney: Jordan S. Friter

**Invoice# 21-1170**

**Re:** Jeffrey and Amanda Evans v. Francis Aloisio and Marlex Express, Inc
File No. 1:19-cv-331

### STATEMENT OF PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | $ AMOUNT |
|------|-------------|-------|----------|
| 07/24/20 | 9:40AM -10:45AM<br>Review Draft Report; conference call with JF at 10:00AM | 1.1 | 412.50 |
| 01/15/21 | 9:30AM – 11:00AM<br>File review, Draft report | 1.5 | 562.50 |
| | 11:30AM – 1:15PM<br>File review, Draft Report | 1.8 | 675.00 |
| | **Expenses:**<br>As of 01/23/21<br>AA: (Administrative Assistant)<br>FedEx (Report) | 1 | 125.00<br>32.90 |

| | |
|---|---|
| **Total current invoice:** | **$1,807.90** |
| **Previous Balance Due:** | |
| **Total due on this invoice:** | **$1,807.90** |

Please make check payable to:     **Scott L. Turner Consulting**
PO Box 1007, Naples, FL 34106

**EIN: 84-3978627**

| PAYER'S name, street address, city or town, state or province, country, ZIP or foreign postal code, and telephone no. | | OMB No. 1545-0116 | |
|---|---|---|---|

Truck Accident & Incident Experts, LLC
dba/ Scott L Turner Consulting
PO Box 1007
Naples, FL 34106

844-974-1870

**2020**

Form **1099-NEC**

Nonemployee
Compensation

1 Nonemployee compensation
$ 32578.46

| PAYER'S TIN | RECIPIENT'S TIN |
|---|---|
| 84-3978627 | 3456 |

2

**Copy C
For Payer or
State Copy**

RECIPIENT'S name, Street address (including apt. no.), City or town, state or province, country, and ZIP or foreign postal code

Aron C Liebe

PO Box 216

Sergeant Bluff, IA 51054

3

4 Federal income tax withheld

$

For Privacy Act
and Paperwork
Reduction Act
Notice, see the
2020 General
Instructions for
Certain
Information
Returns.

| | FATCA filing requirement ☐ |
|---|---|

| Account number (see instructions) | 2nd TIN not. ☐ | 5 State tax withheld $ $ | 6 State/Payer's state no. | 7 State income $ $ |
|---|---|---|---|---|

Form **1099-NEC**     www.irs.gov/Form1099NEC     Department of the Treasury - Internal Revenue Service

EXHIBIT
G
tabbies